**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE TORONTO-DOMINION BANK SECURITIES LITIGATION | **1:17-cv-1665 (NLH/JS)** |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

Lead Plaintiff Ethan Silverman, along with additional Plaintiff Mark Blumenthal (together "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included a review of Defendants' public statements and publicly available documents, conference calls and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Toronto-Dominion Bank, which is collectively known with its subsidiaries as the TD Bank Group (altogether herein, "TD"), analysts' reports and advisories and other press coverage about TD, TD's stock chart, TD's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain witnesses as discussed herein, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants, their family members and their affiliates, who

purchased or otherwise acquired the U.S.-traded stock of the Toronto-Dominion Bank (NYSE: TD) between December 3, 2015 and March 9, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against TD and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Fresh off the worldwide financial crisis, during the Class Period, TD made extensive public statements about its strong risk management, solid organic growth, and surging Canadian Retail segment, in press releases, SEC filings, and investor teleconferences. The picture painted for analysts and investors was one of a surging bank, with strong organic growth, solid earnings and revenue, and intact reputational capital.

3.      However, unbeknownst to investors, but as detailed by hundreds of confidential witnesses (CWs), TD's flagship Canadian Retail segment was festering with improper and illegal misconduct. TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy, exposed TD to significant loss events, risked harming the TD brand, were risks that were not managed, and could not possibly be characterized as right, legal, or fair.

4.     Even when the misconduct was reported, management including Branch and District Managers, Customer Service, Human Resources, and TD corporate headquarters did nothing meaningful to halt it and indeed continued the various sales goals, promotions, and blitzes that encouraged the misconduct in the first place.

5.     Moreover, despite fair warning and significant red flags arising from the highly publicized misconduct at other financial institutions like Wells Fargo, the CW statements illustrate an utter lack of sufficient internal controls and no meaningful enforcement from the Individual Defendants or the Senior Executive Team.

6.     On March 10, 2017, a CBC News report, based on the statements of hundreds of TD employees, revealed this underlying misconduct and thereby exposed the fraud, causing analysts to panic. On this news, TD's stock price fell $2.75, or 5.3%, on high volume, from its March 9, 2017 closing price of $51.77 to close at $49.02 on March 10, 2017.

7.     As a result of Defendants' wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of TD's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as TD's U.S. headquarters are located within this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Lead Plaintiff Ethan Silverman, as set forth in his prior-filed Certification, which is incorporated by reference herein, purchased TD's U.S.-traded stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

13.     Plaintiff Mark Blumenthal, as set forth in the attached Certification, which is incorporated by reference herein, purchased TD's U.S.-traded stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

14.     Defendant TD is incorporated in Ontario, Canada.  Its principal executive offices are located at Toronto-Dominion Centre, King Street West and Bay Street, Toronto, Ontario M5K 1A2, Canada, and its U.S. headquarters are located at 1701 Marlton Pike E., Cherry Hill, New Jersey 08034.  Its shares trade on the NYSE under the ticker symbol "TD."

15.     Defendant Bharat B. Masrani ("Masrani") has served as TD's Chief Executive Officer ("CEO") and President since November 1, 2014.

16.     Defendant Riaz E. Ahmed ("Ahmed") has served as TD's Chief Financial Officer ("CFO") since January 2, 2016.

17.     Defendant Colleen Johnston ("Johnston") served as TD's CFO from November 1, 2005 until January 2, 2016, when she shifted roles to a non-Sarbanes-Oxley-certifying position within TD.

18.     Defendant Teri Currie ("Currie") has served as TD's Group Head, Canadian Personal Banking, beginning January 2, 2016.

19.     Defendant Leo Salom ("Salom") served as TD's Executive Vice President, Wealth Management, TD Bank Group from January 2, 2016 until October 31, 2017 and as TD's Group Head, Wealth Management and TD Insurance, TD Bank Group from November 1, 2017 until present.

20.     Defendant Mike Pedersen ("Pedersen") served as TD's Group Head, U.S. Banking, TD Bank Group and as President and CEO, TD Bank, during the Class Period. Significantly, during the Class Period, TD announced Pedersen's decision to retire, via a press release and Form 6-K filed with the SEC on October 27, 2016.

21.     Defendant Mark Chauvin ("Chauvin") served as Group Head and Chief Risk Officer during the Class Period. Shortly after the Class Period, TD announced Chauvin's decision to retire, via a press release on September 28, 2017 and a Form 6-K filed with the SEC on September 29, 2017, as has served as "Special Advisor" since February 1, 2018.

22.     Defendants referenced above in ¶¶14-21 are sometimes referred to herein, collectively, as the "Individual Defendants."

23.     Defendant TD and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## NON-PARTY CONFIDENTIAL WITNESSES

24.     CW1 was a TD Branch Manager in Petawawa, Ontario from October 2015 to October 2016, and prior to that, worked in other non-retail capacities within TD.  As a Branch Manager, CW1 reported to District Vice President Nancy McPhee and, after Ms. McPhee retired, to District Vice President Jennifer Auld.

25.     CW2 was a Teller at a TD branch in Brantford, Ontario, from September 2013 to December 2013, then at a TD branch in Kitchener, Ontario, from January 2013 to February 2015, reporting to various Teller Managers.  CW2's job was not only to assist customers who visited the branch with their banking needs but also to meet stringent upselling requirements imposed by TD and monitored by TD's computer system and TD's Managers.  CW2 was at one point one of TD's top-selling Tellers, but left TD due to the intense sales pressure.

26.     CW3 was a Teller at a TD branch in Thunder Bay, Ontario, from May 2013 to November 2015, whose job was not only to assist customers who visited the branch with their banking needs but also to meet stringent upselling requirements imposed by TD and monitored by TD's computer system and TD's Managers, the intense pressure of which caused CW3 to quit.  CW3 reported to various Teller Managers during CW3's tenure, one of whom was Gina Viglirolo.

27.     CW4 was a Senior Credit Analyst at TD from 2013 to May 2016, working at a TD credit center located in Toronto and reporting to Remus Epure, Credit Manager.  CW4 was an underwriter for mortgages, loans, and lines of credit and was subject to selling pressures based on TD-tracked metrics like loan approval ratios.

28.     CW5 was a District Vice President at TD for the Manitoba Province from December 2011 to February 2016, overseeing 33 branches and reporting to Senior Vice President Monique Bateman until 2014 and then Senior Vice President Brian Gervais.

29.     CW6 was a TD employee from November 2011 to September 2016 in the following capacities:  Customer Service representative (November 2011 - November 2012); Financial Services Representative (October 2012 to March 2015); and Financial Advisor (March 2015 to September 2016).  CW6 reported to Shriann Gregorio, Financial Services Manager, and to Tracey Macciaccio, Branch Manager at the Brampton, Ontario TD branch.

30.     CW7 was a Manager of Customer Service at the TD branch in Oakville, Ontario from about 2010 to November 2015, when the branch closed.  Prior to that, CW7 worked as a TD Financial Advisor, a Financial Services Representative, and a Teller starting back in 2005. As a Manager of Customer Service, CW7 reported directly to Scott Vail, Branch Manager. CW7's job as a Manager of Customer Service involved dealing with customer issues and overseeing front-line employees, as well as responsibility for employee development and coaching.

31.     CW8 held several different jobs at TD Bank in the Edmonton, Alberta area from 2000 to June 2015: Financial Service Representative (2000-2001), Financial Advisor (2001 – 2005), Manager Financial Services (2005-2008), Branch Manager (2008-2012) and HR Relationship Manager (2012 – June 2015).

32.     CW9 was a Financial Sales Advisor on a six-month contract at TD through an employment agency, Promcom, in mid-2015, based at a TD call center in Gloucester, Ontario, who reported to full-time staff at the call center.  CW9 was hired to handle projects that prompted TD customers to call the bank for services and products, in response to mailings.

33.     CW10, CW11, and CW12 are the three TD employees, two Managers and a Teller, who gave statements to CBC News about the underlying workplace circumstances at

issue, based on their personal, first-hand knowledge, which CBC News included in its March 6, 2017 report discussed in paragraph 185 *infra*.

34. CW13 is the TD Teller who worked for several years at a TD branch in Windsor, Ontario, and who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(a), *infra*. While employed by TD, CW13 was subject to sales revenue, or SR, targets, with respect to which CW13 needed to earn sufficient numbers of SR points. CW13 spoke from first-hand knowledge regarding those SR targets and the improper and illegal actions that CW13 took to meet them.

35. CW14 is a TD Teller with over 20 years of experience at a TD branch in Ontario, who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(b), *infra*. While employed by TD, CW14 was subject to sales revenue, or SR, targets, with respect to which CW14 needed to earn sufficient numbers of SR points. CW14 spoke from first-hand knowledge regarding those SR targets and the improper and illegal actions that CW14 took to meet them.

36. CW15 is a TD Teller who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(c), *infra*. While employed by TD, CW15 was subject to sales revenue, or SR, targets, with respect to which CW15needed to earn sufficient numbers of SR points. CW15 spoke from first-hand knowledge regarding those SR targets and the improper and illegal actions that CW15 took to meet them, and the sick leave that CW15 took in early 2017 to avoid upselling pressures.

37. CW16 is a TD Teller who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(d), *infra*.

CW16 spoke from first-hand knowledge regarding SR targets and commented on an internal TD statement circulated in light of the CBC News reports.

38.     CW17 is a TD Financial Advisor in Ontario who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(e), *infra*.  While employed by TD, CW17 was subject to sales revenue, or SR, targets, with respect to which CW17 needed to earn sufficient numbers of SR points.  CW17 spoke from first-hand knowledge regarding those SR targets and the improper and illegal actions that CW17 took to meet them.

39.     CW18 is a former TD Financial Advisor in Calgary who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(f), *infra*.  While employed by TD, CW18 was subject to sales revenue, or SR, targets, with respect to which CW18 needed to earn sufficient numbers of SR points.  CW18 spoke from first-hand knowledge regarding those SR targets and the improper and illegal actions that CW18 took to meet them.

40.     CW19 is a former TD Financial Advisor who worked for six years in Nanaimo, British Columbia, who gave a statement to CBC News, which was incorporated into the March 10, 2017 CBC News report as discussed in paragraph 186(g), *infra*.  While employed by TD, CW19 was subject to sales revenue, or SR, targets, with respect to which CW19 needed to earn sufficient numbers of SR points.  CW19 spoke from first-hand knowledge regarding those SR targets and the retaliatory threats CW19 faced as a result of expressing concerns to management.

41.     JOHN DOE CWs 20 - 320 are the "hundreds" of then-current or former TD employees, including Tellers and Financial advisors, who contacted CBC News between March 6, 2017 and March 10, 2017 to describe the underlying workplace circumstances at issue,

including SR targets, internal pressures to meet them, and the improper and illegal actions taken to meet them, based on their personal, firsthand knowledge, which CBC News referenced in its March 10, 2017 report discussed in paragraph 186 *infra*. CBC News stated in its March 10, 2017 report that it was concealing their identities because their statements, which included admissions that they violated the law out of desperation to meet quarterly sales goals and to avoid being fired, could have legal ramifications.

## SUBSTANTIVE ALLEGATIONS

### TD's Business & Operations

42.     Headquartered in Toronto, Canada, The Toronto-Dominion Bank and its subsidiaries are collectively known as the TD Bank Group. TD had C$1.3 trillion in assets on October 31, 2017. TD actively trades on the Toronto and New York stock exchanges under the ticker symbol "TD." At issue in this lawsuit are its New York-traded shares.

43.     TD provides banking, wealth management, and other financial products and services to more than 25 million customers worldwide through three key business lines: Canadian Retail, U.S. Retail, and Wholesale Banking.

44.     According to TD's 2015 Form 40-F, its Canadian Retail segment served nearly 15 million customers through a network of 1,165 branches, as well as ATMs, phone, Internet, and mobile banking. It reaches these customers through TD Canada Trust, its customer-focused personal and small business banking business. TD Wealth and TD Asset Management also provide customers with financial planning, investing, brokerage, mutual fund, banking and other consumer financial products on an integrated basis.

45.     TD's U.S. Retail segment has similar divisions providing analogous products and services to its U.S. customers.

46.     During the Class Period, TD and its employees were bound by the terms of its Code of Conduct and Ethics for Employees and Directors, which is described *infra*.

47.     Due to the global financial crises a decade ago, TD's revenues faced strong downward pressure due to a confluence of well-publicized circumstances, including low interest rates, slow loan growth in Canada and the U.S., a lower global revenue growth environment, heightened global volatility, and heightened regulatory scrutiny.

48.     In this context, TD held a Canadian Retail Investor Day on October 15, 2015, shortly before the Class Period, which was well attended by TD executives including Defendants Masrani and Salom.  There, Defendant Masrani described the Canadian Retail Bank as "TD's flagship business, contributing over 60% of our earnings."  Thomas Dyck, TD's Executive VP, Community Banking who oversaw TD's network of branch locations throughout Canada, emphasized that 95% of TD's customer base uses branch locations for banking, about 70% of them bank both online and at branch locations, and those customers are the most "loyal" and "buy more products with us."  He added that TD's research showed that customers "will seek out a human touch at some point in their buying process, particularly for complex needs, often near the end, that will make them, well, more comfortable with their decisions."  Nandita Bakhshi, TD's Executive VP, Direct Channels, added that "about 56% of consumers that actually book the appointment online and walk into our braches actually buy products and services from us."

49.     Mr. Dyck stated, "The key to our future success then is to be good at managing the complete customer journey across all channels, particularly for more complex needs." Toward that end, he said, "[W]e've been developing a more proactive outreach skill for our branch advisors and strengthening our pipeline and sales management tools and processes which are critical for the fulfillment of more complex needs.  At the same time, we've been able to

leverage our strong retail relationships to meet a broader range of our customers' needs, effectively providing expert advice across a wide spectrum." He added, "Effectively, we're repositioning the branch to take a stronger advisory role and a transition from being a retail branch to more broadly representing all of TD in the local marketplace." He added, "We are determined to be understated and very disciplined." Ms. Bakhshi added, "Our priorities are simple. It boils down to focusing on the customer, focusing on the employee experience and a relentless commitment to excellence…." Defendant Salom identified as a TD priority "trying to accelerate the growth in our advice businesses."

**TD's Revenue Growth Was Driven By**
**<u>Undisclosed, Improper And Illegal Misconduct</u>**

50. Yet, during the Class Period, unbeknownst to TD investors, TD was engaged in a widespread, orchestrated array of misconduct designed to artificially inflate the profitability of its flagship Canadian Retail segment, at the direct expense of manipulated, misled, and defrauded customers. As detailed by numerous CW statements, this underlying, undisclosed misconduct spanned several core business areas of the Canadian Retail segment.

***<u>Bank Accounts, Credit Cards, And Teller-Assisted Banking</u>***

*Required Upselling Driven By TD's Computer System*

51. CW3 and CW2 both stated that their jobs as TD Tellers were not merely to assist customers with their banking needs, but that a more pressing part of the job was to sell banking products to every customer who approached the counter. According to CW3, TD Tellers were expected to sell customers on products such as overdraft protection, VISA credit cards, higher credit card limits, and new types of accounts.

52. CW3 said that whenever a customer came to the counter, CW3 was expected to conduct the customer's banking needs while simultaneously reviewing the customer's account

12

information for products that CW3 could sell to the customer. As CW3 stated, "As I was doing their banking, I was trained to use the keyboard instead of the mouse to flip through all the screens quickly and see currently what (banking products) they had. In that short time, you could see what you could sell them on."

53. CW3 also said that when CW3 opened a customer's account information, a "gold star" prompt appeared and CW3 was required to click on it. The gold star revealed products that the customer qualified for, such as a credit card, and CW3 was expected to push the customer to obtain it. CW3 stated that TD's computer system tracked whether CW3 clicked on the gold star, and if CW3 did not click on it, CW3 was later reprimanded by Managers. CW3 said, "They would know you saw 50 customers and only hit that gold star 48 times. You were talked to about why you didn't do it 50 times. It had to be hit every single time." CW3 said that TD's computer system also tracked all the products that Tellers sold to customers.

54. CW5 also said that TD's computer system prompted Tellers about products to discuss with customers when conducting their banking at the branch counter. According to CW5, when a customer swiped their bank card, TD's computer system showed a pop-up message, which CW5 called a "Radar Prompt," that alerted the Teller about products available to the customer. CW5 said that part of the Teller's job responsibilities was to "have a conversation" with the customer about available products and that the Tellers "were trained to do that." CW5 said that Tellers were required to report the outcomes of those conversations, *e.g.* the customer declined, the customer deferred to set up a later appointment to discuss, or the customer signed up for the product. CW5 said that, only as an exception, the Teller could simply close out the prompt without an answer if the line in the branch was too long and discussing the product would delay other customers. CW5 said that the results of the "Radar Prompts" were

tracked. CW5 said that if, for instance, an employee reported a decline 99 out of a 100 times, CW5 would understand that to mean that the employee likely was not having the conversations about the product with consumers, which would prompt CW5 to have a Manager speak to that employee.

55.     CW2 corroborated that TD's computer system kept track of every transaction Tellers did when logged into their computer. As CW2 put it, "They can see everything you do from the moment you turn it on until the moment you turn it off. Every single transaction, every single search, everything you do on that computer, they could see it."

56.     CW5, a District Vice President for the Manitoba Province who oversaw 33 branches, confirmed that TD's internal computer system tracked all sales numbers of all employees, branches, districts, and regions, that the system updated every day, and that the numbers in the system were accessible to all employees at all times. CW5 reviewed the sales numbers each morning, along with metrics that tracked customer service levels.

57.     CW1, a TD Branch Manager, also confirmed that TD tracked every keystroke and banking transaction an employee made on TD's computer system and could therefore determine which Teller put which customer into which account or service on which date and time.

*Corporate Headquarters Set Stringent Sales Targets And Aggressive Promotions*

58.     CW5, a District Vice President, said that Tellers, Branches, Districts, and Regions each had sales targets to meet that were set for the most part by the corporate headquarters in Toronto. According to CW5, sales targets were set for each specific product (credit cards, lines of credit, mortgages, mutual funds, overdraft protection, etc), at all levels, *i.e.* targets were set for individual employees, branches, districts and regions. Corporate headquarters set sales targets for individual employees, such as Tellers and Financial Advisors based on the average for that

employee's market and job title, so that Tellers had lower sales targets than Financial Advisors and Tellers in rural branches had lower sales targets than Tellers in cities. Corporate headquarters also calculated similar averages for branches based on market and set it as the sales target for those all similar branches. CW5 said that a branch "bucket" might exist, which is the difference between the total sales targets for individual employees at a branch as compared to the sale target set for the branch itself (which was usually larger). CW5 said that corporate headquarters also set regional sales targets, which could not change and which were divided among the districts in a given region by the District Vice Presidents like CW5. According to CW5, if CW5's district failed to meet targets for a specific product, so long as the deficiency was made up with sales of a different product, such that the total target was met, that outcome was acceptable.

59.     CW1, a Branch Manager, said that CW1's branch, which serviced a town with a population of 16,500, faced unreasonable sales targets. CW1's District Vice President expected sales revenue that would have required each of CW1's four tellers to sell two units per shift. CW1 did some math and realized only 17 people typically walked into the branch each day, many of them regular customers, and tried to explain to the District Vice President that it was physically impossible for the Tellers to hit the expected targets. However, the District Vice President told CW1 that CW1 either had to do a better job coaching the staff or perhaps needed to find new staff. At one point, the Senior Vice President who oversaw the entire region raised CW1's employees' goals to 4 units a day, at a point where, CW1's front-line staff sold an average of 0.3 units a day.

60.     CW3 said that Tellers were expected to sell at least three units or banking products, such as overdraft protection or a credit card, to customers every day – and that this

figure rose during CW3's tenure to five units a day. CW3 described this requirement as being set by corporate headquarters, which CW3 called the "home office," which set both daily and monthly targets. CW2 recalled that quotas changed often and were provided to the branch on a daily and weekly basis. CW3 said, "Every day you had to meet that by upselling on anything you possibly could." CW3 said that branch Managers often expected Tellers to exceed the minimum units required.

61. CW3 said that Tellers were also expected, every day, to generate two "referrals," which were when the Teller set up an appointment for a customer with a loan officer to discuss banking products the Teller cannot sell, such as a line of credit, a mortgage, or a personal loan. According to CW3, Tellers were expected to review customers' accounts to determine if they currently had such products, and if not, or if the product was listed under the "gold star" prompt, the Teller was expected to try to convince the customer to set up an appointment with a loan officer. CW3 said that daily and monthly referral targets were also set by the "home office," *i.e.*, corporate headquarters.

62. In addition, CW3 said that TD also set revenue targets that Tellers were expected to meet and that those targets were adjusted each month depending on the volume of customers. CW3 said that the revenue goals were set by the "home office," *i.e.*, corporate headquarters, but CW3 also recalled receiving emails about the revenue goals from CW3's Regional Manager. As CW3 put it, "Each thing you sold would give you a dollar amount toward your revenue goal."

63. CW2 recalled that, in addition to daily and weekly quotas at the branch level, TD corporate required Tellers to meet quarterly quotas. CW2 added that TD was also able to track everything each Teller sold to customers every day via the computer system, stating, "When it came to points, they tracked everything through the computer." CW2 said that Managers could

pull reports on each Teller off the TD computer system to determine if Tellers met their sales quotas. As CW2 described, "They would print it off. Every quarter they would show you your sales, show you where you're at for sales and points." CW2 said that TD used those sales numbers to determine if the Teller met quotas and how much of a bonus check they would receive each quarter.

*Tellers Competed For Prizes With Results Posted On A White Board*

64. CW3 said that inside the TD branch, in the Teller's area, the bank set up a large board with each Teller's name on it, on which Tellers were required to keep a tally of the units they sold and the referrals they made throughout the day. As CW3 described, "Everyone could see it, and at the end of the day, whoever had most sales or most referrals won prizes" like candy and gift cards. CW3 said that the board also created an atmosphere in which Tellers competed against each other to make the most sales and "it was a competition every day." CW2 corroborated that the TD branch ran contests each day or week to incentivize Tellers to increase sales. CW2 said a daily contest might award a $50 gift card if a Teller sold 10 credit cards, while a weekly contest might award a $100 gift card to whichever Teller sold the most savings accounts during a week.

65. CW3 and CW2 described an internal reward system whereby employees earned points for sales made to customers. CW2 said that each TD product had a different value if sold to a customer. For instance, CW2 said that signing a customer up for Simply Save, a program whereby customers authorize automatic transfers of small sums from their checking account to their savings account each time they use a debit card as a way to build up savings in small increments, might earn a Teller 50 points. CW2 said that if a Teller signed a customer up for overdraft protection, which required a fee from the customer, the points were higher, maybe 100

17

points. CW2 thinks that signing customers up for credit cards was worth 500 points. CW2 said that Tellers also received about 200 points for referring customers to financial advisors to discuss products Tellers could not sell – such as a mortgage or line of credit. If that customer also bought a product from the financial advisor, then the referring Teller would earn points, for instance 350 points if the customer signed up for a tax-free savings account. CW2 and CW3 said that as tellers built up points, they could go online to TD's internal rewards system and redeem them for a variety of products or gift cards, such as furniture, electronics, and jewelry. As CW2 put it, "They had everything galore. The more points you get, you get to use them online buying stuff."

66. CW3 said that the "best of the best" Tellers were also rewarded with a three-night vacation paid for by TD. CW2 corroborated that the top prize was an all-expense paid four-night, three-day vacation, which CW2 won in 2014, but was unable to go for personal reasons. CW2 said that other good prizes for top sellers included massages and catered lunches at the branch. CW2 also said that Tellers received quarterly cash bonuses from the corporate office for meeting individual sales quotas and a year-end bonus if the branch met its annual quota.

67. In addition, CW2 recalled that Managers pushed different products at different times. For instance, CW2 received email or verbal instructions from the Teller Manager to sell as many VISA credit cards as possible during a particular day or week, a push that typically included an incentive contest rewarding Tellers with gift cards or other prizes for reaching certain sales numbers in the specified product. CW2 recalled that Managers would also verbally remind tellers throughout the day to sell the Visa cards. Similarly, CW5 said that sales "blitzes" were done on "one or two days a month" to increase customer awareness and participation in bank products like Simply Save.

68.     CW5 also described a "Champion Reward Points" program, whereby CW5 or Branch Managers could award discretionary points to employees for jobs well done, either individually or as a branch, including meeting sales targets. For instance, CW5 said that if the branch conducted a "campaign" for a specific product, the Branch Manager could reward employees who did a good job selling that product during the campaign. CW5 said that 1000 points equaled $10 of buying power that could be used in TD's internal rewards program to buy products or gift cards. CW5 said that this program was separate from the sales revenues numbers that employees accumulated based on the number of products and services sold to customers, which is how TD tracked if employees were meeting their targets.

69.     However, CW3 said that the white board also made it known which Tellers were not meeting their targets, indicating who was not doing well and who would be reprimanded. According to CW3, all these requirements and targets were stringently enforced. When CW3 or other Tellers did not meet their daily targets, they were "talked to" by their Managers about it. CW3 was called into CW3's Manager's office a number of times for missing the target by even one unit. "It got to the point, every week pretty much, you were brought into the office if you weren't hitting your quota," CW3 said. CW2 criticized this system as "always negative" and "always discouraging" because, for instance, if a Teller's quota was 10 sales a daily, and that Teller secured 5 sales, the result was a reprimand for failing to get 10 sales rather than praise for securing 5 sales.

70.     CW2 corroborated this scenario, describing a sheet kept on the counter of the employee area of CW2's branch. Each day, CW2 and the other Tellers were expected to tally the number of sales they made of different products during a shift and to post them, beside their own names, on that sheet. CW2 said that a board in another employee area also highlighted the

best-performing Tellers' sales numbers. CW2 said that, in addition to the sheet and the board, Tellers received daily emails from the Teller Manager reporting what each Teller's sales numbers were for the day – even if the Teller had zero sales. CW2 described these tactics as "very discouraging" and "embarrassing' for low-selling Tellers. CW2 said that the TD policies, which made every Teller's sales numbers available to other Tellers, compounded the high-pressure, highly competitive environment at the branches. CW2 added that Tellers could check a TD computer system to see where they ranked in sales against all other Tellers in TD. As CW2 described, "You can look it up to see where you are on the list and across Canada. You can see where everyone else is at, too. Some people would use it as a competitive kind of thing."

71. CW2 said that if Tellers failed to meet their sales quotas, then the Managers "work on you" and "go after you for not selling." According to CW2, Teller Managers "hounded" Tellers who were not meeting quotas, approaching the Teller throughout the day asking, "Did you get your five (products sold) today? Did you get them yet?" CW2 added, "And they were loud," noting that the Managers spoke loud enough for other employees to hear. CW2 described constant "hounding" by Managers, in a high-pressure environment, to sell products and meet sales quotas, stating, "It was so constant. They would stand behind you and watch you to make sure you'd get these quotas." CW2 noticed the same type of high-pressure sales environments when visiting other TD branches besides those at which CW2 worked.

*Underperforming Tellers Faced A Performance Improvement Plan And "Coaching"*

72. CW3 and CW2 said that any Teller who did not meet targets a few times was placed on a Performance Improvement Plan (PIP) and subjected to intense "coaching" from Managers. CW2 said that a PIP would typically last about three months. CW3 was placed on a PIP for failing to meet targets and said, "That's when the coaching began." According to CW3

and CW2, coaching involved the Teller Manager standing at the Teller's side during interactions with customers throughout the day for anywhere between 30 minutes to a few hours. As CW3 put it, "The Manager would stand right beside you while you're helping each client that comes up. At first, she'll listen to your conversation, and then (after the customer leaves) tell you what you should have done or should have said to encourage them to get an overdraft (protection) or unit." CW2 corroborated this description of how the PIP worked.

73. CW3 received scripts for selling overdraft protection and credit cards from the "home office," *i.e.*, corporate headquarters, which Tellers were supposed to use verbatim by accessing via their computer screens. CW3 recalls that the scripts were a "hard sell" and that if customers tried to decline, CW3 was expected to keep pushing the product. As CW3 described, "You can't let them decline it. You keep talking over them until you convince them. You just keep talking over them telling them how great this product is and how much it would benefit them." All of CW3's Branch Managers encouraged CW3 and other Tellers to "make up" a personal experience about how the product benefitted them so they could tell customers in a "since it helped me, it should help them" pitch. At times, if CW3 failed to use the exact script the Manager wanted, the Manager would jump into the conversation with the customer. As CW3 described, "She would cut in to the middle of the conversation and try to sell them something if she didn't like the way I was doing it." CW3's Managers expected products to be pushed on customers even when clear they did not want the product or to even to hear about it. CW3 said that regular customers would cut off the required sales pitch every time saying "I don't even want to hear what you're offering me," but if CW3 was under "coaching" that day, the Manager expected the offer to be made anyway "because maybe this time they would change their mind."

74.     CW1, a Branch Manager, said that those who missed a sales target twice were placed on a Performance Improvement Plan (PIP).  Whereas outside the PIP, CW1 typically coached or checked in on an employee's interaction with customers about once a week, when an employee was on a PIP, CW1 had to check in with the employee three times a day and both of them had to write up reports about the employee's performance and improvement goals, which CW1 called a paperwork-intensive process that the employee hated, management hated, and HR hated.

*Underperforming Tellers Faces Threats And Retaliation*

75.     Beyond the "coaching," CW3 and the other Tellers were also threatened and retaliated against for missing their targets.  CW3 said, "Even if I was one unit short in a day, I was told maybe this position wasn't right for me anymore."  The threat of possible job loss for not selling enough banking products caused CW3 to go home in tears regularly.  As CW3 put it, "You didn't know if you'd come in and be let go every day." One of CW3's co-workers, who was four years from retirement, frequently heard the same threat about how the job maybe wasn't for her anymore, which left her in tears as well.   As CW3 put it, "She didn't know when she came to work every day if she was going to be able to work anymore and retire."

76.     CW3's hours were also cut, sometimes to as low as 10 hours a week, because CW3 was not selling enough banking products.  As CW3 described, "They told me if I wanted more hours, I had to prove to myself and sell more."  But even after a good week or month, the Manager would not always increase CW3's hours.  Moreover, even when CW3 worked a four-hour shift, CW3 was still expected to sell the minimum quota for a full-day shift.  CW3 said that CW3's last Manager was the "worst of them all" and applied so much pressure on Tellers that it prompted CW3 to quit.

77.     CW2 corroborated that low-selling Tellers were treated poorly by management, such that Managers would assist better-performing Tellers with customer transactions before turning attention to those perceived as poorer performers.  CW2 said that TD employees were fully aware that failing to meet sales quotas put them in a lesser position at the branch, while high sales Tellers were treated "like royalty." CW2 said the Tellers got the message that if they improved their sales, they would be treated better at work.

78.     CW2 was actually one of TD's top sellers, at one point ranking in the top 10 throughout Canada and in the top 5 in the Kitchener branch, which was the largest branch in Canada, an extremely busy branch with close to 30 Tellers.  While CW2 was a top seller, CW2 was treated very well by Managers.   However, during the last several months of CW2's employment, CW2's sales efforts slowed down, and CW2 noticed a big change in how Managers treated CW2.  CW2 began to be ignored by CW2's Manager, as CW2 had previously observed occur to other Tellers who were not selling well.  As CW2 put it, "If I were to ask a question or I had to go up to her for something, like approval for a check, I was just ignored, or she'd go to help someone who was doing better.  She would deal with people who were doing better first." Ultimately, CW2 also left TD due to the strain caused by the intense sales pressures.

79.     CW5 said that sales targets at TD rose in recent years, reflecting a greater emphasis on sales and that, over time, the Teller job evolved from one not including a sale component to one where sales constituted 25% of the job performance review.  CW5 said that some Tellers were not comfortable with the sales requirements or struggle with them, but said that no employee was ever fired in CW5's district for failing to meet them.

80.     CW1's statement, as a Branch Manager, told a different story.  CW1 said that all promotions, bonuses, and pay increases were linked to sales revenue performance, and

employees failing to meet sales revenue targets risked losing their jobs. CW1 said that while there was no official policy about it, CW1 said that, from experience, any employee who failed to meet targets more than two quarters in a row was fired. CW1 added that the pressure to meet sales goals in order to keep their job or obtain a promotion caused some employees to feel desperate and was what likely prompted them to manipulate their sales in different ways, including signing customers up for things they did not authorize. CW1 suspected one of CW1's Tellers was doing so, due to her high sales numbers, but before CW1 could investigate further, that Teller quit.

*Customers Were Not Informed About Product Terms And Conditions*

81.     In this pressurized environment, CW2 recalled often overhearing other Tellers selling products to customers and failing to fully inform them about fees and terms, because they were under so much pressure to sell and meet their quotas. As CW2 notes, the top-selling Tellers at a branch would often do the right thing with customers, explaining fees and terms, but the Tellers who struggled to get into that top tier tended to stop caring about customers and failed to fully inform them of fees in an effort to obtain more sales. CW2 described the conflict-of-interest this way: "The ones who were treated like they are never good enough, they would do anything they could to get their points. They tried too hard, but didn't try hard in the right way. They tried for themselves not for the customer. That drove me nuts."

82.     For instance, CW2 recalled three separate occasions where three different Tellers tried to sell customers a credit card by saying the card had no annual fee, when, in actuality, the card had no annual fee for the first year, but did have an annual fee every year thereafter. The first time, CW2 was unaware of the annual fee after the first year, but after learning of it, CW2

spoke up and interjected "Don't forget the fee starts after the first year" when the other two Tellers tried to sell the card to a customer without disclosing this term.

83.     CW3 also overheard Tellers "quite a bit" pushing products on customers and not fully telling customers about fees associated with the products being sold.  As CW3 put it, "There were definitely people who never explained fully about the fees."  CW3 regularly saw customers return to the branch to complain that Tellers had not told them about fees associated with products, and CW3 said that, usually, the Tellers who sold the most products were the ones not fully explaining the product fees to customers.

84.     For instance, CW3 described a TD savings account that charged customers a fee every time they withdrew money and recalled that Tellers regularly did not tell customers about that fee.  Also, CW3 described a checking account with no monthly fee if the balance stayed above $5,000, but recalled that Tellers would recommend the account without explaining that a $30 fee was charged if the balance dipped below $5,000, even by a dollar.  CW2 recalled an email instructing Tellers to push that $5,000 minimum balance account and reminding them to tell customers that they did not have to pay a fee if they kept $5,000 in the account, but not instructing them to inform customers that they would actually be charged a monthly fee whenever the balance dropped below $5,000.

85.     CW3 said that "students were our biggest target."  CW3 described a $500 VISA credit card for which students were pre-approved, which Tellers pushed hard on student customers, telling them that they should sign up immediately because the card "might not be available later," even if the student said that they wanted to speak to their parents first.  As CW3 put it, "We kind of bullied them into taking the card. We just really pushed them on it whether they were comfortable or not. We wanted them to make the decision right then and there and not

have to think about it." Per CW3, Tellers only had to provide students with the paperwork to sign and were not required to explain the interest rate or payment schedules. CW3 saw student cards with over-the-limit balances and late fees, and heard students say they did not realize they needed to pay monthly or the interest fees. As CW3 recalled, "They would not understand how it works, that you have to pay it back every so many days."

*Management Unquestionably Knew About These Improprieties And Failed To Stop Them*

86.     CW2 knew that CW2's Managers were aware that Tellers were not fully informing customers about fees and terms. As CW2 put it, "I knew because I told them." CW2 recalls informing CW2's District Manager, Sam, who was based out of the Kitchener TD branch, of what the two Tellers CW2 had observed and corrected regarding the "no annual fee credit card" had done. CW2 did not see any change in management or Teller behavior thereafter, and, for the entire time that CW2 worked at TD, CW2 continued to observe Tellers failing to fully inform customers "quite often" about fees and terms of products being sold.

87.     CW3's Managers were also fully aware that Tellers were not telling customers about all the fees and terms of products they were trying to sell. As CW3 described, "They would stand and listen to our conversations of us not telling them that." CW3 said that when customers returned later to complain about the fees, the Managers were defensive and insisted the customer was told about the fees or would say that the customer "needed to be self-aware of how their account works." CW3 said that all of CW3's Managers acted this way.

88.     During meetings about failures to meet sales quotas, CW3 told CW3's Managers that CW3 did not think it was fair to so aggressively push products on customers and not fully explain the fees and terms of the products. CW3 described the Managers' response as being: "They would say, 'This is what we have to do to sell and keep our quotas up.'" CW3 could not

recall ever receiving any training or ethics classes about requirements to fully explain fees and terms to customers.

89. CW5, a District Vice President, recalled "one off" conversations with corporate level executives who visited CW5's district regarding the fact that employees felt pressured to meet sales targets, and CW5 recalled employees occasionally raising the issue in Q&A sessions when Executive Vice Presidents visited with front line employees.

*Corporate Oversight Focused On Catching "Anomalous" Sales*

90. CW5, a District Vice President overseeing 33 branches, held a weekly teleconference with all Branch Managers in CW5's district to discuss sales revenue numbers and customer service issues. CW5 said that the individual, branch, and district sales numbers were also reviewed by the regional and corporate offices. CW5 said that a monthly report would show if someone manipulated sales revenues. According to CW5, if the regional office notices any anomalies in the sales numbers at any level, a report about them was sent to the district office for investigation. CW5 said that the Regional HR and Regional Finance Departments looked at full sales reports to flag anomalies, as "oversight" to identify "any monkey business," such as sales trends out of the norm for the regional, district, branches, or individual employees. As an example, CW5 said that if an employee who typically signed up five customers a month for credit cards suddenly signed up 50 customers for credit cards in a week, that activity would be flagged. CW5 would be instructed to investigate any such anomaly and estimated that six to ten anomalies were investigated in CW5's district per year. CW5 estimated that only one or two employees were formally reprimanded, and none were terminated, during CW5's five years as a District Vice President. CW5 said that sale "blitzes" sometimes generated anomalies by

increasing sales in a single product like Simply Save on a given day, which CW5 would have to explain to CW5's boss if asked at the end of the month.

*Pervasive Customer Complaints Demonstrate Internal Controls Failures*

91.     CW1 was a TD Branch Manager in a town with a population of 16,500 and estimated that on an average day, only 17 customers came into the branch, many of them regular customers. Yet, almost daily, CW1 dealt with a customer who complained about a fee on their statement that they did not understand. As CW1 put it, "We would have someone come in at least once a day, and say, 'I don't know what this item in on my statement. Why am I getting charged? I'm not supposed to pay.'"

92.     CW1 said that when CW1 or an employee went through the discovery process to determine what happened, they typically found the fee was for a bank service or upgraded account that the customer said they did not authorize. CW1 said that trying to determine if the customer actually gave permission or not was almost impossible because often the service or account upgrade only required verbal authorization.

93.     So, instead of getting into a "he said, she said," situation with the Teller involved in the transaction, usually CW1 or a branch employee simply refunded the fees and removed the service or upgraded account from the customer's account. As CW1 put it, "We would just waive the fee and apologize and send them on their way." CW1 said that these types of complaints were common and were something all employees and Managers at TD branches encountered on a frequent basis, adding: "Every branch in the entire county, that's a very common occurrence. Any manager will experience it."

94.     CW1 said the most common item customers complained they did not authorize was overdraft protection. As CW1 described, customers were not charged for overdraft

protection unless they wrote a check or debited amounts in excess of their balance in the account, meaning that some customers would never know they had been signed up for the service, until they actually overdrew their account balance, when they would see the fee and question it. CW1 said tellers under pressure to meet sales targets and who were willing to sign-up customers for services without authorization, were apt to do so with overdraft protection because often customers never noticed or never complained if they did. CW1 said that the front-line employee received credit for the overdraft service sales revenue regardless of whether or not a customer was charged for an overdraft.

95. CW1 said customers also frequently complained about being placed in upgraded accounts without permission. As CW1 explained, TD had different levels of accounts, from "no frills" to "Cadillac," with the upgraded accounts generally being no-fee accounts if the customer kept a minimum balance: the customer was only charged if the balance dropped below $3,000 for the mid-level account and below $5,000 for the highest-level account. CW1 said that front-line employees under pressure to meet sales targets would target customers who maintained high balances of $20,000 to $30,000 and who would often not notice that they had been upgraded without permission because they were never charged. However, CW1 said that the front-line employee would receive the sales revenue credit for the upgrade.

96. CW1 said that despite the fact that TD required and kept data on almost all aspects of its business and employee activities, and despite the frequency of customer complaints about services and account upgrades they did not authorize, TD did not require branch level employees or Branch Managers to keep a tally and report all the complaints upward to the regional or corporate level. Instead, CW1 said that only if the customer was unsatisfied with the response provided by the branch would the complaint go further up the chain or become part of

an official TD record. Yet, CW1 said that "99.9 percent" of the customer complaints CW1 dealt with at the branch level satisfied the customer and, thus, never went any further and were never memorialized in TD's records.

97. CW1 said that only when a customer remained unsatisfied was the customer complaint submitted to dispute resolution, which was called TD Cares, where a case worker was assigned and details were kept in TD's internal record system. However, even as a Branch Manager handling customer complaints on a day-to-day basis, CW1 had no idea if or how TD ever compiled data from the complaints that were submitted to TD Cares.

98. Moreover, as CW1 corroborated, TD tracked every keystroke and banking transaction an employee made on TD's computer system and, thus, could determine which Teller put which customer into which account or service on which date and time. Nevertheless, according to CW1, when customers complained about an account or service they did not authorize, Branch Managers were not required to report the employee involved in the transaction or flag that employee's record in any way. Thus, CW1 confirmed that there was no TD policy or practice in place that would keep track of how many complaints a particular Teller was racking up.

*Knowledge Of Unauthorized Services And Accounts Was Widespread*

99. CW1 said that, internally, "everyone knew" that TD's retail employees were placing customers in services and accounts without authorization, but that management avoided discussing it openly. CW1 recalled monthly meetings with CW1's District Vice President and all 17 Branch Managers to discuss sales and other activities. CW1 said the meetings were competitive between Branch Managers, most of whom would not admit their sales goals were

too high or report problems with customers complaining about unauthorized accounts or services.

100.    When CW1 privately discussed with CW1's District Vice President the unreasonable sales goals for CW1's Branch, she told CW1 a good manager does not complain about sales targets, a good manager finds a way to meet the sales targets.  As CW1 put it, "The further up the chain you go, the more pay and incentives are linked to performance, and performance is almost exclusively determined by sales revenue." So, CW1 said that management had incentive to ignore indications that employees were meeting their sales goals by signing up customers for products or accounts without permission. CW1 said that the complaint from employees about management regarding this problem was that "management was turning a blind eye" to it.

101.    CW1 said that the Individual Defendants must have learned that TD employees were placing customers in unauthorized services and accounts, because the practice was so well known throughout TD.

### Loans, Lines of Credit, And Mortgages

*Insufficient Time To Properly Review Files*

102.    CW4 was an underwriter for mortgages, loans, and lines of credit, working at a TD credit center located in Toronto.  According to CW4, on average, each loan file took at least an hour to review, though some files took two hours.  However, CW4 stated that TD expected underwriters to review 14 loan files each day, which was impossible, and underwriters were under intense pressure to eat lunch at their desks and work long overtime hours to meet this expectation.

*Requirement To Maintain An Elevated Ratio Of Loans Reviewed To Loans Approved*

103.    Moreover, CW4 stated that TD also expected underwriters to keep their ratio of loans approved compared to loans reviewed at a high level.  If underwriters rejected too many loans, even legitimately, their approval ratio would decline and they would be called on it during quarterly job performance reviews.  Managers compared CW4's loan approval ratio to that of other underwriters, and if CW4's ratio was lower, they would pressure CW4 to increase it the next quarter.  CW4 recalled managers saying in a job performance review, "This employee's approval ratio is 79, but your approval ratio is 75.  You need to bring it up."  CW4 added, "They would always peg you with what your (ratio) number was compared to someone else," and if an underwriter was below the average, or even below the highest single performing underwriter, the managers would pressure that employee to "Get up to speed" with co-workers.  As CW4 put it, "You know you're in this horse race and the frontrunner is doing this many deals and you're lagging," recalling the kind of pressure the underwriters received from managers.  CW4 felt that TD was more concerned with approval ratios and did not share best practices of other employees.

104.    As a result of this pressure to maintain approval ratios, underwriters approved mortgages, loans, and lines of credit that customers did not qualify for under strict interpretation of TD's guidelines.  According to CW4, "Management…they really beat upon you, 'We have to make this deal work.  We are going to bend backwards.  We're going to take the line as far back as we can take it' to approve a loan."  CW4 stated that CW4 was "was made to feel, if you don't do it, your approval ratio goes down."

105.    Manager criticism was relentless and approval ratios were tied to compensation.  CW4 said that if CW4's approval ratio was lower than managers wanted it, CW4 was told CW4 was being "too hard" and "not flexible."  When managers told CW4 and colleagues during job performance reviews that they expected a higher approval ratio, they understood that their job

performance was being judged on that metric. CW4 said that they also understood that any promotions and raises were based on the job performance reviews and ratings.

*Loosened Standards And A Failure Of Internal Controls*

106. Significantly, CW4 said that TD regularly "tweaked" its own guidelines and bent its own rules to approve mortgages and loans. According to CW4, underwriters approved loans in this way with the complicity of their managers to keep their approval ratios up. CW4 recalls management's attitude toward customers as being, in CW4's words, "We're going to make them qualify for this mortgage" even if "We're going to put them in a precarious position – it doesn't matter." CW4 said that CW4's manager, Remus Epure, was particularly pushy about approving as many loans as possible, even if CW4 did not feel the customer qualified.

107. CW4 said that TD lacked sufficient internal controls to catch or prevent approval of loans that were too large for a customer. According to CW4, TD gambled on putting customers in precarious financial positions with their loans, betting that they would find a way to pay the mortgage even if they had to live on one meal a day. As CW4 put it, "The last thing that would ever go delinquent is the mortgage. Everybody knows that, even the bank."

### ***Financial Advising***

*Unreasonable Sales Targets And "Coaching" For Failure To Meet Them*

108. CW5 said that, like Tellers, TD Financial Advisors had sales targets to meet that were set for the most part by the corporate headquarters in Toronto. CW6 said that CW6 had quarterly and annual sales quotas to meet that determined CW6's bonus and performance reviews. CW6's quota as a Financial Advisor was about $13 to $15 million in volume per quarter, including any loans or lines of credit that are secured and investments. CW6 was also

required to do about $230,000 to $270,000 in sales revenue for signing up customers for other types of accounts and services.

109.    Although CW6 occasionally met these quotas, CW6 and CW6's Financial Advisor co-workers were usually unable to meet their goals.  As CW6 put it, "You would get lucky and hit it one quarter, but then the next several you wouldn't.  It was stressful."  CW6 added, "I don't think they were feasible to be honest" and indicated that CW6 believed the quotas to be unfair.

110.    CW6 said that, in addition to quarterly quotas, Financial Advisors also had weekly, daily and sometimes hourly goals at the branch, and when they failed to meet their quota, which was frequent, the Branch Managers put them on intensive monitoring or "coaching," which involved the Manager frequently observing their work and customer interaction.

111.    CW6 said that nearly every sales employee at CW6's branch was under the intensive monitoring or what the bank called "coaching," though CW6 characterized it as separate from the official Performance Improvement Plans.  However, according to CW5, Financial Advisors, even moreso than Tellers, were put onto PIP plans for not meeting sales targets, since the main job of the Financial Advisors was assisting customers in signing up for products and services.

112.    CW6 also said that Financial Advisors were also required to report to their Managers about each interaction with customers and whether they sold anything.  CW6 said that the Branch Manager also passed out a sheet of paper "every two hours" during the workday on which each employee had to write what they had sold so far that day to customers so that "everyone could see what everyone was doing."  CW6 said that the branch also kept a

spreadsheet on a shared file that tallied what each employee was selling throughout the quarter and year.

*Pressure To Advise Customers To Sign Up For Unneeded Accounts And Products*

113.     CW6 said that, due to the pressure to sell TD products, CW6 felt pressure to advise clients to sign up for products and credit they did not need.  As CW6 described the products CW6 was expected to push on clients, "I wouldn't say it was the wrong thing," but "sometimes it was not warranted."  To meet the required quotas, CW6 felt the need to "advise (customers) to take products that were not in their best interest."

114.     CW6 said that whenever a customer came into the branch, regardless of why, Financial Advisors were required to do a "full assessment" of the customer's financials. CW6 added that even if a customer came in simply to replace a lost ATM card, Financial Advisors were required to fill out a form with the customers' financial picture and assess what other products the bank could sell to them.  As CW6 put it, "We were really looking for a needle in a haystack to find what we could give them.  People came in to drink a glass of water, and we gave them a tumbler of water."

115.     CW6 finally resigned from TD because CW6 did not want to participate in "not giving customers the best advice."

*Management Knew Of The Pressures; Complaints Were Ignored Or Met With Threats*

116.     CW6 said that TD employees complained to Branch Managers that the sales goals were too high, but the managers told them that they had no control over the issue at the branch level, as they were set by executives higher above.  CW6 said that when employees complained, the Branch Managers acknowledged the quotas were difficult to meet, but said, "We have to figure out a way to meet them."

117. CW6 said that if any employee continued to struggle to meet their quotas or continued to complain that the targets were too high, the Managers would comment, "If you think it's too much for you, maybe you should look at doing something else" for a job.

118. CW6 believed that regional managers were aware that employees felt the quotas were too high because TD held regional pep rallies every few months. As CW6 put it, "Regional managers knew the pressure was really high. We used to have rallies every couple of months to cheer us up and give us hope and boost us up."

### *Customer Service*

#### *The High-Pressure Environment Extended to Customer Service Professionals*

119. CW7, a Manager of Customer Service, was not only aware of the pressure front-line TD employees were under to meet sales quotas, CW7 also had CW7's own sales quotas to meet, which were based on the combined quotas of the 17 front-line employees CW7 oversaw. If CW7 was not meeting CW7's quota, the Branch Manager was on CW7's back, asking her, "What are you doing? Why haven't you met it? How are you going to meet it?"

#### *Customer Service Professionals Observed The Pressures On Front-Line Employees And Their Resulting Improprieties*

120. CW7 corroborated that CW7's underlying front-line employees (Tellers, Financial Services Representatives and Financial Advisors) had quarterly and annual corporate-level quotas to meet, but also had branch-level targets often on a weekly and daily basis. CW7 said, that for instance, the branch might start the day with a directive for Tellers to sign up 11 customers for credit cards, and so the Branch Manager would hound Tellers throughout the day, asking how many credit cards they had sold and if they were not on track for the 11 units, pushing them to hit the target. CW7 said that the front-line employees were in constant competition with each other to meet sales targets or win prizes during branch-level contests,

calling it a "dog eat dog world." For example, CW7 corroborated that TD often pushed particular products during sales "blitzes," in which employees were urged to sign up as many customers for the product as possible and employees who sold the most units or hit the target for that product the fastest won prizes like cash cards, concert or sports tickets, days off, or dinners out. CW7 said that branches also competed against one another during the blitzes, *e.g.*, the branch that met the credit card sales target fastest during a blitz would receive a pizza party or the branch that signed up the most customers for overdraft protection was served a lunch by the branch that signed up the fewest for overdraft protection.

121. CW7 also stated that TD employees who consistently met sales quotas were also offered promotions with higher pay, so, for instance, a Branch Manager will approach a Teller consistently hitting the sales target about a promotion to a Financial Services Representative (FSR), which is a higher paying job. If, once promoted, that employee continued to consistently hit sales targets as a FSR, an offer for the next higher position (and higher salary) as a Financial Advisor could be expected. Conversely, CW7 corroborated that employees who did not meet their quotas also risked losing their jobs, often by management suggesting that perhaps they would prefer to "do something else."

122. CW7 corroborated that the constant pressure to meet sales targets was so intense and stressful that some employees signed customers up for bank products without the customers' permission. As CW7 explained, "People would do things they are not supposed to do just to make the target." For instance, CW7 said that when traffic in the bank branch was slow, front-line employees would go through customer "signature cards," the records of customers who opened accounts at the branch, to identify potential sales opportunities. CW7 said that the cards were referred to internally as the "gold mine" because they revealed so many sales opportunities.

123.    Describing one such opportunity, CW7 said that customers who had a government-required, low-cost "value account," were easy targets for TD Tellers, who received a sales revenue credit of about $650 toward their quotas for upgrading those customers into an "Infinity account," a full-service account with a $30 monthly fee.   CW7 said that while TD policy technically required employees to call a customer to offer the upgraded account, send the customer information about the upgraded account, and obtain the customer's permission, TD employees regularly did not take any of these steps, because making the switch did not require a signature from the customer.   According to CW7, Tellers often counted on customers to not notice they had been placed in an upgraded account, not complain if they did notice, or simply not deal with closing the account.   Significantly, CW7 estimated that as many as 70% of the customers switched from the "value account" to the "Infinity account" did not provide approval.

124.    CW7, corroborating CW1, said that if customers later complained, CW7 described the situation as the customer's word against the that of the Teller, who would insist they had obtained permission and sent the information, at which point the Branch Managers would usually not take the issue further.   As CW7 described it, "It's kind of a no talk rule about it.  The bank would back them up."  So, according to CW7, the branch might refund the account fees to the customers who complained, or often, the branch would try to offer to simply waive the monthly fee for another month or two so as to keep customers in the upgraded account in the hopes that they would ultimately stay in it.

125.    CW7 said that TD employees also used the signature cards, in combination with the customer account information in TD's computer system, to identify other products and services the customers were eligible for and/or were not signed up for, such as overdraft protection, for which they might be pre-approved.   CW7 said that while some employees called

the customers for permission, often employees signed customers up for services, such as overdraft protection and even credit cards, without talking to the customer. Again, significantly, CW7 estimated that 80% of customers signed up for overdraft protection were signed up without their permission.

126. CW7 also said that TD pushed hard on Financial Advisors to sell mortgage insurance on every mortgage and incentivized them with a substantial amount towards their sales revenue quotas from mortgage insurance, about $2,500 per $100,000 in mortgage value. CW7 said that Financial Advisors were required to discuss mortgage insurance with each customer, and if the customer did not want it, the Financial Advisor was supposed to have the customer sign an insurance cancellation form. However, according to CW7, when customers cancelled the mortgage insurance, Financial Advisors often did not submit the cancellation until 90 days after the closing, which allowed the Financial Advisor to receive credit for the mortgage insurance sale, and often the customer was never aware they had it or never complained. Significantly, CW7 estimated that 90% of the mortgage insurance sales were done without the customers' awareness that it had not been cancelled.

*Management Professionals Were Complicit*

127. CW7 confirmed that both Customer Service and management were complicit in this conduct. CW7 said that CW7 and the Branch Manager both assigned Tellers to review the customer signature cards on a regular basis as a way to identify potential sales. For example, according to CW7, one Teller was assigned to look through customer names from A through E, another teller was assigned F through J, etc. As CW7 put it, "If it was a slow time, we always got them to go through the signature cards to find buckets," where the term "buckets" described when an employee was able to make a sale, such as an account upgrade. CW7 said, "It was just

another opportunity to meet goals. It was just another way to try (to sell) instead of cold calling."

128. CW7 said that very little was done about TD employees signing up customers for services without permission. As CW7 put it, "You didn't really get into big trouble," she said. "Just a conversation." CW7 regularly suspected employees of improperly signing customers up for services, but was instructed by HR that CW7 could not accuse an employee of anything without direct evidence or unless CW7 saw it happen. CW7 said, "You can't accuse people of something like that. We had to watch what we said."

129. CW7 said that when customers complained they did not give permission for a bank product, the typical explanation from the Teller involved was denial and claims they had done what they were supposed to do. CW7 described the typical attitude of a Teller when confronted with a complaining customer as a dismissive, "Oh, you didn't get that information in the mail? Must have gotten lost." But, CW7 said, often the Teller never sent the information to the customer about the product. CW7 knew employees were not doing things properly because it was usually "obvious" from the customer complaints or the employee's high sales numbers. For instance, if a Teller switched four customers from value accounts to an upgraded account and three of those customers complained they did not approve it, CW7 would have a good idea the employee was not calling customers before upgrading their accounts.

130. However, if CW7 reported the suspicion to HR, instead of a formal investigation, the employees just received "coaching" sessions, in which they were reminded of all the steps and approvals they must obtain when signing customers up for bank products. CW7 does not recall any formal investigations of employees suspected of improperly placing customers into bank products. CW7 also said that HR representatives usually met with

employees off-site so co-workers would not be aware the employee was talking to HR or possibly reprimanded. CW7 never saw or heard of anyone suspended or fired for placing customers into bank products improperly.

*Customer Service Contract Hires Were Pushed To Close Sales, Not Do Customer Service*

131. CW9 was hired as a contract worker by an agency, Promcom, that placed CW9 and about 20 to 25 other contract workers at a TD call center in Gloucester, Ontario, on a six-month contract to handle projects TD was running at the time. As CW9 described the job, "It was supposed to be (customer service), but it really wasn't. As we went into the job, it became more of sales. Sales, sales, sales."

132. As CW9 explained, the projects were basically sales outreach efforts by TD, where letters were sent to customers informing them of different products or services they qualified for, such as a higher line of credit. When the customers called, the calls went to CW9 and the other contract employees, who were supposed to close the sale of the product or service described in the letter to the customer, as well as pitch other products and services. As CW9 put it, "Once the call comes through, we had different things we needed to add. We had to offer, offer, offer."

133. CW9 said that when customers called, prompts on their TD computer screens would alert the contract employees to the products they were expected to try to sell. CW9 said that the contract workers were expected to offer products even if the customer clearly was not interested, so for instance, even after a long call about a particular customer service need, CW9 was expected to push other bank products.

134. CW9 said that contract employees received a type of "report card" that tallied how many products they were selling and would get reviews "every so often" during which their

Manager would go over the report card. In CW9's reviews, if CW9 was under-selling, the Manager would pressure CW9 to sell more. CW9 said that the contract employees were "really under pressure" if they failed to meet weekly quotas.

135. CW9 had a hard time selling loan insurance, which was one of the products CW9 was expected to push. When CW9 failed to meet the applicable sales quota, CW9's Managers regularly said, "Don't forget you're not selling (enough) insurance."

136. When CW9 and the other contract employees were brought in to work at TD, they were told by their TD Managers that if they did a good job, TD might hire them as full-time employees. CW9 understood from the pressures by Managers that to do a good job meant to sell bank products and services. As CW9 put it, "They would say, 'Just make sure you can sell as much as you can here.'"

137. CW9 described an environment that was highly competitive between contract employees. As CW9 put it, "We were always competing. The team was competing to sell more. Everybody was to their own." CW9 said that sales numbers for each of the contract employees was viewable to all the other contract employees, which contributed to the competitive environment. CW9 said, "Your stats were shown to people. Whoever had the highest sales, bringing in the most money, were offered a job."

138. CW9 said that contract employees who were not selling enough were given the cold shoulder from Managers. As CW9 described, "If you weren't good (at selling), you weren't treated the same way. They left it quiet to make you feel like you're going to lose your job. A lot of people (the contract job) left early."

139. CW9 was one of them, leaving after four months because CW9 was unable to sell insurance at a level that Managers expected. CW9 knew CW9 did not have a future at TD, given

that environment, and CW9 did not enjoy working at TD.  CW9 also concluded that the offer for a full-time job was only an "illusion" created to motivate contract employees to sell products.

140.    CW9 recalled that only two of the 20 to 25 people in CW9's contract employee group were hired for full-time jobs with TD.   CW9 sat next to one of them, a top seller of TD products and services who was an aggressive salesperson with a background in the casino industry.  CW9 had the impression that he was not fully informing customers about the products and services he was pushing on them.  According to CW9, TD Managers even questioned him about his sales efforts during what she called a "bit of an investigation" whereby he "got approached to ask if he was doing it correctly" and he "said yes, but he continued to do it the way he was doing it."  CW9 said that he "laughed about it, saying 'I was doing my job,'" and was later hired as a full-time employee.

*The Corporate Office Knew About The Improprieties And Responded With Wrist-Slaps*

141.    CW7 said that at the branch level, everyone knew that rules were being broken so that employees could achieve sales targets.  CW7 described messaging from the corporate office that indicated both knowledge of the misconduct and a lack of any real desire to address it.  For instance, CW7 said that the corporate office might send a stern email about the high number of customers placed in overdraft protection without permission.  As CW7 put it, "There'd be an email from head office, saying, 'It's come to our attention that overdraft protection is being put on accounts improperly… Stop doing it, let's not be a part of that culture.'"  However, CW7 said that TD would then continue to push blitzes for overdraft protection at the branch level, where employees were grilled almost hourly about how many customers they had signed up for overdraft protection that day.  CW7 discussed this problem with Managers at the branch level, and they all knew about it.

142.     As far as how far up the corporate hierarchy knowledge of improper sales reached, CW7 said, "Everybody knew. It was just a given."  CW7 also noted that if anyone in the corporate office reviewed the data, it reflected numbers indicating that employees must have been cutting corners to sell products.  CW7 said that TD wanted sales employees to be "pacing at 150%" of their goals at all times, meaning that if their sales revenue goals were $10 million for the quarter, they should be on track to hit 150% of that throughout the quarter.  CW7 said that management should have realized that something was not right when employees were running at much higher percentages all the time, such that "You could tell at 180% there's something up.  If you have someone pacing at 350%, way over their goals, what are they doing? It is a given (that their numbers were not legitimate)."

143.     CW7 said that TD had what employees at the branch level referred to as the "SR Police," or Sales Revenue Police, which were a department at TD responsible for noticing and overseeing improper sales tactics.  However, CW7 said in CW7's 10 years at the bank, CW7 never saw anyone from SR Police come to the CW7's branch to conduct an audit or a specific review of an employee's activities, notwithstanding CW7's own reports to HR about suspicious employee sales.  This statement adds important context to CW5's comments about the detection of anomalies.

### *Human Resources*

144.     CW8, an HR Relationship Manager, regularly served as a sounding board for Managers frustrated with the level of pressure they came under to meet increasing sales targets, which the Managers felt were unattainable.  CW8 observed the sales targets and correlating pressures to sell increase substantially since at least 2014, coincident with Defendant Masrani becoming CEO.

145.    While in HR, CW8 recalled talking with a TD employee who said she spent a lot of time closing accounts for customers when she noticed accounts the customers did not need and were unaware they had.  CW8 also recalled customers who came into branches to complain that employees had not told them about accounts or services opened in their names or had not informed them of the fees for those products.  CW8 recalls questioning employees about the complaints, but the employees simply denied not telling customers about the accounts or services.  CW8 felt unable to prove anything, but felt the employees had probably not fully informed customers about the accounts because were under so much pressure to sell products.  As CW8 put it, describing the obvious conflict of interest, "There was never any formal reprimand, it was never proven," CW8 said. "But in my gut, absolutely, it told me there's a lot of demand on sales, and (employee) compensation is linked to improving performance and (sales) metrics, so it's in the employees' best interests to push services that customers may or may not need."

146.    CW8 recalled some of the ways employees were shamed or reprimanded for failing to meet sales goals.  CW8 recalled that employees in the Edmonton District who failed to meet sales goals for signing customers up for loan insurance were sent to a training session, and it was known that being sent to this training indicated they were not performing well.  CW8 said that TD also made sales statistics for all the branches and employees available to the employees, so it was clear to everyone who was at the top and who was at the bottom.  CW8 called it, "the wall of shame, publically hanging out the loser of the pack."

147.    CW8 confirmed that the bank had the technological ability to conduct investigations of employees regarding customer complaint about unapproved accounts, with every keystroke by an employee recorded.  As CW8 confirmed, "They had the ability to be able

to track everything" the employee did with each customer, including what products they sold each customer. CW8 said TD did conduct such investigations, though CW8 did not personally conduct them.

***Post-Class Period Witness Statements Corroborate The Foregoing***

148.    As detailed in paragraphs 185-186 *infra*, the statements given by CWs 10 - 320 to CBC News, which are incorporated by reference into this section of the Complaint, corroborate the detailed statements of CWs 1 -9 set forth above.

**Materially False and Misleading**
**Statements Issued During the Period**

149.    During the Class Period, Defendants made materially false and misleading statements that can be organized into three primary threads of the alleged fraud: (i) the Risk Management & Internal Controls Fraud, (ii) the Business Operations Fraud, and (iii) the Reported Results Fraud.

***Risk Management & Internal Controls Fraud***

150.    On December 3, 2015, TD filed its Form 40-F for the fiscal year ended October 31, 2015 (the "2015 40-F"), which was accompanied by certifications under the Sarbanes-Oxley Act of 2002 ("SOX") executed by Defendants Masrani and Johnston. The 2015 40-F set forth many materially false and misleading provisions regarding TD's purported risk culture, risk appetite, and risk management.

(a)    The 2015 40-F described TD's "Risk Appetite" as follows:

RISK APPETITE
TD's RAS [Risk Appetite Statement] is the primary means used to communicate how TD views risk and determines the type and amount of risk it is willing to take to deliver on the Bank's strategy and enhance shareholder value. In defining its risk appetite, the Bank takes into account its vision, mission, strategy, guiding principles, risk philosophy, and capacity to bear risk. The guiding principles for TD's RAS are as follows:

***The Bank takes risks required to build its business, but only if those risks:***
1.      ***Fit the business strategy, and can be understood and managed.***
2.      ***Do not expose the enterprise to any significant single loss events***; TD does not 'bet the Bank' on any single acquisition, business, or product.
3.      ***Do not risk harming the TD brand.***

TD considers current operating conditions and the impact of emerging risks in developing and applying its risk appetite. Adherence to enterprise risk appetite is managed and monitored across the Bank and is informed by the RAS and a broad collection of principles, policies, processes, and tools. TD's RAS describes, by major risk category, the Bank's risk principles and establishes both qualitative and quantitative measures with key indicators, thresholds, and limits, as appropriate. RAS measures consider both normal and stress scenarios and include those that can be aggregated at the enterprise level and disaggregated at the business segment level.

Risk Management is responsible for establishing practices and processes to formulate, monitor, and report on TD's RAS measures. The function also monitors and evaluates the effectiveness of these practices and measures. RAS measures are reported regularly to senior management, the Board, and the Risk Committee; other measures are tracked on an ongoing basis by management, and escalated to senior management and the Board, as required. Risk Management regularly assesses management's performance against TD's RAS measures.

(b)      The 2015 40-F also described TD's "Risk Culture" as follows:

RISK CULTURE
***The Bank's risk culture embodies the "tone at the top" set by the Board, Chief Executive Officer (CEO), and Senior Executive Team (SET), which informs TD's vision, mission, guiding principles, and leadership profile. These governing objectives describe the attitudes and behaviours that the Bank seeks to foster, among its employees, in building a culture where the only risks taken are those that can be understood and managed.*** TD's risk culture promotes accountability, learning from past experiences, and encourages open communication and transparency on all aspects of risk taking. ***TD employees are encouraged to challenge and escalate when they believe the Bank is operating outside of its risk appetite.***

Ethical behaviour is a key component of TD's risk culture. TD's Code of Conduct and Ethics guides employees and Directors to make decisions that meet the highest standards of integrity, professionalism, and ethical behaviour. ***Every TD employee and Director is expected and required to assess business decisions and actions on behalf of the organization in light of whether it is right, legal, and fair.*** …

In addition, governance, risk, and oversight functions operate independently from business segments supported by an organizational structure that provides independent oversight and objective challenge. Governance, risk, and oversight function heads, including the Chief Risk Officer (CRO), have unfettered access to respective Board Committees to raise risk, compliance, and other issues. Lastly, awareness and communication of TD's RAS [Risk Appetite Statement] and the ERF [Enterprise Risk Framework] take place across the organization through enterprise risk communication programs, employee orientation and training, and participation in internal risk management conferences. These activities further strengthen TD's risk culture by increasing the knowledge and understanding of the Bank's expectations for risk taking.

151. The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy, exposed TD to significant loss events, risked harming the TD brand, were risks that were not managed, and could not possibly be characterized as right, legal, or fair. Moreover, even when the misconduct was reported, management including Branch and District Managers, Customer Service, Human Resources, and TD corporate headquarters did nothing meaningful to halt it and indeed continued the various sales goals, promotions, and blitzes that encouraged the misconduct in the first place. Moreover, despite fair warning and significant red

flags arising from the highly publicized misconduct at other financial institutions like Wells Fargo, the CW statements illustrate an utter lack of sufficient internal controls and no meaningful enforcement from the Individual Defendants or the Senior Executive Team.

152. On March 16, 2016, TD filed a Form 6-K (the "3/16/2016 Code of Conduct 6-K") appending its "Code of Conduct and Ethics for Employees and Directors" (the "Code of Conduct"), which was replete with provisions that were material false and misleading, given the ongoing improper and illegal conduct being perpetrated on TD's customers. For instance:

(a) The Code of Conduct was preceded by a Message from Defendant Masrani and TD's Chairman of the Board Brian Levitt, who signed it. The Message stated:

> The TD shield is synonymous with trust – a reputation built up over decades and one we can all point to with pride.
>
> ***Safeguarding this reputation is the responsibility of every TD employee and is key to our continued growth as an organization***. By acting ethically and with integrity, we will ensure that our stakeholders' confidence in TD is stronger than ever**. *Protecting our customers is at the heart of the successful relationships that set TD apart***.
>
> ***The Code of Conduct and Ethics is our roadmap to maintaining our reputation***. It supports the TD Framework, which encompasses the elements that will help us achieve our vision to be The Better Bank.
>
> We ask you to read the Code and ensure you understand how it applies to your daily work. If you have any questions or concerns, please consult your manager or other appropriate contact as described in the Code.
>
> Thank you for your efforts in protecting our reputation as a trusted financial institution.

(b) The Code of Conduct makes clear that it was binding upon all employees, stating, "The Code of Conduct and Ethics (Code) establishes the standards that govern the way we deal with each other, our customers, shareholders, … and the public at large. ***Complying with the Code is part of the terms and conditions of our employment*** with The Toronto-Dominion Bank (TD Bank) together with its wholly-owned subsidiaries (collectively, TD)." It added, "***Every***

*employee and director of TD, in every location, every job, at every level, and at all times, is responsible to safeguard the reputation of TD, including by complying with this Code*."

(c)     The Code of Conduct also makes clear that it applies to every single customer interaction and transaction, regardless of size, stating:

> As a responsible business enterprise and corporate citizen, **TD is committed to conducting its affairs to the highest standards of ethics, integrity, honesty, fairness and professionalism – in every respect, without exception, and at all times**. While reaching our business goals is critical to our success, equally important is the way we achieve them. **Every employee and director of TD is expected and required to assess every business decision and every action on behalf of the organization in light of whether it is right, legal and fair and within our risk appetite**. **This applies at all levels of the organization, from major decisions made by the Board of Directors to day-to-day business transactions**. The Code is intended to help employees and directors meet these expectations and make such assessments.

* * *

> **TD employees and directors are required to review and attest to compliance with this Code on an annual basis**.

(d)     The Code of Conduct even made explicit reference to the "ethical lapses at many leading organizations" – like Wells Fargo – in underscoring the importance that its provisions be understood and adhered to in all situations, while also emphasizing the importance of the direct management of TD employees in overseeing their conduct and addressing any issues that would violate the Code of Conduct.  Specifically:

> **In recent years, the number of news stories regarding ethical lapses at many leading organizations reminds us of the critical importance of a strong ethical culture**.  By following the ethical practices outlined in the Code and incorporating elements of the TD Framework in our day-to-day activities, we will continue to promote a culture of high integrity at TD and reduce the risk that our actions will cause harm to TD.  Conveying a strong ethical culture starts with the "tone from the top" as highlighted in the introductory message from our Group President and Chief Executive Officer and our Chairman of the Board. However, it is equally important for all of our leaders to consistently demonstrate unwavering integrity and to promote awareness and compliance with the Code.  **Employees often take their cues from their managers. In addition, since employees most frequently**

*report misconduct that they observe to their managers and Human Resources, it is critical for those who receive such information to address it promptly and with the seriousness it deserves*.

(e)     The Code of Conduct also makes clear that every employee must adhere not only to its provisions, but also to the codes of conduct, policies, and guidelines set by TD's various business segments, as well as all applicable laws.  The Code of Conduct also requires any questions as to potential conflicts between these authorities to be addressed to managers and TD's Legal Department and that any violations of the Code of Conduct be timely reported. Specifically, it states (with non-italicized bolding reflecting emphasis in the original) as follows:

*The Code sets out a common baseline of ethical standards required of all of us*. The Code also references other TD policies in specific areas. **It is important to note that certain business segments, regions or roles also have supplementary or jurisdiction-specific codes of conduct and policies, compliance manuals, sales guidelines, operational procedures, etc. to which their employees or directors must also adhere. We must also comply with local laws and regulations, as well as our responsibilities to professional associations, self-regulatory organizations or regulators where these may impose greater or more rigorous standards than provided for in the Code or TD policies.** In the event of an apparent conflict between the provisions of this Code of Conduct and local laws and regulations, we must seek guidance from our manager and/or the Legal, Compliance or Global Anti-Money Laundering departments. Within this framework, employees and directors are expected to exercise good judgment and be accountable for their actions.

\* \* \*

Furthermore, *all employees and directors are obliged to report, in a timely fashion, any violations of the Code we may witness or reasonably suspect, ask question about our culture of integrity and raise good faith concerns about compliance with the Code.*

(f)     For avoidance of doubt, the Code of Conduct spells out a step-by-step process for how it should be applied by TD employees in daily circumstances.  It states (with non-italicized bolding reflecting emphasis in the original):

Not every situation can be addressed specifically in the Code. We are expected to apply the principles outlined in the Code in exercising our judgment when we face questions, concerns or issues that do not present obviously correct answers or approaches. It may be helpful for us to apply a process such as the one below to making these types of decisions. If we are still uncertain, we should seek the advice and direction of a more senior TD manager or Human Resources (or in the case of a director, the General Counsel) so that all relevant interests are fully recognized and properly served.

**When we recognize that we are faced with a challenging decision that engages the principles outlined in the Code, we should:**

**Step 1: Collect the necessary information, and:**
• Consider what is right, legal and fair, without rationalizing

**Step 2: Consider the available options, and:**
• Weigh the business and ethical pros and cons
• Review how the decision may align with TD's risk appetite statement
• Consider the impact of the options on TD's different stakeholders
• Think about the long-term impact of our decision

**Step 3: Develop a preliminary decision and test it by asking ourselves:**
• Does it strike the right balance?
• Do I think I would be able to explain the decision to those affected by it, or even to my close family members in a way that would not embarrass me or TD?
• Might this decision harm TD's or my reputation?
• Should I get help from my manager or others to make the decision?

**Step 4: Make the decision and be transparent, and:**
• Acknowledge difficult ethical decisions that make us uncomfortable and may in fact require us to choose between two imperfect outcomes. We should consider reviewing difficult decisions with our managers
• Remember that, as we commit ourselves to a course of action, our Chief Executive Officer and Chairman of the Board are expecting us to make decisions that are right, legal and fair and within our risk appetite

(g)     Under a section entitled "Respecting the Law," the Code of Conduct details how

TD employees are required to "make the right decision" in conducting their business:

Making the Right Decision
***Concern for what is right should be our first consideration in all business decisions and actions, and that includes compliance with the law***. Financial services are heavily regulated in all jurisdictions in which we operate.  We need to be familiar with and observe all laws and regulations relating to TD in the jurisdiction(s) in or for which we work or that is/are impacted by the decisions

that we make. **We must avoid performing any task that could reasonably be considered legally suspect, even if it might be common practice in the country or region**. Adhering to the requirements in the Code and TD's other policies and procedures that relate to TD as a whole, or our business segment and job function will help us fulfill these requirements. **Employees will not knowingly assist or allow** customers or **other employees to take actions which would violate the law**. … If we have any doubt at all, we should seek advice and direction from our manager or the Human Resources, Legal, Compliance or Global Anti-Money Laundering departments. … Directors must be aware of and consider laws that apply to the matters placed before the Board, and may seek advice from the Chairman of the Board and the Chairman may refer to the General Counsel for clarification.

(h)     The Code of Conduct also expressly and unambiguously bars "irregular business conduct," which it defines and explains in significant detail:

F. Irregular Business Conduct
**Irregular business conduct** (**which includes any criminal, fraudulent or illegal conduct, any impropriety, lack of professional responsibility or dishonesty**) **will not be tolerated under any circumstances**. Such conduct may not only be subject to internal disciplinary action, but may also lead to criminal prosecution, regulatory action or civil suit. Some of the most serious types of violations are described below:

* * *

**Forgery, Falsifying Accounts, Documents and Records** – Improperly creating or reproducing, or falsifying a signature or initial, or otherwise creating a false document will not be tolerated under any circumstances. In addition:

We must not manipulate internal accounts or make entries to any account which are false, have not been properly verified or obscure the true nature of the transaction, or allow such entries to be made. **We must not establish or operate, for any purpose, an account on the books of TD that cannot withstand the closest public scrutiny of its propriety**. Also, we must not manipulate or falsify any TD financial statement, record or return.

We must not intentionally complete inaccurate reports, forms or other documents (including marketing and client presentation material) that are relied upon by TD to be an accurate record of the circumstances, or that are disclosed publicly or directly to third parties, including government agencies, regulators and customers or potential customers.

* * *

**Sales Misconduct** – **A central component of TD's mission is to be customer focused**. Accordingly, **whenever employees are servicing customers or providing**

*advice or recommendations, we must deal fairly with our customers. <u>As such,</u>* <u>*we must not allow our desire to increase our performance results to come*</u> <u>*before our focus on our customers*</u>. Employees must not willfully spread rumours or disseminate false or misleading information. Care must also be exercised when handling unsubstantiated market information. Customer communications in particular should have a reasonable basis, be fair and balanced, and not contain any inaccurate or misleading information.

* * *

**Tied Selling –** We cannot coerce or impose undue pressure on a customer or potential customer to obtain another product or service from TD as a condition of approving a request for a TD product or service.

(i)      The Code of Conduct also expressly bars, and extensively defines, conflicts of interest, particularly those that arise between TD employees and TD customers, stating (with non-italicized bolded text reflecting emphasis in the original):

A. Introduction to Conflicts of Interest
In keeping with expectations regarding ethical corporate conduct, ***customers and the public have a right to openness and honesty in all their dealings with TD***. ***As representatives of TD, we must avoid activities or circumstances that create conflicts between our personal interests and our responsibilities as employees or directors***, ***as well as complying with policies and procedures that manage potential conflicts between TD's interests and those of other stakeholders, such as customers*** and counterparties.

***Conflicts of interest arise when individuals or organizations have personal interests that may interfere with, or appear to interfere with, the independent exercise of judgment in business dealings. We must avoid having our decisions on behalf of TD influenced (or to even be seen to be influenced by) conflicting interests***.  For these reasons, actual, potential and perceived conflicts of interest (each a "Conflict" and collectively described as "Conflicts" in this section) must be carefully managed.  The following Conflict of Interest sub-sections describe many of the more commonly encountered Conflicts, but we must always be alert to other situations that may give rise to Conflicts.  **In any situation where there is a Conflict, we must bring the situation to the attention of our manager, Human Resources Partner or other contact listed in this Code**.

* * *

B. Conflicts Arising from Personal Benefit
***A Conflict may arise where we may be motivated to act in a manner that is not in the best interests of TD, our customers and/or our shareholders***. ***Often this is***

***because we***, or our relatives or people with whom we share a financial or close personal relationship, ***stand to benefit from the action in some way***.

***We must avoid acting in a manner that places our personal interests ahead of the best interests of TD, our customers and/or our shareholders***. As noted above, we must also avoid situations that might create the appearance of a conflict of interest whether or not it actually exists and whether or not we believe we would be improperly influenced. For example, we may not, directly or indirectly purchase or acquire an interest in real property that is being sold by TD following repossession or foreclosure. Where we face a potential conflict, we must disclose the situation to our manager or Human Resources Partner.

\* \* \*

L. Conflicting TD Interests

***TD is committed to avoiding material Conflicts between its interests and those of its customers*** and counterparties. A material Conflict would exist if TD were to engage in any transaction or activity that could involve or result in TD's interests being materially adverse to the interests of a customer or counterparty. TD has established, maintained and enforced information barriers as set out in the *TD Information Barrier Policy* to physically separate employees or functions, or limitations on types of activity, to help prevent Conflicts from involving or resulting in a materially adverse effect on a customer or counterparty.

***If***, notwithstanding the information barriers established, ***we know or should reasonably know that a specific transaction or activity may involve a Conflict that could result in a materially adverse effect on a customer*** or counterparty, ***we must discuss the situation with our manager and/or our Compliance department representative and assess whether disclosure of the Conflict to the customer*** or counterparty ***is necessary or appropriate***. If so, we must ensure that (i) we make clear, timely, and effective disclosure of the Conflict; and (ii) the customer or counterparty has the opportunity to negate, or substantially mitigate, any materially adverse effect created by the Conflict.

(j)     The Code of Conduct also contains extensive provisions requiring actual or suspected violations to be reported, prohibiting intimidation or retaliation against any employee that makes such a report, imposing penalties including financial penalties and potential termination for failures to comply, and requiring employees to annually attest their compliance.

153.     The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee

compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy, exposed TD to significant loss events, risked harming the TD brand, were risks that were not managed, and could not possibly be characterized as right, legal, or fair. Moreover, even when the misconduct was reported, management including Branch and District Managers, Customer Service, Human Resources, and TD corporate headquarters did nothing meaningful to halt it and indeed continued the various sales goals, promotions, and blitzes that encouraged the misconduct in the first place. Moreover, despite fair warning and significant red flags arising from the highly publicized misconduct at other financial institutions like Wells Fargo, the CW statements illustrate an utter lack of sufficient internal controls and no meaningful enforcement from the Individual Defendants or the Senior Executive Team.

154. At the Barclays Global Financial Services Conference on September 13, 2016, materially false and misleading misstatements and omissions were made regarding whether TD was engaging in misconduct like the fraudulent account practices that exposed Wells Fargo to a huge wave of regulatory penalties and civil lawsuits, and the controls and protections that TD purportedly had in place to prevent such misconduct, in this exchange:

> Analyst: Wells recently announced that they paid a substantial fine related to some unauthorized account openings. Their CFO was here this morning, kind of spoke to that a little bit and said that it was relatively small number of folks that were considered underperformers trying to hold on to their job. So my question is,

is that something you guys monitor and I guess also, is it something that – how can you be sure that your incentives don't encourage that type of activity, essentially?

Defendant Pederson: So, **the answer is yes, that we have controls in place to attempt to prevent those kinds of situations**. So, **as an example, we've controls in place where if our compliance department sees that products have been sold that don't get used or funded, like a card that doesn't get used, or a deposit account that doesn't get funded, that's a flag – that means we will take a look at it**. **We have a system whereby we look at complaints specifically to try to ascertain whether there's any miss-selling risk raised by these complaints, and numerous other controls**.

**We also have a philosophy around compensation that's very conservative. So, the pay at stake for our sales force and the stores is significantly less than in other banks, because of our philosophy**, which applies to my compensation too, **that we have always believed we don't want compensation systems that incent any swinging for the fences**.

Of course, one hopes that one's culture would always prevent these kinds of things. But **I do think that we have controls in place that I hope are preventing them**. **Obviously every bank in North America will be looking to see if there's anything we should do to strengthen those, but this is something that has been top of mind for us for some time now**. I'll also say that when I referred to the upside that we have before, that reflects that we are not nearly as evolved as some of the large banks in terms of share of wallet, and therefore, have a long way to go before we reach the levels that they're currently at. And, I would hope therefore, have some lower risk in terms of some of these issues.

155.    The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD.  As described by the CWs, the actions taken, pervasively throughout all levels of

TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy, exposed TD to significant loss events, risked harming the TD brand, were risks that were not managed, and could not possibly be characterized as right, legal, or fair. Moreover, even when the misconduct was reported, management including Branch and District Managers, Customer Service, Human Resources, and TD corporate headquarters did nothing meaningful to halt it and indeed continued the various sales goals, promotions, and blitzes that encouraged the misconduct in the first place. Moreover, despite fair warning and significant red flags arising from the highly publicized misconduct at other financial institutions like Wells Fargo, the CW statements illustrate an utter lack of sufficient internal controls and no meaningful enforcement from the Individual Defendants or the Senior Executive Team.

156. On December 1, 2016, TD filed its Form 40-F for the fiscal year ended October 31, 2016 (the "2016 40-F"), which was accompanied by certifications under the Sarbanes-Oxley Act of 2002 ("SOX") executed by Defendants Masrani and Ahmed. The 2016 40-F set forth many materially false and misleading provisions regarding TD's purported risk culture, risk appetite, and risk management.

(a) The 2016 40-F described TD's "Risk Appetite" as follows:

RISK APPETITE
TD's RAS [Risk Appetite Statement] is the primary means used to communicate how TD views risk and determines the type and amount of risk it is willing to take to deliver on the Bank's strategy and enhance shareholder value. In defining its risk appetite, the Bank takes into account its vision, mission, strategy, guiding principles, risk philosophy, and capacity to bear risk. The guiding principles for TD's RAS are as follows:

***The Bank takes risks required to build its business, but only if those risks:***
1. ***Fit the business strategy, and can be understood and managed.***
2. ***Do not expose the enterprise to any significant single loss events***; TD does not 'bet the Bank' on any single acquisition, business, or product.
3. ***Do not risk harming the TD brand.***

TD considers current operating conditions and the impact of emerging risks in developing and applying its risk appetite. Adherence to enterprise risk appetite is managed and monitored across the Bank and is informed by the RAS and a broad collection of principles, policies, processes, and tools. TD's RAS describes, by major risk category, the Bank's risk principles and establishes both qualitative and quantitative measures with key indicators, thresholds, and limits, as appropriate. RAS measures consider both normal and stress scenarios and include those that can be aggregated at the enterprise level and disaggregated at the business segment level.

Risk Management is responsible for establishing practices and processes to formulate, monitor, and report on TD's RAS measures. The function also monitors and evaluates the effectiveness of these practices and measures. RAS measures are reported regularly to senior management, the Board, and the Risk Committee; other measures are tracked on an ongoing basis by management, and escalated to senior management and the Board, as required. Risk Management regularly assesses management's performance against TD's RAS measures.

(b)    The 2016 40-F also described TD's "Risk Culture" as follows:

RISK CULTURE
***The Bank's risk culture embodies the "tone at the top" set by the Board, Chief Executive Officer (CEO), and Senior Executive Team (SET), which informs TD's vision, mission, guiding principles, and leadership profile***. ***These governing objectives describe the attitudes and behaviours that the Bank seeks to foster, among its employees, in building a culture where the only risks taken are those that can be understood and managed***. TD's risk culture promotes accountability, learning from past experiences, and encourages open communication and transparency on all aspects of risk taking. ***TD employees are encouraged to challenge and escalate when they believe the Bank is operating outside of its risk appetite***.

Ethical behaviour is a key component of TD's risk culture. TD's Code of Conduct and Ethics guides employees and Directors to make decisions that meet the highest standards of integrity, professionalism, and ethical behaviour. ***Every TD employee and Director is expected and required to assess business decisions and actions on behalf of the organization in light of whether it is right, legal, and fair***. …

In addition, governance, risk, and oversight functions operate independently from business segments supported by an organizational structure that provides independent oversight and objective challenge. Governance, risk, and oversight function heads, including the Chief Risk Officer (CRO), have unfettered access to respective Board Committees to raise risk, compliance,

and other issues. Lastly, awareness and communication of TD's RAS [Risk Appetite Statement] and the ERF [Enterprise Risk Framework] take place across the organization through enterprise risk communication programs, employee orientation and training, and participation in internal risk management conferences. These activities further strengthen TD's risk culture by increasing the knowledge and understanding of the Bank's expectations for risk taking.

157. The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy, exposed TD to significant loss events, risked harming the TD brand, were risks that were not managed, and could not possibly be characterized as right, legal, or fair. Moreover, even when the misconduct was reported, management including Branch and District Managers, Customer Service, Human Resources, and TD corporate headquarters did nothing meaningful to halt it and indeed continued the various sales goals, promotions, and blitzes that encouraged the misconduct in the first place. Moreover, despite fair warning and significant red flags arising from the highly publicized misconduct at other financial institutions like Wells Fargo, the CW statements illustrate an utter lack of sufficient internal controls and no meaningful enforcement from the Individual Defendants or the Senior Executive Team.

***Business Operations Fraud***

158.    On December 3, 2015, TD held an earnings call on which the Individual

Defendants participated.  During it, Defendant Masrani falsely and misleadingly touted "organic

growth strategies" at TD, in this exchange:

> Analyst:  … The nature of the question is this, when the senior executive team sits
> down to meet on various issues, does ROE and an ROE outlook, does that get any
> air time at all?
>
> Defendant Masrani:  … ***[I]t is also important to see what kind of operating
> ROEs we are generating out of our businesses, because that is very important to
> us as we know whether we are generating good returns on organic growth
> strategies, which is a key pillar for our success going forward*** and ***I feel quite
> comfortable that on an operating basis*** not only in many cases we are
> outperforming many of our competitors, but ***we are showing healthy levels on a
> consistent basis***. So I just wanted to make sure that that perspective is added as
> well.

159.    The foregoing misstatements were materially false and misleading because, as

demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's

widespread reliance on forced sales targets, incentivized conflicts of interest, employee

compensation and perks tied to sales rather than service, highly pressurized work environments,

coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for

under-selling employees were illegal, were violative of the TD's own Code of Conduct and

Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's

articulated risk appetite, and risked severe financial, reputational, branding, and customer base

harm for TD.  As described by the CWs, the actions taken, pervasively throughout all levels of

TD employees across the entire footprint of the Canadian Retail segment, did not fit any

legitimate business strategy and could not possibly support the notion of successful organic

growth strategies, growth within a risk appetite, consistency or healthy business performance.  It

was also materially false and misleading to reference positive metrics like higher volumes, rising

fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

160. On February 25, 2016, TD held an earnings call on which the Individual Defendants participated. During it, in prepared remarks, Defendant Masrani falsely and misleadingly touted "higher volumes" and "rising fee income" from TD's Canadian retail banking and wealth businesses, without discussing the reasons for the increases in volume or fee income, by stating:

> Turning to our businesses; Canadian Retail net income rose to CAD 1.5 billion this quarter, up 4% from a year ago. ***Our banking and wealth franchises performed well, benefiting from higher volumes, rising fee income, and tightly-managed expenses***. Personal banking delivered record growth in mortgage originations and checking account balances. Our wealth business grew net assets by more than CAD 10 billion despite volatile equity markets.

161. The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base

harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

162. At the National Bank Financial Canadian Financial Services Conference on March 31, 2016, materially false and misleading misstatements and omissions were made, when TD's Chief Risk Officer called any concerns over "consumer debt" "in[ ] the range of risks that we manage," while failing to list the widespread misconduct alleged herein as among the significant risks, even when asked, point-blank, to list such risks, and instead referencing the potential compromise of personal data because the "relationship with customers is based on trust and they have to have faith in their organization," lest TD face "a very significant impact on our brand, and our overall business," in this exchange:

> Analyst: Mark, we have most of the Chief Risk Officers here – so folks that are more concerned about the downside as much as, or perhaps more than, the upside. So, with that in mind, what keeps you up at night?

> Defendant Chauvin: I'll certainly tell you what does. ***I don't want to underestimate the concern we have over*** oil and gas or that we think about the

housing industry in Canada or **consumer debt**, **but these, to me, fall into the range of the risks that we manage**. So, those are not the areas that will keep me up at night. **What keeps me up at night, our greatest concerns, are things that we can't control as well** – significant tail risk-type events.

But if you want to look at the top thing within the enterprise today, it would really be the cyber threat because it's something that – first of all, we can – we've invested a lot over the years to strengthen our perimeter, to deal with disruption of service attacks. But the reality is this game is constantly increasing, and we have to constantly be ahead of it.

And if, God forbid, something went wrong, **if you had a loss of customer data that for someone trying to monetize that data, or if simply, someone disrupted your systems so that you didn't have availability for an extended period of time**, **those are far greater risks to me** as an organization than credit losses. **Because what they get to is our relationship with customers is based on trust and they have to have faith in their organization**. **And then anything that would question that could have a very significant impact on our brand, and our overall business. So, that's the greatest thing we worry about**. We're satisfied that from an IT, technology perspective, that we're doing everything possible to do it and keep – this is the one area that all of the financial institutions in Canada and the telcos and the other areas will work together because we all have a common goal here.

The area that I think is important though from our perspective is that we have to get it engrained in our culture the risk of a cyber threat. And so what that means is that, we have to have all of our employees – because that's ultimately someone just opening something they shouldn't have or maybe being loose with access. We have to get it embedded in our culture, the importance of it, no different than AML requirements and credit. So our focus is very much on training, training and training, to ensure that our workforce understands the importance of it. And will treat it no differently, it will just be engrained in what they do, is that this is a constant thing that we have to be on the watch for and to be careful of.

163.     The foregoing misstatements were materially false and misleading because, as

demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's

widespread reliance on forced sales targets, incentivized conflicts of interest, employee

compensation and perks tied to sales rather than service, highly pressurized work environments,

coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for

under-selling employees were illegal, were violative of the TD's own Code of Conduct and

Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

164.    On May 26, 2016, TD held an earnings call on which the Individual Defendants participated. During it, materially false and misleading misstatements and omissions were made regarding the growth prospects that could legitimately be derived from existing customers. Specifically, Defendant Currie falsely and misleadingly touted TD's efforts to expand business from its existing customer base, in this exchange:

> Analyst: Quickly over in domestic retail, the earnings growth has not been strong this year, certainly not this quarter, and I am focusing specifically on retail banking. There are some pretty good explanations for why, not the least of which is the higher taxes associated with mortgage insurance. The question is, once we look beyond this year and the obvious headwinds, does this strike you as a kind of business that can go back to growing at 5% or 4%, like inflation plus type growth or is that type of growth environment behind us now that the Canadian consumers over-leverage; what's your thinking there?

Defendant Currie: So, we remain committed to the medium-term guidance that we gave you in our Investor Day. And I'd say **for Personal Banking in particular, we have a number of opportunities** that we outlined in Investor Day **where we are under share with our primary customer base that we are working hard to leverage, so unsecured lending where we're growing disproportionately within our risk appetite, business credit card**, which we outlined again at the Investor Day **and mutual fund would be some examples** of that. So, we feel quite confidence that the business over the medium term would still be able to meet the kind of goals that we talked about before.

Analyst: These goals, just to refresh memory, were 5% plus?

Defendant Currie: Yes

165. The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed

risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

166. On August 25, 2016, TD held an earnings call on which the Individual Defendants participated. During it, materially false and misleading misstatements and omissions were made regarding the potential to legitimately engage customers in expanded business offerings. Specifically:

(a) During the question-and-answer portion of the call, Defendant Currie misrepresented the relationship between TD and its customers, in this exchange:

Analyst: Revenue growth in the Canadian P&C business is a little bit under 2% year-over-year, below average. And I'm wondering how you view that. How much of that is a frustration? How much of that is just a reflection of your concern about the market specifically? There's been a lot of talk obviously about the housing market and some problem areas there.

Defendant Currie: … Just in terms of revenue growth and sort of outlook, we're committed to the growth opportunities that we talked about in the fall in the Investor Day. We expect good volume growth across our businesses, good claims management, good wealth client acquisition. **We're continuing to see record primary checking customer acquisition, which continues to give us great opportunity to continue to deepen relationships with those customers** like we talked about in the fall Investor Day. We have opportunities where we're under sharing unsecured lending business, credit card, mutual funds and we're continuing to make good progress in all of those. …

(b) Defendant Currie did so again, during this exchange:

Analyst: … I was just wondering, do you view this as a disappointing quarter for the last few quarters? The growth has been on the soft side. Or do you think this is more of a transition period and we'll have better results out of the Canadian Retail business in the next year or so?

Defendant Currie: …I'd say our results were as advertised this quarter and I think that as I said before and as we talked about in the fall, **we've got some really strong levers of growth in terms of deepening relationships with our existing**

***customers that I do believe will pay off as we move forward***. And we continue to remain committed to the medium-term objectives that we talked about.

Analyst:  That was like 5% to 10% growth?  Or 7% I think?

Defendant Currie:  7% at the Canadian Retail level.

167.    The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD.  As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance.  It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks.   It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein.  It was simply false to state that TD avoids actions that are not the right thing to do.

168.    At the Scotiabank Financials Summit on September 7, 2016, materially false and misleading misstatements and omissions were made regarding TD's refusal to engage in activities that are not the "right thing" for its customers and its not being "fixated" on quarterly numbers, as follows.

(a)    Defendant Masrani falsely and misleadingly stated that if TD thinks an activity is not the "right thing" to do for its customers, it "won't do such an activity," in this exchange:

Analyst:    Sitting here in, what looks like it's going to be another record year of earnings for the sector, although it did necessarily feel like that at the beginning of the year. Once again, we've seen a pretty good level of resilience from not only TD, but your peers as well. So the way I've kind of phrased this is the crisis was officially a number of years ago, but subsequently it feels like we spent a lot of time thinking about what can go wrong. And maybe as a result of that, we've underappreciated or underestimated certain parts of the business, particularly in Canada and especially with TD.  But I'd be interested in hearing, maybe, what some of those factors are that you think have underpinned that resilience for the Group, and for your Bank in particular.

Defendant Masrani:  I think, firstly, on a macro basis for the industry, I mean, we have a market where most of the players have good scales, some have better scale than others, but for the most part there is good scale for the players in the market. We have regulatory system that is principles-based and works over the long haul. And frankly we have a culture, generally, in the country that understands probably risk more so than we might have seen in other parts of the world. And that has played an important role for banks generally in Canada.

I'd say TD, for us in particular, staying with the culture theme, we've found that to be a powerful force within the Bank. We look at our history, even prior to the crisis, we were one of the few banks that decided to get out of structured products and that turned out to be a good decision. Although at the time it wasn't as popular. But we were one of the few banks that did not partake in asset-backed commercial paper and this is all to do with the Bank's culture, because I think – this probably applies to all the banks, but **with TD I can talk more confidently – that as a bank we take our role very seriously in a sense that although it may be the fashionable thing to do, or it may be allowed under a particular regulation, that doesn't mean is the right thing to do for the Bank or for our customers. And if that's what we think, then we won't do such an activity**. So I think that plays an important role.

Our business mix is important. You know that, you write about it. As to what exposures we have, and what industries – I think that plays an important role of

risk management. It has been a key differentiator for TD over many years. I think that plays an important role.

And lastly and most importantly are our 80,000 TD bankers around the world. We run a large, complex bank and ***it's important that culturally, from a values perspective, that every one of those bankers is doing the right thing for the Bank and our customers***. ***And that has played well because you see the headlines from the rest of the world that sometimes those basic things get missed and they can cost a lot to the shareholders***. So, a lot of good reasons why Canadian banks have done pretty well and ***TD has done particularly well – because of those characteristics***.

(b)      Defendant Masrani also falsely and misleadingly said that TD was not "fixated"

on quarterly figures, in this exchange:

Analyst:      So your ability to generate ongoing efficiency improvements, or positive operating leverage, however you want to measure it, is not dependent on the benefits of restructuring charges.

Defendant Masrani:   We always strive to generate positive operating leverage. And again, I was glad that we did. ***Some of our segments delivered more so than others***. And that's a great story for the Bank. ***But we're not as fixated that you know every 90 days. This is going to be the number***. If the right investment opportunities were to present themselves, then as our shareholders you would expect us to look at those seriously, and where appropriate, make those investments.

169.     The foregoing misstatements were materially false and misleading because, as

demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's

widespread reliance on forced sales targets, incentivized conflicts of interest, employee

compensation and perks tied to sales rather than service, highly pressurized work environments,

coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for

under-selling employees were illegal, were violative of the TD's own Code of Conduct and

Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's

articulated risk appetite, and risked severe financial, reputational, branding, and customer base

harm for TD.  As described by the CWs, the actions taken, pervasively throughout all levels of

TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

170. At the TD Group CIBC Eastern Institutional Investor Conference on September 21, 2016, materially false and misleading misstatements and omissions were made regarding TD's purportedly "very deliberate" "organic model" of growing its wealth management business as "the most attractive place for [a financial] advisor to build a practice" by offering clients "more choice" within the "intimacy of that client-advisor relationship," leading to "significant growth" potential from the "cross sell opportunity," as follows.

(a) Defendant Salom falsely and misleadingly attributed the "double-digit earnings growth" and the "industry leading return on equity of 50%" experienced in TD's wealth management division to a "very deliberate" "organic model," in this exchange:

> Analyst: I'm going to start with a bit of a general question for you, and it's really kind of relates around how the business is working from a Canadian PNC banking, cross-selling, getting the asset flows? It strikes to me that the strength of that TDCT vacuum cleaner is a big part of the story. How well is it working?

Defendant Salom: It is the source of much of the growth that we enjoy in the Wealth business. So just to give the group a bit of a background, when we talk about the Canadian Wealth business, we are talking about serving two million clients with about CAD 600 billion in assets, around three core lines of businesses. But ***one of the big catalysts and what's allowed us to be able to deliver double-digit earnings growth and generate a industry leading return on equity of 50% is this organic model***. The relationship between the retail, commercial, and our Wealth businesses is at the core of that model. On an annual basis in any one given year, we generate over CAD 20 billion of referrals out of the TDCT Network, and that's the unique competitive advantage. Having worked at two other organizations, I have never experienced a model that's quite as effective as the one we have within the group. And I still think – while I think it's been the source of growth in the past, I still believe there is tremendous opportunities there. The Bank serves 11 million clients, approximately 4 million of those would be mass affluent and high net worth in nature, and in the advice space, we only bank about 12% of those clients. So, ***being very deliberate about aligning distribution against that opportunity set, I think, is the real source of strength for us***. And ***I think it's the reason why we have a great deal of confidence that we can sustain a double-digit earnings worth profile in the Wealth business***.

(b) Defendant Salom also falsely and misleadingly touted both the "organic"

expansion of TD's financial planners and the "significant growth" potential from their "cross sell

opportunity," in this exchange:

Analyst: So, there are some historical reasons for that, which maybe you'd get into. But is there a structural reason for it as well or is there – is that really the opportunity set, is to get it to where everything else is?

Defendant Salom: I think it's the strategic choices that we made in the wealth space. So TD started as largely a discount brokerage arm. And we did not buy a broker dealer. So we didn't go out and buy one of the established broker dealers. So, ***our entire advice core business, which is our financial planners in the branches, our full service brokers, were really organically built***. Today, we have over 2,000 advisors. But that means that ***over the last 10 years, we've been organically picking and building teams, and lining up that team with our core retail branch system***.

So, it's been slower in the build, but I think that now we've got the foundation in place to begin to be able to truly franchise clients. And there's still opportunities to grow that distribution network. One of the things that we made mentioned at the Retail Investor Day is that ***I'd love to be able to add another 500 advisors over the next three years to five years. I think we've got the capacity to be able to do that***. We're still slightly undersized to some of the existing competitors in

the marketplace. And ***given the opportunity set that I just referenced in terms of cross sell opportunity, I think this is going to be a source of significant growth for us***.

(c)     Defendant Salom falsely and misleadingly characterized TD's wealth management business as able to maintain "double-digit earnings growth," by highlighting "cross-sell opportunities" and "product gap opportunities" while omitting to disclose the improper and illegal methods that TD's financial planners were pressured into using to fulfill those opportunities, in this exchange:

Analyst:     It's interesting to hear you say that you still see it as a double-digit growth engine. Is that largely through, you think you have a larger market share opportunity in front of you or do you think the industry is still actually growing at those kind of rates?

Defendant Salom:     [Discussion of industry "headwinds"] … That said, the tailwinds, I still believe, more than compensate for that. And the tailwinds from our perspective is the fact that we still think that the fundamental demographics are strong. We still think we're underrepresented in terms of wealth offerings to the broader retail group. ***We still think that there is an opportunity for us to franchise across North America, some of the client cross-sell opportunities***. And then, finally, ***I think to the extent that we're able to execute against some of the product gap opportunities, you put all that together, we should be able to generate double-digit earnings growth***.

(d)     Defendant Salom also falsely and misleadingly touted TD's delivery of "fee-based" solutions as a way of "providing clients much more choice, in this exchange:

Analyst:     The fee-based account is another interesting development that it's becoming – I guess it's happening faster. And some banks in particular are being more proactive about it as an opportunity to gain share just by – faster than it needed to happen kind of thing.

Defendant Salom:     Sure. Right.

Analyst:     What do you think is driving that portion? And is there a plan to put them into the branches at some point? Is there a plan to become more active still on this fee-based? Because it sounds like the Series A mutual fund, the big 2% plus MER, is going away regardless of whether it gets regulated away or not.

73

Defendant Salom: That's right. That's right. And so just for some context, about 60% of all of our sales today in Wealth are in fee-based product. So we're trying to get out in front of what is a logical evolution. And if regulators do decide to ban embedded commissions, we want to be in a position such that the entire distribution engine already has the capability to deliver fee-based solutions across all. I do think it will include the branches. Today, our financial planning arm sells fee-based solutions in the branches. And I could see us extending that beyond just the financial planning arm to include most of our mutual fund suite as well. So, I think those are things that we're exploring now. I would say that it also – while we're looking at it as a potential source of margin compression, *it's also a tremendous opportunity for us to innovate the offering, and be able to provide much more product solutions in fee-based type form into some of those emerging channels*. So *I think we're going to be working on ways of* not only meeting a regulatory standard, but also *providing clients much more choice as we roll out some of these fee-based solution*s.

(e)    Defendant Salom also falsely and misleadingly touted the "intimacy" of the

"client-advisor relationship" and the "good environment" for financial advisors to work at TD, in

this exchange regarding the retention of financial advisor personnel:

Analyst: Are you able to keep your most productive salespeople in wealth? And a related question is, is it important to your customers that it's fundamentally people serving them, or not?

Defendant Salom: Without question. In fact, retaining your best advisors, whether that be in the mass affluent space, in the high net worth space is job one, because *much of our solutions in the advice businesses are dependent on that, on the intimacy of that client-advisor relationship*. So *making TD the most attractive place for that advisor to build a practice*, and giving them the tools to be able to scale that practice so that they view that there is no plateauing based on either administration or challenges, *that is fundamental in terms of being able to manage a brokerage business*. And we've been fortunate, we've had very low turnover.

We've been a little bit more acquisitive in terms of trying to bring new teams to be able to round out our high net worth offerings in select markets. But thus far, *I think the combination of the organic model with retail, the technology driven support structure that we're trying to drive in the Wealth business, and I think the culture within TD broadly, has allowed us to be able to create a good environment*. It's a different environment than your classic full-service brokerage business, it's a much more integrated wealth management model. But it's one that has served us well thus far.

74

171. The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

172. On December 1, 2016, TD held an earnings call on which the Individual Defendants participated. During it, materially false and misleading misstatements and omissions were made regarding the basis for TD's investments to enhance customer and employee

experiences. Specifically, in prepared remarks, Defendant Masrani misrepresented TD's investments to "improve the customer and employee experience" by stating:

> Canadian retail earnings increased 1% this fiscal year and personal and commercial bank net income rose 2%. ***We continue to grow revenue*** and manage expenses in a slow growth economy, ***while making investments to*** optimize our branch network and ***improve the customer and employee experience***.

He added, "I've been sharing examples this year of how we're investing and innovating in the digital space. ***By putting the customer front and center, we've been able to drive engagement to new levels***, particularly in mobile."

173. The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed

risks.  It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein.  It was simply false to state that TD avoids actions that are not the right thing to do.

174.  On March 2, 2017, TD held an earnings call on which the Individual Defendants participated.  During it, materially false and misleading misstatements and omissions were made regarding the basis for TD's revenue growth, the reasons for its expenses, and the level of customer satisfaction, as follows.

(a)  Revenue growth was falsely and misleadingly attributed to positive "organic growth" trends:

> Analyst:  [W]ithin Canadian Banking, I think this was the first quarter in a while that your year-over-year revenue growth was over 5% and you've had pretty good accelerating revenue growth there.  Can you just talk a little bit more on the revenue dynamics across, not just on margins?
>
> Defendant Currie:  For sure. So thanks for noticing that. I would say, obviously for Canadian Retail, Wealth performed particularly well, with strong growth there. Business lending and personal lending performed well and unsecured personal lending has been a strategic growth focus for us. Great core deposit growth, business lending at double digits, personal deposit growth, again record checking volumes in Q1. So a lot of things working in our favor. And then again, **we've got the embedded growth in the franchise that's helping us**. So I'd say **we had good organic growth across many of our businesses, including cards**.
>
> Analyst:  And so within that Canadian personal and commercial banking piece, your non-interest income was up pretty smartly. Is that repeatable, do you think?
>
> Defendant Currie:  **Certainly the biggest factor was our broad-based organic growth**.  And so I would say the caveat I would probably put on it is we had such good deposit growth, I would expect that to moderate somewhat. Otherwise, I'd say yes.

(b)  Expenses were falsely and misleadingly attributed to costs of front-line personnel to purportedly fulfill customer needs:

Analyst:  … [A]s you talk about expenses, growth abating or expenses coming down, as some of that initiative spending gets pulled back, how should I see these lines evolving over the course of the year?

Defendant Currie:  So *for our Canadian Retail businesses*, again, *a big part of the number was front line advisors and customer support to ensure that as we grew our business, we could continue to grow our capabilities to meet our customers' needs*. And the other thing that you would have seen would be increased costs along with investing in our businesses. That obviously requires more people to deliver those investments in those projects.

(c)  The satisfaction level of TD's customers was also misrepresented:

Analyst:  [I]t was alluded to earlier that you had good revenue growth in Canadian Banking this quarter. There's been some acceleration there. Has it been -- maybe we underestimate that from where we sit or where I sit anyway, but as you're pushing through these transformations and cultural changes, really when you're digitizing, I guess that's going to have an effect on the culture, there's a lag between or maybe a negative impact on your revenues short term, like we saw last year, maybe 2015, as well and you're starting to turn the corner on that as the new, as the plan advances, I guess. Is there some validity to that?

Defendant Currie:  For sure I would reinforce the midterm guidance that we've given on Canadian Retail around mid-single digits. That's still what we would be projecting. But I would I say, I think when we think about how we're delivering our strategy, it's definitely a multi-channel strategy. And while our customers are taking up our new capabilities, *it's equally true that most of our customers deal with us across multiple channels*. *And when they do that, they actually have more business with us and they're more satisfied*. …

175.  The foregoing misstatements were materially false and misleading because, as demonstrated at length by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base

harm for TD. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. It was simply false to state that TD avoids actions that are not the right thing to do.

### ***Reported Results Fraud***

176. TD made a series of filings and public statements reporting revenues, net income, and earnings without disclosing that they were being generated through improper and illegal practices. These statements also touted TD's customer statistics as a primary contributor to these results, without disclosing that the TD employees were improperly and illegally coercing customers into fee-generating products and services, or putting them into such products and services without their knowledge or consent. These misstatements violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2). The "Reported Results Fraud" included the following misstatements.

177. TD announced its Q4 and full-year 2015 financial results in a series of filings made on December 3, 2015, including the following:

(a)      On December 3, 2015, TD issued an Earnings Release (the "12/3/2015 Earnings Release"), which was filed with the SEC as an exhibit to a Form 6-K (the "12/3/2015 Shareholder Report 6-K"), announcing its financial and operating results for the three and twelve months ended October 31, 2015.  In them, TD reported Q4 2016 net income of $1,839 million and diluted earnings per share ("EPS") of $0.96, on revenue of $8,047 million.  Contributing to these results was the performance of TD's Canadian Retail segment, which reported net income of $1,496 million, which was an increase of 15% over 2014, attributed "primarily due to good loan and deposit volume growth, wealth asset growth, strong credit performance, higher insurance earnings, and good expense management."  Full year results included $8,024 million in net income, $4.22 earnings per share, and revenue of $31,426 million.  Defendant Masrani was quoted as saying, "We are very pleased to finish the year with strong total adjusted earnings of $8.8 billion, an increase of 8% over last year.  Results for the year reflect good earnings performance from all businesses, driven by good organic growth, strong credit quality, favourable currency translation and positive operating leverage."  He added, "Our 2015 results truly demonstrate the strength and resilience of TD's earning power.  This year we took decisive steps to optimize our operations and adapt to a slower growth environment, enabling us to reinvest in our businesses, and positioning us well for growth.  We will continue to grow, take market share and relentlessly focus on delivering legendary customer experiences across all of our business channels.  I would like to thank our incredible employees for their continuing outstanding dedication and contributions to building the even Better Bank."

(b)      The same day, TD filed a Form 6-K (the "12/3/2015 Certificates 6-K") appending certifications executed by Defendants Masrani and Johnston indicating that they reviewed the interim reported results and that "[b]ased on my knowledge, having exercised reasonable

diligence," "the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings" and "the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer." The certifications further state that Defendants Masrani and Johnston were responsible for establishing and maintaining the disclosure controls and procedures and internal control over financial reporting and that they designed those controls or caused them to be designed to provide reasonable assurance, *inter alia*, that material information relating to the issuer was made known to them by others and that information required to be disclosed in its annual and interim filings is recorded, processed, summarized and reported within the time periods specified by law.

(c)     Also on December 3, 2015, TD filed its 2015 40-F, which was accompanied by SOX certifications executed by Defendants Masrani and Johnston. The 2015 40-F reported the same financial and operating results as were reported in the 12/3/2015 Earnings Release. It said that the Canadian Retail net income for 2015 of $5,938 million was an increase of 13% compared to 2014. In addition, its MD&A section stated, "Canadian Retail earnings have been strong with good loan and deposit volume growth, higher fee-based revenue driven by wealth asset growth, and higher insurance earnings." Under the heading "Quarterly Trend Analysis," the MD&A section stated, "The Bank has had solid underlying adjusted earnings growth over the past eight quarters. Canadian Retail earnings have been strong with good loan and deposit volume growth, higher fee-based revenue driven by wealth asset growth, and higher insurance earnings." A discussion of the Canadian Retail segment touted its "record adjusted earnings of

$5,938 million," driven, *inter alia*, by strong loan volume growth of 9% and by checking and savings deposit volume growth due to a focus on acquiring and retaining core customer accounts, as TD "[c]ontinued to focus on customer service and convenience."  It also described the "Overall Business Strategy" for the Canadian Retail segment as, *inter alia*, "Consistently deliver a legendary customer experience in everything we do," "Be recognized as an extraordinary place to work," and "Make the customer and employee experience simple, fast, and easy in order to drive efficiency."

178.    TD announced its Q1 2016 financial results in a series of filings made on February 25, 2016, including the following:

(a)    On February 25, 2016, TD issued a Report to Shareholders (the "2/25/2016 Shareholder Report"), which was filed with the SEC as an exhibit to a Form 6-K (the "2/25/2016 Shareholder Report 6-K"), announcing its financial and operating results for the three months ended January 31, 2016.  In them, TD reported net income of $2.223 million and diluted earnings per share ("EPS") of $1.17, on revenue of $8,610 million.  Contributing to these results was the performance of TD's Canadian Retail segment, which reported net income of $1,513 million, which was an increase of 4% compared with Q1 2015 and was attributed to "loan and deposit volume growth, higher fee-based revenue, and wealth asset growth."  Defendant Masrani was quoted as saying, "We are pleased to report adjusted earnings of $2.2 billion, up 6% from the first quarter last year.  Our performance reflects organic growth, favourable margins, higher provision for credit losses, and a higher effective tax rate."  He added, "Our first quarter results demonstrate the ability of our diversified business model to perform in a challenging environment…. [W]e remain focused on driving organic growth, improving our productivity,

adapting and innovating with new initiatives and investments, and helping our customers achieve their goals."

(b)     The same day, TD filed a Form 6-K (the "2/25/2016 Certificates 6-K") appending certifications executed by Defendants Masrani and Ahmed indicating that they reviewed the interim reported results and that "[b]ased on my knowledge, having exercised reasonable diligence," "the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings" and "the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer."   The certifications further state that Defendants Masrani and Ahmed were responsible for establishing and maintaining the disclosure controls and procedures and internal control over financial reporting and that they designed those controls or caused them to be designed to provide reasonable assurance, *inter alia*, that material information relating to the issuer was made known to them by others and that information required to be disclosed in its annual and interim filings is recorded, processed, summarized and reported within the time periods specified by law.

179.    TD announced its Q2 2016 financial results in a series of filings made on May 26, 2016, including the following:

(a)     On May 26, 2016, TD issued a Report to Shareholders (the "5/26/2016 Shareholder Report"), which was filed with the SEC as an exhibit to a Form 6-K (the "5/26/2016 Shareholder Report 6-K"), announcing its financial and operating results for the three and six months ended April 30, 2016.  In them, TD reported net income of $2,052 million and diluted

earnings per share ("EPS") of $1.07, on revenue of $8,259 million. Contributing to these results was the performance of TD's Canadian Retail segment, which reported net income of $1.5 billion, which was an increase of 2% over Q2 2015, attributed to "the result of loan, deposit, and wealth asset growth, and lower insurance claims." Defendant Masrani was quoted as saying, "We are pleased to report adjusted earnings of $2.3 billion, up 5% from the second quarter last year. Our performance this quarter demonstrates our diversified business strategy and ability to generate strong organic growth." He added, "We continue to innovate and adapt to meet our customer's evolving needs…. [W]e remain focused on providing our customers and clients with seamless, legendary experiences across all of our business channels."

(b)     The same day, TD filed a Form 6-K (the "5/26/2016 Certificates 6-K") appending certifications executed by Defendants Masrani and Ahmed indicating that they reviewed the interim reported results and that "[b]ased on my knowledge, having exercised reasonable diligence," "the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings" and "the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer." The certifications further state that Defendants Masrani and Ahmed were responsible for establishing and maintaining the disclosure controls and procedures and internal control over financial reporting and that they designed those controls or caused them to be designed to provide reasonable assurance, *inter alia*, that material information relating to the issuer was made known to them by others and that information

required to be disclosed in its annual and interim filings is recorded, processed, summarized and reported within the time periods specified by law.

180.    TD announced its Q3 2016 financial results in a series of filings made on August 25, 2016, including the following:

(a)    On August 25, 2016, TD issued a Report to Shareholders (the "8/25/2016 Shareholder Report"), which was filed with the SEC as an exhibit to a Form 6-K (the "8/25/2016 Shareholder Report 6-K"), announcing its financial and operating results for the three and nine months ended July 31, 2016.  In them, TD reported net income of $2,358 million and diluted earnings per share ("EPS") of $1.24, on revenue of $8,701 million.  Contributing to these results was the performance of TD's Canadian Retail segment, which reported net income of $1.5 billion, which was represented growth of 3% compared with the third quarter of 2015. Defendant Masrani was quoted as saying, "TD's results demonstrate the strength of our diversified business model, with adjusted earnings of $2.4 billion, up 6% from the third quarter last year.  Our performance reflects both organic growth and a focus on expense management." He added, "We remain focused on going above and beyond for our customers by providing legendary service and convenience while investing for the future to meet their evolving needs."

(b)    The same day, TD filed a Form 6-K (the "8/25/2016 Certificates 6-K") appending certifications executed by Defendants Masrani and Ahmed indicating that they reviewed the interim reported results and that "[b]ased on my knowledge, having exercised reasonable diligence," "the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings" and "the interim financial report together with the other financial information

included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer." The certifications further state that Defendants Masrani and Ahmed were responsible for establishing and maintaining the disclosure controls and procedures and internal control over financial reporting and that they designed those controls or caused them to be designed to provide reasonable assurance, *inter alia*, that material information relating to the issuer was made known to them by others and that information required to be disclosed in its annual and interim filings is recorded, processed, summarized and reported within the time periods specified by law.

181. TD announced its Q4 and full-year 2016 financial results in a series of filings made on December 1, 2016, including the following:

(a) On December 1, 2016, TD issued an Earnings News Release (the "12/1/2016 Earnings Release"), which was filed with the SEC as an exhibit to a Form 6-K (the "12/1/2016 Earnings Release 6-K"), announcing its financial and operating results for the three and twelve months ended October 31, 2016. In them, TD reported Q4 2016 net income of $2,303 million and diluted earnings per share ("EPS") of $1.20, on revenue of $8,745 million. Contributing to these results was the performance of TD's Canadian Retail segment, which reported net income of $1,502 million, which reflected 3% growth. Full year results included $8,936 million in net income, $4.67 earnings per share, and revenue of $34,315 million. Defendant Masrani was quoted as saying, "Our results this year demonstrate the strength of our diverse business mix, organic growth strategy and the investments we've made to become a more productive and customer-focused organization."

(b) The same day, TD filed a Form 6-K (the "12/1/2016 Certificates 6-K") appending certifications executed by Defendants Masrani and Ahmed indicating that they reviewed the

interim reported results and that "[b]ased on my knowledge, having exercised reasonable diligence," "the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings" and "the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer." The certifications state that Defendants Masrani and Ahmed were responsible for establishing and maintaining the disclosure controls and procedures and internal control over financial reporting and that they designed those controls or caused them to be designed to provide reasonable assurance, *inter alia*, that material information relating to the issuer was made known to them by others and that information required to be disclosed in its annual and interim filings is recorded, processed, summarized and reported within the time periods specified by law.

(c)     Also on December 1, 2016, TD filed its 2016 40-F, which was accompanied by SOX certifications executed by Defendants Masrani and Ahmed. The 2016 40-F reported the same financial and operating results as were reported in the 12/1/2016 Earnings Release. In addition, its MD&A section stated, "Canadian Retail revenue increased due to loan and deposit volume growth, wealth asset growth, higher fee-based revenue in personal and commercial banking, and changes in the fair value of investments supporting claims liabilities…." Under the heading "Quarterly Trend Analysis," the MD&A section stated, "The Bank has had steadily increasing underlying earnings over the past eight quarters reflecting a consistent strategy, organic growth, expense discipline and investments to support future growth. Canadian Retail earnings reflect loan and deposit growth, higher fee based revenue in personal and business

banking, wealth asset growth, and lower claims, with moderate expense growth." A discussion of the Canadian Retail segment touted its "record reported earnings of $5,988 million," driven, *inter alia*, by personal checking and savings volume growth of 9.5% and record net asset acquisition and record assets under administration by the private wealth investment advice group, as TD "[c]ontinued to focus on customer service and convenience." It also described the "Overall Business Strategy" for the Canadian Retail segment as, *inter alia*, "Consistently deliver legendary customer experiences and provide trusted advice to help our customers achieve their goals and aspirations," "Be recognized as an extraordinary place to work by…helping all our colleagues achieve their full potential," and "Deliver organic growth by deepening relationships and focusing on underrepresented products and markets."

182. TD announced its Q1 2017 financial results in a series of filings made on March 2, 2017, including the following:

(a) On March 2, 2017, TD issued a Report to Shareholders (the "3/2/2017 Shareholder Report"), which was filed with the SEC as an exhibit to a Form 6-K (the "3/2/2017 Shareholder Report 6-K"), announcing its financial and operating results for the three months ended January 31, 2017. In them, TD reported net income of $2,533 million and diluted earnings per share ("EPS") of $1.32, on revenue of $9,120 million. Contributing to these results was the performance of TD's Canadian Retail segment, which reported net income of $1,566 million, which was "an increase of 4% compared with the same quarter last year, reflecting volume growth, improved margins, and higher wealth revenue." Defendant Masrani was quoted as saying, "Our focus on organic growth, combined with favourable market conditions this quarter led to strong results in our retail and wholesale business segments on both sides of the border."

He added, "We experienced good revenue growth this quarter and made investments in technology and front-line employees to strengthen relationships with our customers and clients."

(b)     The same day, TD filed a Form 6-K (the "3/2/2017 Certificates 6-K") appending certifications executed by Defendants Masrani and Ahmed indicating that they reviewed the interim reported results and that "[b]ased on my knowledge, having exercised reasonable diligence," "the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings" and "the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer." The certifications further state that Defendants Masrani and Ahmed were responsible for establishing and maintaining the disclosure controls and procedures and internal control over financial reporting and that they designed those controls or caused them to be designed to provide reasonable assurance, *inter alia*, that material information relating to the issuer was made known to them by others and that information required to be disclosed in its annual and interim filings is recorded, processed, summarized and reported within the time periods specified by law.

183.    The foregoing statements in ¶¶176-182 were materially false and misleading because they reported financial metrics and results like revenues, net income, and earnings per share figures for TD without disclosing that these results were generated through improper and illegal activities that, as detailed by the CW statements set forth in ¶¶50-148 and ¶¶185-186 herein, arose from TD's widespread reliance on forced sales targets, incentivized conflicts of interest, employee compensation and perks tied to sales rather than service, highly pressurized

work environments, coercive public shaming and reprimands, and implicit threats of job loss if not outright firings for under-selling employees that were illegal, were violative of the TD's own Code of Conduct and Ethics for Employees and Directors, violated TD's express Risk Culture, exceeded TD's articulated risk appetite, and risked severe financial, reputational, branding, and customer base harm for TD. They also described positive aspects of the Canadian Retail segment, without disclosing that its performance was materially driven by this misconduct. As described by the CWs, the actions taken, pervasively throughout all levels of TD employees across the entire footprint of the Canadian Retail segment, did not fit any legitimate business strategy and could not possibly support the notion of successful organic growth strategies, growth within a risk appetite, consistency or healthy business performance. It was also materially false and misleading to reference positive metrics like higher volumes, rising fee income, and cross-selling opportunities or to discuss potentially significant concerns like compromised consumer data while omitting disclosure of the rampant misconduct described by the CWs herein, which both inflated the positive metrics and surpassed in severity the disclosed risks. It was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein. As such, these misstatements and omissions violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

## The Truth Begins To Emerge

184. The truth about Defendants' fraud was revealed in March 2017.

185. On March 6, 2017, a CBC News report, based on statements from two unidentified TD managers and one teller, indicated that these employees felt pressured to upsell customers in order to reach internal sales revenue targets. However, the same report contained TD's denials of these allegations alongside references to its 14% year-over-year increase in

earnings. Specifically, TD spokesperson Daria Hill stated, *inter alia*, that metrics and goals were good business strategy but "we will only achieve our goals by doing the right thing for our customer," that "[o]ur expectations are that our employees should never sell a customer a product that doesn't fill a need," and that customers had stated their desire for TD employees "to know them, understand their needs, give them proactive advice and ask them about how we can best meet their financial needs." These denials stifled the corrective effect of the CBC News report and perpetuated inflation in TD's stock price.

186. On March 10, 2017, a second CBC News report, based on statements by "hundreds" of current and former TD employees – including Tellers and Financial Advisors – who contacted CBC News after seeing the March 6, 2017 report, as well as statements by affected customers and consumer advocacy groups, revealed Defendants' fraud. These hundreds of TD employees described a "poisoned," "stress inducing," and "insane" workplace with "zero focus on ethics." Many TD workers told CBC News that they had taken medical leave, suffering from anxiety and/or depression due to constant pressure to upsell customers. Others said that escalating concerns to management led to threats regarding job security. Specific statements featured by CBC News included the following:

(a)     One TD Teller who worked for several years at a TD branch in Windsor, Ontario, said, "I've increased people's lines of credit by a couple thousand dollars, just to get SR [sales revenue] points," while admitting that he did not tell the customers of that chance, which is a violation of the Canadian federal Bank Act.

(b)     A Teller with over 20 years of experience at a TD branch in Ontario said that she has increased customers' overdraft protection amounts and their TD Visa card borrowing limits – without informing the customers – so as to earn points toward her sales revenue target.

(c)     A TD Teller on sick leave due to the effects of upselling pressures described how a manager stood behind her three times per day to push her to sell customers more products and services.  She stated, "They just really stress you out and say, 'You're not doing good.  I need you to do double the amount you've been doing.'  I couldn't sleep.  I'd be thinking… 'What can I do tomorrow to try and get sales?'"  She admitted that she upgraded customers to higher-fee checking accounts, without telling them, "[b]ecause that gives us sales revenue.  And the customers don't have to sign for it."

(d)     A TD Teller was asked to comment on an internal letter sent to employees that characterized the March 6, 2017 CBC News report as an opportunity "to pause, reflect and ask ourselves how we can do better for our people and our customers."  The Teller balked, saying, "Maybe if they stood back for a moment and thought about how they have put so much pressure on employees (with ridiculous sales goals) they wouldn't be in this situation right now!"

(e)     A TD financial advisor in Ontario admitted acting in her own interest rather than that of clients after she failed to meet her sales targets and was put onto a Performance Improvement Plan, a program that involves coaching and that could result in her termination.  She admitted, "I have invested clients' savings into funds which were not suitable, because of the SR [sales revenue] pressure.  That's very difficult to admit.  I didn't do this lightly."  She added, "We do it because our jobs are at stake."

(f)     A former TD financial advisor in Calgary said that he would downplay to customers the risk of products that would serve to give him a big boost toward his quarterly sales revenue goal.  He said, "I was forced to lie to customers, just to meet the sales revenue targets."  He added, "I was always asked by my managers to attach unnecessary products or services to the original sale just to increase the sales points – and not care if the customer can afford it or not."

(g)     Another former TD financial advisor, who worked for six years in Nanaimo, British Columbia, before quitting, said, "[P]eople eventually snap, or lose all sense of themselves and do anything to close sales."  Revealing the retaliatory threat to whistleblowers, this financial advisor added, "I have had multiple conversations with branch and district managers.  These conversations led to my being asked if I was still the right fit for the job."

(h)     Bev Beaton, a TD customer, described having had an account with a $5,000 minimum monthly balance opened in her name, without her consent, which led to her being charged a $29.95 monthly fee for failure to maintain the required (but undisclosed) balance.

(i)     Wanda Morris, VP of advocacy for CARP, a national advocacy association for Canadians over the age of 50, expressed grave concerns that the high-pressure environment on TD employees to meet extreme sales goals put Canadian seniors at risk.

(j)     Duff Conacher, Democracy Watch founder, said that the scope of the wrongdoing, involving hundreds of TB Bank employees who contacted CBC News with concerns over the high-pressure sales environment, meant that the Canadian federal government needed to act by instituting rules and regulations and by stepping up oversight efforts by the Financial Consumer Agency of Canada and the ombudsman for banking services.

187.     Analysts immediately sounded the alarm bells.  For instance, analyst John Aiken at Barclays, who covers TD, likened the March 10, 2017 CBC News report to a "Wells Fargo moment," in reference to the widespread employee abuses, including bogus accounts created to hit sales targets and earn bonuses, which resulted in massive fines and a wave of lawsuits against Wells Fargo.  Mr. Aiken stated, "Concerns are arising with investors that the fallout could be similar to what happened to Wells Fargo."  His 12-month price target for TD's stock was lower than its trading price, and he gave it an "underweight" rating.

188.   On this news, TD's stock price fell $2.75, or 5.3%, on high volume, from its March 9, 2017 closing price of $51.77 to close at $49.02 on March 10, 2017.

189.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TD's securities, Plaintiffs and other Class members have suffered significant losses and damages.

190.   In March 2017, the Financial Consumer Agency of Canada ("FCAC") announced that it would review the business practices of Canada's major banks, including TD.  At the end of December 2017, an FCAC spokesperson stated that FCAC supervision staff had reviewed thousands of consumer complaints, interviewed over 500 bank directors and bank personnel, analyzed volumes of bank documents, and examined the potential impact of sales targets and incentive programs on consumers.  A report on the review is expected to be issued the first quarter of 2018.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

### Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter

191.   The 2015 40-F and the 2016 40-F describe and illustrate a clear risk management structure at TD, establishing a direct line of information from TD's business segments up to the Individual Defendants, who either knew or were reckless in not knowing the facts and circumstances alleged herein regarding the underlying improper and illegal misconduct.



192.    According to the  2015 40-F and the 2016 40-F:

TD's risk governance structure emphasizes and balances strong independent oversight with clear ownership for risk control within each business segment. Under the Bank's approach to risk governance, business segments are accountable for risks arising in their business and are responsible for identifying, assessing, and measuring the risks, as well as designing and implementing mitigating controls. Business segments also monitor and report on the ongoing effectiveness of their controls to safeguard TD from exceeding its risk appetite.

The Bank's risk governance model includes a senior management committee structure that is designed to support transparent risk reporting and discussions. TD's overall risk and control oversight is provided by the Board and its committees (primarily the Audit and Risk Committees). The CEO and SET [Senior Executive Team] determine TD's long-term direction within the Bank's risk appetite and apply it to the business segments. Risk Management, headed by the Group Head and CRO, sets enterprise risk strategy and policy and provides independent oversight to support a comprehensive and proactive risk management approach. The CRO, who is also a member of the SET, has unfettered access to the Risk Committee. The Bank also employs a "three lines of defence" model to describe the role of business segments (first line), governance, risk, and oversight functions, such as Risk Management and Legal and Regulatory Compliance functions (second line), and Internal Audit (third line) in managing risk across TD.

193.    The 2016 40-F describes the risk management role of the CEO and Senior Executive Team as follows: "The CEO, in consultation with the CRO determines TD's Executive Committees, which are chaired by SET members. The committees meet regularly to oversee governance, risk, and control activities and to review and monitor risk strategies and associated risk activities and practices.   The ERMC [Enterprise Risk Management Committee], chaired by the CEO, oversees the management of major enterprise governance, risk, and control activities and promotes an integrated and effective risk management culture."  It also described various Executive Committees "established to manage specific major risks based on the nature of the risk and related business activity."  They include the Operational Risk Oversight Committee (OROC), which was described as follows: "Chaired by the Group Head and CRO, the OROC oversees the identification, monitoring, and control of key risks within TD's operational risk profile."  They also include the Disclosure Committee, described as follows: "Chaired by the Group Head and Chief Financial Officer, the Disclosure Committee oversees that appropriate controls and procedures are in place and operating to permit timely, accurate, balanced, and compliant disclosure to regulators, shareholders, and the market." They also include the Reputational Risk Committee, which was described as follows: "Chaired by the Group Head and CRO, the RRC oversees the management of reputational risk within the Bank's risk appetite."

194.    The 2016 40-F also describes the Risk Management function, as headed by TD's CRO, as follows (with similar language in the 2015 40-F):

> The Risk Management function, headed by the CRO, provides independent oversight of enterprise risk management, risk governance, and control including the setting of risk strategy and policy to manage risk in alignment with the Bank's risk appetite and business strategy. Risk Management's primary objective is to support a comprehensive and proactive approach to risk management that promotes a strong risk management culture. Risk

Management works with the business segments and other corporate oversight functions to establish policies, standards, and limits that align with TD's risk appetite and monitors and reports on existing and emerging risks and compliance with TD's risk appetite. The CRO is supported by a dedicated team of risk management professionals organized to oversee risks arising from each of the Bank's major risk categories. There is an established process in place for the identification and assessment of top and emerging risks. In addition, the Bank has clear procedures governing when and how risk events and issues are brought to the attention of senior management and the Risk Committee.

195.    The 2015 40-F and the 2016 40-F also described the business segment as the "first line of defense," with its responsibilities including "Manage and identify risk in day-to-day activities," "Ensure activities are within TD's risk appetite and risk management policies," "Design, implement, and maintain effective internal controls," "Implement risk based approval processes for all new products, activities, and systems," "Deliver training, tools, and advice to support its accountabilities," and "Monitor and report on risk profile."  They elaborated:

Each business segment has a dedicated risk management function that reports directly to a senior risk executive, who, in turn, reports to the CRO. This structure supports an appropriate level of independent oversight while emphasizing accountability for risk within the business segment. Business management is responsible for setting the business-level risk appetite and measures, which are reviewed and challenged by Risk Management, endorsed by the ERMC and approved by the CEO, to align with TD's risk appetite and manage risk within approved risk limits.

196.    Among the various risks described in the 2016 40-F (with similar language in the 2015 40-F) is "Operational Risk," defined as "the risk of loss resulting from inadequate or failed internal processes or technology or from human activities or from external events."  They add, "The Bank must mitigate and manage operational risk so that it can create and sustain shareholder value, successfully execute the Bank's business strategies, operate efficiently, and provide reliable, secure, and convenient access to financial services."  They elaborate:

Operational Risk Management is an independent function that designs and maintains the Bank's overall operational risk management framework. This

framework sets out the enterprise-wide governance processes, policies, and practices to identify and assess, measure, control, monitor, escalate, and report operational risk. Operational Risk Management ensures that there is appropriate monitoring and reporting of the Bank's operational risk profile and exposures to senior management through the OROC, the ERMC, and the Risk Committee.

Significantly, the 2015 40-F and the 2016 40-F also describe how TD was to monitor operational risks, including those that previously arose at other financial institutions – like Wells Fargo:

In order to reduce the Bank's exposure to future loss, it is critical that the Bank remains aware of and responds to its own and industry operational risks. The Bank's policies and processes require that operational risk events be identified, tracked, and reported to the appropriate level of management to ensure that the Bank analyzes and manages such risks appropriately and takes suitable corrective and preventative action. ***The Bank also reviews, analyzes, and benchmarks TD against operational risk losses that have occurred at other financial institutions using information acquired through recognized industry data providers***.

197.    These allegations, along with those by the CWs as set forth above describing internal reporting of the underlying misconduct and conscious actions and non-actions taken by management, Branch Managers, District Managers, Customer Service, Human Resources, and even TD corporate headquarters, evidence the knowledge of the Individual Defendants or, at minimum, their recklessness.

### Suspicious, Widespread Insider Trading During the Class Period Evidences Scienter

198.    Defendants' scienter is further evidenced by the Class Period transactions in TD stock, options, and stock-related units by Individual Defendants, suspicious in timing and amount, accumulating millions of dollars in ill-gotten gains during the fraud alleged herein. Specifically, such sales included the following:

(a)     <u>Defendant Masrani Class Period Sales</u>

Defendant Masrani entered the Class Period with balances of 459,820 TD shares (Toronto Exchange), 861,108 stock options, 184,242 PSUs, 92,444 VSUs, 146,045 DSUs, and 0 RSUs.[1] Defendant Masrani's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Expiration Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of Options | 186,268 | 12/09/2025 | C$53.15 | C$0 |
| 12/23/2015 | Exercise of Options (below market pricing) | 153,768 | 12/14/2019 | C$32.99 | (C$5,072,806) |
| 12/05/2016 | Exercise of Options (below market pricing) | 3,200 | n/a | C$36.63 | (C$117,200) |
| 12/12/2016 | Compensation of Options | 157,224 | 12/12/2026 | C$65.75 | C$0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 343,492 | | **Cost** | C$0 |
| **Sub-Total Options Exercised** | | 156,968 | | **Cost** | (C$5,190,006) |
| **Sub-Total Options Sold** | | 0 | | **Proceeds** | C$0 |
| Stock Transactions | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 12/31/2015 | Purchase * □ | 24 | | C$53.50 | (C$1,284) |
| 12/31/2015 | Purchase * □ | 25 | | C$53.50 | (C$1,338) |
| 12/31/2016 | Purchase * □ | 26 | | C$56.50 | (C$1,469) |

[1] As defined in TD's 2016 Proxy: (i) Rights Performance Share Units (PSUs) "are phantom share units that track the price of common shares of the bank, receive dividend equivalents in the form of additional units, and are subject to an adjustment at maturity to reflect bank performance over the performance period"; (ii) Rights Deferred Share Units (DSUs) are "phantom units that track the price of common shares, receive additional DSUs when dividends are paid on common shares, and have no voting rights. DSUs are valued using the closing price for common shares on the TSX on the trading day prior to the purchase or grant date, vest immediately, and may be redeemed in cash after the executive departs the bank"; and (iii) Rights Vesting Share Units (VSUs) "are comparable to DSUs except that they vest over a period of time, and are subject to forfeiture in certain circumstances, including in the event of a termination with cause." As defined in TD's 2006 Proxy, Rights Restricted Share Units (RSUs) "are phantom share units with a value equivalent to the average of high and low prices for 20 trading days preceding the award date for TD Bank common shares. These awards vest and mature on the third anniversary of the award date at the average of the high and low prices for the 20 trading days preceding the redemption date. The redemption value, after withholdings, is paid in cash. Dividend equivalents are not paid on these units."

| Sub-Total Stock Purchases | | 75 | **Cost** | (C$4,091) |
|---|---|---|---|---|
| **Sub-Total Stock Sales** | | 0 | **Proceeds** | C$0 |

| Performance, Restricted, Deferred, And Vesting Unit Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Expiration / Vesting Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of PSUs | 79,417 | 12/09/2018 | C$53.15 | C$0 |
| 12/13/2015 | Grant of PSUs | 4,638 | n/a | n/a | C$0 |
| 12/13/2015 | Exercise of PSUs | (69,050) | 12/13/2015 | C$40.54 | C$2,799,287 |
| 12/13/2015 | Purchase of PSUs □ | 7,028 | n/a | C$53.18 | (C$373,749) |
| 12/12/2016 | Compensation of PSUs | 63,841 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 12,911 | n/a | n/a | C$0 |
| 12/12/2016 | Exercise of PSUs | (77,464) | 12/12/2016 | C$65.45 | C$5,070,019 |
| 12/31/2016 | Purchase of PSUs □ | 7,982 | n/a | C$56.65 | (C$452,180) |
| 12/31/2015 | Purchase of VSUs □ | 3,526 | n/a | C$53.18 | (C$187,513) |
| 12/31/2016 | Purchase of VSUs □ | 3,714 | n/a | C$56.65 | (C$210,398) |
| 12/31/2015 | Purchase of DSUs □ | 5,571 | n/a | C$53.18 | (C$296,266) |
| 12/31/2016 | Purchase of DSUs □ | 5,867 | n/a | C$56.65 | (C$332,366) |
| | | | | | |
| **Sub-Total Purchases of PSUs** | | 15,010 | | **Cost** | (C$825,929) |
| **Sub-Total Grants of PSUs** | | 96,966 | | **Cost** | C$0 |
| **Sub-Total Exercises of PSUs** | | (146,514) | | **Proceeds** | C$7,869,306 |
| **Sub-Total Purchases of VSUs** | | 7,240 | | **Cost** | (C$397,911) |
| **Sub-Total Grants of VSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of VSUs** | | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of DSUs** | | 11,438 | | **Cost** | (C$628,631) |
| **Sub-Total Grants of DSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of DSUs** | | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of RSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Grants of RSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of RSUs** | | 0 | | **Proceeds** | C$0 |
| Gifts, Bequeaths, And Non-Sale Transfers | | | | | |
| 12/05/2016 | Disposition (Gift) | (3,200) | | C$63.32 | n/a |
| | | | | | |
| **Sub-Total Shares Gifted** | | (3,200) | | n/a | n/a |
| | | | | | |
| **Totals** | **Shares Purchased** | **75** | **Transaction Costs (dividend reinvest)** | | (C$4,091) |

| | | | | |
|---|---|---|---|---|
| **Shares Acquired By Options** | **156,968** | **Transaction Costs (below market pricing)** | | **(C$5,190,006)** |
| **Shares Gifted** | **(3,200)** | **Transaction Costs** | | **C$0** |
| **Shares Sold** | **0** | **Transaction Proceeds** | | **C$0** |
| **Purchase of PSUs** | **15,010** | **Transaction Costs (dividend reinvest)** | | **(C$825,929)** |
| **Exercise of PSUs** | **(146,514)** | **Transaction Proceeds** | | **C$7,869,306** |
| **Purchase of VSUs** | **7,240** | **Transaction Costs (dividend reinvest)** | | **(C$397,911)** |
| **Exercise of VSUs** | **0** | **Transaction Proceeds** | | **C$0** |
| **Purchase of DSUs** | **11,438** | **Transaction Costs (dividend reinvest)** | | **(C$628,631)** |
| **Exercise of DSUs** | **0** | **Transaction Proceeds** | | **C$0** |
| **Purchase of RSUs** | **0** | **Transaction Costs** | | **C$0** |
| **Exercise of RSUs** | **0** | **Transaction Proceeds** | | **C$0** |
| | | **Net Gain to Defendant Bharat Masrani** | | **C$822,738** |

(b)    <u>Defendant Ahmed Class Period Sales</u>

Defendant Ahmed entered the Class Period with balances of 298,512 TD shares (Toronto Exchange), 354,052 stock options, 81,248 PSUs, 4,766 VSUs, 199,347 DSUs, and 0 RSUs. Defendant Ahmed's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Expiration Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of Options | 58,444 | 12/09/2025 | C$53.15 | C$0 |
| 12/24/2015 | Exercise of Options (below market pricing) | 52,720 | 12/14/2019 | C$32.99 | (C$1,739,233) |
| 12/12/2016 | Compensation of Options | 50,192 | 12/12/2026 | C$65.75 | C$0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 108,636 | | **Cost** | C$0 |
| **Sub-Total Options Exercised** | | 52,720 | | **Cost** | (C$1,739,233) |
| **Sub-Total Options Shares Sold** | | 0 | | **Proceeds** | C$0 |
| Stock Transactions | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |

| Sub-Total Stock Purchases | | 0 | Cost | C$0 |
|---|---|---|---|---|
| Sub-Total Stock Sales | | 0 | Proceeds | C$0 |
| **Performance, Restricted, Deferred, And Vesting Unit Transactions** | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Expiration / Vesting Date | Price | Funds Spent / Gained |
| 12/09/2015 | Exercise of PSUs | (33,616) | 12/13/2015 | C$40.54 | C$1,362,793 |
| 12/09/2015 | Grant of PSUs | 2,258 | n/a | n/a | C$0 |
| 12/09/2015 | Grant of PSUs | 24,960 | 12/09/2018 | C$53.15 | C$0 |
| 12/31/2015 | Purchase of PSUs ☐ | 3,099 | n/a | C$53.18 | (C$164,805) |
| 12/12/2016 | Compensation of PSUs | 20,380 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 5,582 | n/a | n/a | C$0 |
| 12/12/2016 | Exercise of PSUs | (33,489) | n/a | C$65.45 | C$2,191,855 |
| 12/31/2016 | Purchase of PSUs ☐ | 3,016 | | C$56.65 | (C$170,856) |
| 12/31/2015 | Purchase of VSUs ☐ | 182 | n/a | C$53.18 | (C$9,679) |
| 12/31/2016 | Purchase of VSUs ☐ | 191 | n/a | C$56.65 | (C$10,820) |
| 12/31/2015 | Purchase of DSUs ☐ | 7,604 | n/a | C$53.18 | (C$404,381) |
| 12/31/2016 | Purchase of DSUs ☐ | 8,008 | n/a | C$56.65 | (C$453,653) |
| | | | | | |
| Sub-Total Purchases of PSUs | | 3,099 | | Cost | (C$335,661) |
| Sub-Total Grants of PSUs | | 53,180 | | Cost | C$0 |
| Sub-Total Exercises of PSUs | | (67,105) | | Proceeds | C$3,554,648 |
| Sub-Total Purchases of VSUs | | 373 | | Cost | (C$20,499) |
| Sub-Total Grants of VSUs | | 0 | | Cost | C$0 |
| Sub-Total Exercises of VSUs | | 0 | | Proceeds | C$0 |
| Sub-Total Purchases of DSUs | | 15,612 | | Cost | (C$858,034) |
| Sub-Total Grants of DSUs | | 0 | | Cost | C$0 |
| Sub-Total Exercises of DSUs | | 0 | | Proceeds | C$0 |
| Sub-Total Purchases of RSUs | | 0 | | Cost | C$0 |
| Sub-Total Grants of RSUs | | 0 | | Cost | C$0 |
| Sub-Total Exercises of RSUs | | 0 | | Proceeds | C$0 |
| **Gifts, Bequeaths, And Non-Sale Transfers** | | | | |
| | Disposition (Gift) | 0 | | n/a | n/a |
| | | | | | |
| Sub-Total Shares Gifted | | **0** | | n/a | n/a |
| | | | | | |
| Totals | Shares Purchased | **0** | Transaction Costs (dividend reinvest) | C$0 |

| | | | |
|---|---|---|---|
| **Shares Acquired By Options** | **52,720** | **Transaction Costs (below market pricing)** | **(C$1,739,233)** |
| **Shares Gifted** | **0** | **Transaction Costs** | **C$0** |
| **Shares Sold** | **0** | **Transaction Proceeds** | **C$0** |
| **Purchase of PSUs** | **3,099** | **Transaction Costs (dividend reinvest)** | **(C$335,661)** |
| **Exercise of PSUs** | **(67,105)** | **Transaction Proceeds** | **C$3,554,648** |
| **Purchase of VSUs** | **373** | **Transaction Costs (dividend reinvest)** | **(C$20,499)** |
| **Exercise of VSUs** | **0** | **Transaction Proceeds** | **C$0** |
| **Purchase of DSUs** | **15,612** | **Transaction Costs (dividend reinvest)** | **(C$858,034)** |
| **Exercise of DSUs** | **0** | **Transaction Proceeds** | **C$0** |
| **Purchase of RSUs** | **0** | **Transaction Costs** | **C$0** |
| **Exercise of RSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Net Gain to Defendant Riaz Ahmed** | | **C$601,221** |

(c)    <u>Defendant Johnston Class Period Sales</u>

Defendant Johnston entered the Class Period with balances of 102,050 TD shares (Toronto Exchange), 388,940 stock options, 79,696 PSUs, 0 VSUs, 141,359 DSUs, and 0 RSUs. Defendant Johnston's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Expiration Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of Options | 53,220 | 12/09/2025 | C$53.15 | C$0 |
| 12/12/2016 | Compensation of Options | 46,428 | 12/12/2026 | C$65.75 | C$0 |
| 12/15/2016 | Exercise of Options (below market pricing) | 72,488 | 12/14/2019 | C$32.99 | (C$2,391,379) |
| 03/07/2017 | Exercise of Options (below market pricing) | 30,000 | 12/13/2020 | C$36.63 | (C$1,098,750) |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 99,648 | | **Cost** | C$0 |
| **Sub-Total Options Exercised** | | 102,488 | | **Cost** | (C$3,490,129) |
| **Sub-Total Options Sold** | | 0 | | **Proceeds** | C$0 |
| Stock Transactions | | | | | |

| Transaction Date | Purchases / Sales | Shares | Price | Funds Spent / Gained |
|---|---|---|---|---|
| 12/31/2015 | Purchase * □ | 25 | C$53.50 | (C$1,338) |
| 06/03/2016 | Sale Δ | (200) | C$57.31 | C$11,462 |
| 12/15/2016 | Sale | (72,488) | C$66.69 | C$4,834,225 |
| 12/16/2016 | Sale Δ | (20,000) | C$66.84 | C$1,336,800 |
| 12/31/2016 | Purchase * □ | 26 | C$56.84 | (C$1,478) |
| 03/07/2017 | Sale | (30,000) | C$70.15 | C$2,104,500 |
| | | | | |
| **Sub-Total Stock Purchases** | | **51** | **Cost** | **(C$2,815)** |
| **Sub-Total Stock Sales** | | **(122,462)** | **Proceeds** | **C$8,286,987** |

| Performance, Restricted, Deferred, And Vesting Unit Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Unit Grants / Exercises | Units | Expiration / Vesting Date | Price | Funds Spent / Gained |
| 12/09/2015 | Grant of PSUs | 22,690 | 12/09/2018 | C$53.15 | C$0 |
| 12/13/2015 | Grant of PSUs | 2,337 | n/a | n/a | C$0 |
| 12/13/2015 | Exercise of PSUs | (34,795) | 12/13/2015 | C$40.54 | C$1,410,589 |
| 12/31/2015 | Purchase of PSUs □ | 3,040 | n/a | C$53.18 | (C$161,667) |
| 12/12/2016 | Compensation of PSUs | 18,852 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 5,347 | | C$97.17 | C$0 |
| 12/12/2016 | Exercise of PSUs | (32,082) | 12/12/2016 | C$65.45 | C$2,099,767 |
| 12/31/2016 | Purchase of PSUs □ | 2,824 | n/a | C$56.65 | (C$159,980) |
| 12/09/2015 | Purchase of DSUs □ | 10,536 | n/a | C$53.15 | (C$559,988) |
| 12/31/2015 | Purchase of DSUs □ | 5,392 | n/a | C$53.18 | (C$286,747) |
| 12/12/2016 | Compensation of DSU's | 9,167 | n/a | C$65.75 | C$0 |
| 12/31/2016 | Purchase of DSUs □ | 6,087 | n/a | C$56.65 | (C$344,829) |
| | | | | | |
| **Sub-Total Purchases of PSUs** | | **5,864** | | **Cost** | **(C$321,647)** |
| **Sub-Total Grants/Compensations of PSUs** | | **49,226** | | **Cost** | **C$0** |
| **Sub-Total Exercises of PSUs** | | **(66,877)** | | **Proceeds** | **C$3,510,356** |
| **Sub-Total Purchases of VSUs** | | **0** | | **Cost** | **C$0** |
| **Sub-Total Grants of VSUs** | | **0** | | **Cost** | **C$0** |
| **Sub-Total Exercises of VSUs** | | **0** | | **Proceeds** | **C$0** |
| **Sub-Total Purchases of DSUs** | | **22,015** | | **Cost** | **(C$1,191,564)** |
| **Sub-Total Grants/Compensations of DSUs** | | **9,167** | | **Cost** | **C$0** |
| **Sub-Total Exercises of DSUs** | | **0** | | **Proceeds** | **0** |

| | | | | |
|---|---|---|---|---|
| **Sub-Total Purchases of RSUs** | 0 | | **Cost** | 0 |
| **Sub-Total Grants of RSUs** | 0 | | **Cost** | 0 |
| **Sub-Total Exercises of RSUs** | 0 | | **Proceeds** | 0 |
| **Gifts, Bequeaths, And Non-Sale Transfers** | | | | |
| | Disposition (Gift) | 0 | n/a | n/a |
| | | | | |
| **Sub-Total Shares Gifted** | **0** | | n/a | n/a |
| | | | | |
| **Totals** | **Shares Purchased** | **51** | **Transaction Costs (dividend reinvest)** | **(C$2,815)** |
| | **Shares Acquired By Options** | **102,488** | **Transaction Costs (below market pricing)** | **(C$3,490,129)** |
| | **Shares Gifted** | **0** | **Transaction Costs** | **C$0** |
| | **Shares Sold** | **(122,688)** | **Transaction Proceeds** | **C$8,286,987** |
| | **Purchase of PSUs** | **5,864** | **Transaction Costs (dividend reinvest)** | **(C$321,647)** |
| | **Exercise of PSUs** | **(66,877)** | **Transaction Proceeds** | **C$3,510,356** |
| | **Purchase of VSUs** | **0** | **Transaction Costs (dividend reinvest)** | **C$0** |
| | **Exercise of VSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of DSUs** | **22,015** | **Transaction Costs (dividend reinvest)** | **(C$1,191,564)** |
| | **Exercise of DSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of RSUs** | **0** | **Transaction Costs** | **C$0** |
| | **Exercise of RSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Net Gain to Defendant Colleen Johnston** | | | **C$6,791,188** |

(d)    <u>Defendant Currie Class Period Sales</u>

Defendant Currie entered the Class Period with balances of 885 TD shares (Toronto Exchange), 315,156 stock options, 74,709 PSUs, 4,766 VSUs, 41,127 DSUs, and 0 RSUs. Defendant Currie's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Expiration Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of Options | 53,220 | 12/09/2025 | C$53.15 | C$0 |
| 06/30/2016 | Exercise of Options (below market pricing) | 15,000 | 12/14/2019 | C$32.99 | (C$494,850) |

| 08/30/2016 | Exercise of Options (below market pricing) | 29,000 | 12/14/2019 | C$32.99 | (C$956,710) |
| 12/12/2016 | Compensation of Options | 45,172 | 12/12/2026 | C$65.75 | C$0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 98,392 | | **Cost** | C$0 |
| **Sub-Total Options Exercised** | | 44,000 | | **Cost** | (C$1,451,560) |
| **Sub-Total Options Sold** | | 0 | | **Proceeds** | C$0 |

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 12/31/2015 | Purchase * □ | 622 | C$53.51 | (C$33,283) |
| 06/03/2016 | Sale | (15,000) | C$57.16 | C$857,400 |
| 08/30/2016 | Sale | (29,000) | C$58.51 | C$1,696,790 |
| 12/31/2016 | Purchase * □ | 589 | C$57.08 | (C$33,620) |
| 01/29/2017 | Compensation for Services * | 10 | C$68.50 | C$0 |
| | | | | |
| **Sub-Total Stock Purchases** | | **1,211** | **Cost** | **(C$66,903)** |
| **Sub-Total Stock Sales** | | **(44,000)** | **Proceeds** | **C$2,554,190** |

| Performance, Restricted, Deferred, And Vesting Unit Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Expiration / Vesting Date** | **Price** | **Funds Spent / Gained** |
| 12/06/2015 | Grant of PSUs | 1,980 | n/a | n/a | C$0 |
| 12/09/2015 | Exercise of PSUs | (29,487) | 12/13/2015 | C$40.54 | C$1,195,403 |
| 12/09/2015 | Grant of PSUs | 22,690 | 12/09/2018 | C$53.15 | C$0 |
| 12/31/2015 | Purchase of PSUs □ | 2,850 | n/a | C$53.18 | (C$151,563) |
| 12/12/2016 | Compensation of PSU's | 18,342 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 5,300 | n/a | n/a | C$0 |
| 12/12/2016 | Exercise of PSUs | (31,801) | 12/12/2016 | C$65.45 | C$2,081,375 |
| 12/31/2016 | Purchase of PSUs □ | 2,815 | n/a | C$56.65 | (C$159,470) |
| 12/31/2015 | Purchase of VSUs □ | 182 | n/a | C$53.18 | (C$9,679) |
| 12/31/2016 | Purchase of VSUs □ | 191 | n/a | C$56.65 | (C$10,820) |
| 12/31/2015 | Purchase of DSUs □ | 1,569 | n/a | C$53.18 | (C$83,439) |
| 12/31/2016 | Purchase of DSUs □ | 1,652 | n/a | C$56.65 | (C$93,586) |
| | | | | | |
| **Sub-Total Purchases of PSUs** | | 5,665 | | **Cost** | (C$311,033) |
| **Sub-Total Grants/Compensations of PSUs** | | 48,312 | | **Cost** | C$0 |

| | | | | |
|---|---|---|---|---|
| **Sub-Total Exercises of PSUs** | | (61,288) | **Proceeds** | C$3,276,778 |
| **Sub-Total Purchases of VSUs** | | 373 | **Cost** | (C$20,499) |
| **Sub-Total Grants of VSUs** | | 0 | **Cost** | C$0 |
| **Sub-Total Exercises of VSUs** | | 0 | **Proceeds** | C$0 |
| **Sub-Total Purchases of DSUs** | | 3,221 | **Cost** | (C$177,025) |
| **Sub-Total Grants of DSUs** | | 0 | **Cost** | C$0 |
| **Sub-Total Exercises of DSUs** | | 0 | **Proceeds** | C$0 |
| **Sub-Total Purchases of RSUs** | | 0 | **Cost** | C$0 |
| **Sub-Total Grants of RSUs** | | 0 | **Cost** | C$0 |
| **Sub-Total Exercises of RSUs** | | 0 | **Proceeds** | C$0 |
| **Gifts, Bequeaths, And Non-Sale Transfers** | | | | |
| | Disposition (Gift) | 0 | n/a | n/a |
| | | | | |
| **Sub-Total Shares Gifted** | | **0** | n/a | n/a |
| | | | | |
| **Totals** | **Shares Purchased** | **1,211** | **Transaction Costs (dividend reinvest)** | **(C$66,903)** |
| | **Shares Acquired By Options** | **44,000** | **Transaction Costs (below market pricing)** | **(C$1,451,560)** |
| | **Shares Gifted** | **0** | **Transaction Costs** | **C$0** |
| | **Shares Sold** | **(44,000)** | **Transaction Proceeds** | **C$2,554,190** |
| | **Purchase of PSUs** | **5,665** | **Transaction Costs (dividend reinvest)** | **(C$311,033)** |
| | **Exercise of PSUs** | **(61,288)** | **Transaction Proceeds** | **C$3,276,778** |
| | **Purchase of VSUs** | **3,221** | **Transaction Costs (dividend reinvest)** | **(C$20,499)** |
| | **Exercise of VSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of DSUs** | **3,221** | **Transaction Costs (dividend reinvest)** | **(C$177,025)** |
| | **Exercise of DSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of RSUs** | **0** | **Transaction Costs** | **C$0** |
| | **Exercise of RSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | | | **Net Gain to Defendant Teri Currie** | **C$3,803,948** |

(e)     Defendant Salom Class Period Sales

Defendant Salom entered the Class Period with balances of 0 TD shares (Toronto Exchange), 139,600 stock options, 48,790 PSUs, 6,008 VSUs, 0 DSUs, and 8,404 RSUs. Defendant Salom's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Options Grants / Exercises | Shares | Expiration Date | Price | Funds Spent / Gained |
| 12/07/2016 | Exercise of Options (below market pricing) | 7,912 | 12/12/2021 | C$36.64 | (C$1,631,796) |
| 12/12/2016 | Compensation of Options | 28,748 | 12/12/2026 | C$65.75 | C$0 |
| 01/12/2017 | Exercise of Options (below market pricing) | 30,688 | 12/13/2022 | C$40.54 | (C$1,820,570) |
| | | | | | |
| Sub-Total Options from Grants/Compensation | | 28,748 | | Cost | C$0 |
| Sub-Total Options Exercised | | 38,600 | | Cost | (C$3,452,366) |
| Sub-Total Options Sold | | 0 | | Proceeds | C$0 |
| Stock Transactions | | | | | |
| Transaction Date | Purchases / Sales | Shares | | Price | Funds Spent / Gained |
| 12/05/2016 | Sale | (6,322) | | C$63.65 | C$402,395 |
| 01/11/2017 | Sale | (30,688) | | C$67.02 | C$2,056,710 |
| | | | | | |
| Sub-Total Stock Purchases | | 0 | | Cost | C$0 |
| Sub-Total Stock Sales | | (37,010) | | Proceeds | C$2,459,105 |
| Performance, Restricted, Deferred, And Vesting Unit Transactions | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Expiration / Vesting Date | Price | Funds Spent / Gained |
| 12/12/2016 | Compensation of PSUs | 13,414 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 3,612 | n/a | n/a | C$0 |
| 12/12/2016 | Exercise of PSUs | (21,669) | 12/12/2016 | C$65.45 | C$1,418,236 |
| 12/31/2016 | Purchase of PSUs □ | 1,888 | n/a | C$56.65 | (C$106,955) |
| 12/31/2016 | Purchase of VSUs □ | 232 | n/a | C$56.65 | (C$13,143) |
| 12/31/2016 | Purchase of RSUs □ | 247 | n/a | C$55.32 | (C$13,664) |
| | | | | | |
| Sub-Total Purchases of PSUs | | 1,888 | | Cost | (C$106,955) |

| | | | | |
|---|---|---|---|---|
| **Sub-Total Grants/Compensations of PSUs** | 17,026 | | **Cost** | C$0 |
| **Sub-Total Exercises of PSUs** | (21,669) | | **Proceeds** | C$1,418,236 |
| **Sub-Total Purchases of VSUs** | 232 | | **Cost** | (C$13,143) |
| **Sub-Total Grants of VSUs** | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of VSUs** | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of DSUs** | 0 | | **Cost** | C$0 |
| **Sub-Total Grants of DSUs** | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of DSUs** | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of RSUs** | 247 | | **Cost** | (C$13,664) |
| **Sub-Total Grants of RSUs** | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of RSUs** | 0 | | **Proceeds** | C$0 |
| **Gifts, Bequeaths, And Non-Sale Transfers** | | | | |
| 12/2/2016 | Disposition (Gift) | (1,590) | C$63.52 | **n/a** |
| | | | | |
| **Sub-Total Shares Gifted** | | (1,590) | n/a | n/a |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs (dividend reinvest)** | **C$0** |
| | **Shares Acquired By Options** | **38,600** | **Transaction Costs (below market pricing)** | **(C$3,452,366)** |
| | **Shares Gifted** | **(1,590)** | **Transaction Costs** | **C$0** |
| | **Shares Sold** | **(37,010)** | **Transaction Proceeds** | **C$2,459,105** |
| | **Purchase of PSUs** | **1,888** | **Transaction Costs (dividend reinvest)** | **(C$106,955)** |
| | **Exercise of PSUs** | **(21,669)** | **Transaction Proceeds** | **C$1,418,236** |
| | **Purchase of VSUs** | **232** | **Transaction Costs (dividend reinvest)** | **(C$13,143)** |
| | **Exercise of VSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of DSUs** | **0** | **Transaction Costs (dividend reinvest)** | **C$0** |
| | **Exercise of DSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of RSUs** | **247** | **Transaction Costs (dividend reinvest)** | **(C$13,664)** |
| | **Exercise of RSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | | **Net Gain to Defendant Leo Salom** | | **C$291,213** |

(f)   Defendant Pedersen Class Period Sales

Defendant Pedersen entered the Class Period with balances of 4,009 TD shares (Toronto Exchange), 566,212 stock options, 151,274 PSUs, 12,697 VSUs, 12,424 DSUs, and 0 RSUs. Defendant Pedersen's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Expiration Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of Options | 60,868 | 12/9/2025 | C$53.15 | C$0 |
| 12/12/2016 | Compensation of options | 51,368 | 12/12/2026 | C$65.75 | C$0 |
| 03/06/2017 | Exercise of Options (below market pricing) | 218,552 | 12/12/2021 | C$36.635 | (C$8,006,653) |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 112,236 | | **Cost** | C$0 |
| **Sub-Total Options Exercised** | | 218,552 | | **Cost** | (C$8,006,653) |
| **Sub-Total Options Sold** | | 0 | | **Proceeds** | C$0 |
| Stock Transactions | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 12/31/2015 | Purchase * □ | | 152 | C$53.50 | (C$8,132) |
| 12/31/2016 | Purchase * □ | | 162 | C$56.16 | (C$9,098) |
| 01/31/2017 | Purchase * □ | | 35 | C$67.95 | (C$2,378) |
| 03/06/2017 | Sale | | (218,552) | C$70.20 | C$15,342,350 |
| | | | | | |
| **Sub-Total Stock Purchases** | | | 349 | **Cost** | (C$19,608) |
| **Sub-Total Stock Sales** | | | (218,552) | **Proceeds** | C$15,342,350 |
| Performance, Restricted, Deferred, And Vesting Unit Transactions | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Expiration / Vesting Date** | **Price** | **Funds Spent / Gained** |
| 12/09/2015 | Grant of PSUs | 71,578 | 12/09/2025 | C$53.15 | C$0 |
| 12/13/2015 | Grant of PSUs | 3,644 | n/a | n/a | C$0 |
| 12/13/2015 | Exercise of PSUs | (54,257) | 12/13/2015 | C$40.54 | C$2,199,579 |
| 12/31/2015 | Purchase of PSUs □ | 5,770 | n/a | C$53.18 | (C$306,849) |
| 12/12/2016 | Compensation of PSUs | 57,320 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 8,766 | n/a | n/a | C$0 |
| 12/12/2016 | Exercise of PSUs | (52,597) | 12/12/2016 | C$65.45 | C$3,442,474 |

| 12/31/2016 | Purchase of PSUs □ | 6,888 | n/a | C$56.65 | (C$390,205) |
|---|---|---|---|---|---|
| 01/31/2017 | Purchase of PSUs □ | 1,619 | n/a | C$69.95 | (C$113,249) |
| 12/31/2015 | Purchase of VSUs □ | 484 | n/a | C$53.18 | (C$25,739) |
| 12/31/2016 | Purchase of VSUs □ | 510 | n/a | C$56.65 | (C$28,892) |
| 01/31/2017 | Purchase of VSUs □ | 112 | n/a | C$67.95 | (C$7,610) |
| 12/31/2015 | Purchase of DSUs □ | 474 | n/a | C$53.18 | (C$25,207) |
| 12/31/2016 | Purchase of DSUs □ | 499 | n/a | C$56.65 | (C$28,268) |
| 01/31/2017 | Purchase of DSUs □ | 109 | n/a | C$67.95 | (C$7,407) |
|  |  |  |  |  |  |
| **Sub-Total Purchases of PSUs** | | 14,277 | | **Cost** | (C$810,303) |
| **Sub-Total Grants/Compensations of PSUs** | | 141,308 | | **Cost** | C$0 |
| **Sub-Total Exercises of PSUs** | | (106,854) | | **Proceeds** | C$5,642,052 |
| **Sub-Total Purchases of VSUs** | | 1,106 | | **Cost** | (C$62,241) |
| **Sub-Total Grants of VSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of VSUs** | | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of DSUs** | | 1,082 | | **Cost** | (C$60,882) |
| **Sub-Total Grants of DSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of DSUs** | | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of RSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Grants of RSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of RSUs** | | 0 | | **Proceeds** | C$0 |
| **Gifts, Bequeaths, And Non-Sale Transfers** | | | | | |
|  | Disposition (Gift) | 0 | | n/a | n/a |
|  |  |  |  |  |  |
| **Sub-Total Shares Gifted** | | **0** | | n/a | n/a |
|  |  |  |  |  |  |
| **Totals** | **Shares Purchased** | **349** | **Transaction Costs (dividend reinvest)** | | **(C$19,608)** |
|  | **Shares Acquired By Options** | **218,552** | **Transaction Costs (below market pricing)** | | **(C$8,006,653)** |
|  | **Shares Gifted** | **0** | **Transaction Costs** | | **C$0** |
|  | **Shares Sold** | **(218,552)** | **Transaction Proceeds** | | **C$15,342,350** |
|  | **Purchase of PSUs** | **14,277** | **Transaction Costs (dividend reinvest)** | | **(C$810,303)** |
|  | **Exercise of PSUs** | **(106,854)** | **Transaction Proceeds** | | **C$5,642,052** |
|  | **Purchase of VSUs** | **1,106** | **Transaction Costs (dividend reinvest)** | | **(C$62,241)** |
|  | **Exercise of VSUs** | **0** | **Transaction Proceeds** | | **C$0** |

| | | | | |
|---|---|---|---|---|
| | Purchase of DSUs | 1,082 | Transaction Costs (dividend reinvest) | (C$60,882) |
| | Exercise of DSUs | 0 | Transaction Proceeds | C$0 |
| | Purchase of RSUs | 0 | Transaction Costs | C$0 |
| | Exercise of RSUs | 0 | Transaction Proceeds | C$0 |
| | | Net Gain to Defendant Mike Pedersen | | C$12,024,716 |

(g)     <u>Defendant Chauvin Class Period Sales</u>

Defendant Chauvin entered the Class Period with balances of 125,780 TD shares (Toronto Exchange), 302,728 stock options, 76,242 PSUs, 0 VSUs, 5,953 DSUs, and 0 RSUs. Defendant Chauvin's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Options Grants / Exercises | Shares | Expiration Date | Price | Funds Spent / Gained |
| 12/09/2015 | Grant of Options | 49,672 | 12/09/2025 | C$53.15 | C$0 |
| 03/02/2016 | Exercise of Options (below market pricing) | 1,890 | 12/13/2020 | C$36.63 | (C$69,221) |
| 12/12/2016 | Compensation of Options | 43,816 | 12/12/2026 | C$65.75 | C$0 |
| 01/04/2017 | Exercise of Options (below market pricing) | 56,520 | 12/13/2020 | C$36.63 | (C$2,070,045) |
| | | | | | |
| Sub-Total Options from Grants/Compensation | | 106,192 | | Cost | C$0 |
| Sub-Total Options Exercised | | 58,410 | | Cost | (C$2,139,266) |
| Sub-Total Options Sold | | 0 | | Proceeds | C$0 |
| Stock Transactions | | | | | |
| Transaction Date | Purchases / Sales | Shares | | Price | Funds Spent / Gained |
| 01/04/2017 | Sale | (55,000) | | C$67.66 | C$3,721,300 |
| | | | | | |
| Sub-Total Stock Purchases | | 0 | | Cost | C$0 |
| Sub-Total Stock Sales | | (55,000) | | Proceeds | C$3,721,300 |
| Performance, Restricted, Deferred, And Vesting Unit Transactions | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Expiration / Vesting Date | Price | Funds Spent / Gained |
| 12/09/2015 | Grant of PSUs | 2,258 | n/a | n/a | C$0 |

| 12/09/2015 | Exercise of PSUs | (33,616) | 12/13/2015 | C$40.54 | C$1,362,793 |
|---|---|---|---|---|---|
| 12/09/2015 | Grant of PSUs | 21,178 | 12/09/2018 | C$53.15 | C$0 |
| 12/31/2015 | Purchase of PSUs □ | 2,908 | n/a | C$53.18 | (C$154,647) |
| 12/12/2016 | Compensation of PSUs | 17,792 | 12/12/2019 | C$65.75 | C$0 |
| 12/12/2016 | Grant of PSUs | 5,159 | n/a | n/a | C$0 |
| 12/12/2016 | Exercise of PSUs | (30,956) | 12/12/2016 | C$65.45 | C$2,026,070 |
| 12/31/2016 | Purchase of PSUs □ | 2,669 | n/a | C$65.65 | (C$175,220) |
| 12/31/2015 | Purchase of DSUs □ | 227 | n/a | C$53.18 | (C$12,072) |
| 12/31/2016 | Purchase of DSUs □ | 239 | n/a | C$56.65 | (C$13,539) |
| | | | | | |
| **Sub-Total Purchases of PSUs** | | 2,908 | | **Cost** | (C$329,867) |
| **Sub-Total Grants of PSUs** | | 7,417 | | **Cost** | C$0 |
| **Sub-Total Exercises of PSUs** | | (64,572) | | **Proceeds** | C$3,388,863 |
| **Sub-Total Purchases of VSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Grants of VSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of VSUs** | | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of DSUs** | | 466 | | **Cost** | (C$25,611) |
| **Sub-Total Grants of DSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of DSUs** | | 0 | | **Proceeds** | C$0 |
| **Sub-Total Purchases of RSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Grants of RSUs** | | 0 | | **Cost** | C$0 |
| **Sub-Total Exercises of RSUs** | | 0 | | **Proceeds** | C$0 |
| **Gifts, Bequeaths, And Non-Sale Transfers** | | | | | |
| 03/02/2016 | Disposition (Gift) | (1,890) | | C$53.34 | n/a |
| 03/08/2016 | Disposition (Gift) | (1,890) | | C$54.65 | n/a |
| 01/10/2017 | Disposition (Gift) | (1,520) | | C$67.10 | n/a |
| | | | | | |
| **Sub-Total Shares Gifted** | | **(5,300)** | | n/a | n/a |
| | | | | | |

| Totals | Shares Purchased | **0** | Transaction Costs (dividend reinvest) | **C$0** |
|---|---|---|---|---|
| | **Shares Acquired By Options** | **58,410** | **Transaction Costs (below market pricing)** | (C$2,139,266) |
| | **Shares Gifted** | **(5,300)** | **Transaction Costs** | **C$0** |
| | **Shares Sold** | **(55,000)** | **Transaction Proceeds** | **C$3,721,300** |
| | **Purchase of PSUs** | **2,908** | **Transaction Costs (dividend reinvest)** | (C$629,867) |
| | **Exercise of PSUs** | **(64,572)** | **Transaction Proceeds** | **C$3,388,863** |

| | | | | |
|---|---|---|---|---|
| | **Purchase of VSUs** | **0** | **Transaction Costs** | **C$0** |
| | **Exercise of VSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of DSUs** | **466** | **Transaction Costs (dividend reinvest)** | **(C$25,611)** |
| | **Exercise of DSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | **Purchase of RSUs** | **0** | **Transaction Costs** | **C$0** |
| | **Exercise of RSUs** | **0** | **Transaction Proceeds** | **C$0** |
| | | **Net Gain to Defendant Mark Chauvin** | | **C$4,615,418** |

\* These indirect purchases were made in The Canada Trust Company. According to the TD Investment Services Inc. Disclosure Document, The Canada Trust Company is a wholly-owned indirect subsidiary of The Toronto-Dominion Bank.

□ These purchases were made in the Dividend Reinvestment Plan. According to the Toronto-Dominion Bank's website, under Investor Relations > Dividends, holders of TD common shares have the option to participate in TD's Dividend Reinvestment Plan, whereby dividends paid on common shares are used to purchase additional common shares. The common shares will be purchased either at the market price on the open market, or at the Average Market Price with up to a 5% discount. (https://www.td.com/investor-relations/ir-homepage/share-information/dividend-reinvestment-plan/drip.jsp)

Δ These indirect sales were made through Johnston's separate RESP (Registered Education Savings Plan) or Spousal Joint Account.

199.    These transactions during the Class Period, while the fraud was raging and the true facts of TD's business and operations as alleged herein remained hidden from investors, yielded the Individual Defendants a combined *C$28,950,441* in net ill-gotten gains from prices inflated by the fraud alleged herein.  These sales constitute strong evidence of scienter.

### **TD Raised Funds During The Class Period**

200.    During the Class Period, TD announced its intention to raise billions of dollars in funds while its stock was trading at prices elevated by the fraud alleged herein.  For instance, in a January 5, 2016 press release and Form 6-K, TD announced that it was expanding the size of its offering of Non-Cumulative 5-Year Rate Reset Preferred Shares, Series 12, to 28 million shares to be sold on the Toronto Stock Exchange.  In a February 26, 2016 press release and Form 6-K,

TD announced a domestic public offering of $1.25 billion of medium term notes bearing an interest rate of 4.859% until 2026 and the three-month bankers' acceptance rate plus 3.49% thereafter until 2031. In an August 29, 2016 press release and Form 6-K, TD announced that it was expanding the size of its offering of Non-Cumulative 5-Year Rate Reset Preferred Shares, Series 14, to 40 million shares to be sold on the Toronto Stock Exchange. It also announced a U.S. offering of $1.5 billion of 3.625% Non-Viability Contingent Capital Subordinated Notes due 2031, via a press release and Form 6-K filed on September 8, 2016. These offerings, during the fraud alleged herein, are evidence of TD's corporate scienter.

### The Fraud Implicated Core Operations

201. The fraud alleged herein implicates the core operations of TD. The Canadian Retail segment is TD's largest and most important division, and the alleged underlying misconduct directly implicated not only TD's reputational capital but also its direct relationship with its customer base. Moreover, as the CW statements alleged herein conclusively demonstrate, the fraud was on an incredibly widespread scale, infecting the entire footprint of the Canadian Retail segment and all layers of its employee base.

202. In light of these facts, it is inconceivable that the Individual Defendants, TD's executive management, and its Board did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within TD, and the litany of facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including by the CW statements.

**The Fraud Involved Misconduct Similar To That Which Occurred At Wells Fargo**

203.    From at least 2011 to mid-2016, Wells Fargo employees, facing rigid sales quotas, created more than 1.5 million unauthorized deposit accounts and issued 565,000 unauthorized credit card applications.  The sham accounts largely went unnoticed until an L.A. Times investigation in 2013 helped uncover the fraud.  In May 2015, the city of Los Angeles filed a complaint against Wells Fargo for its unfair business practices, and shortly after, federal regulators got involved.  Because of these illegal practices, Wells Fargo announced on September 8, 2016 that it was paying a staggering $185 million in fines, including a $100 million penalty from the U.S. Consumer Financial Protection Bureau, the largest such penalty the agency had issued.  Additionally, Wells Fargo's executives came under intense scrutiny from the U.S. Senate because of, among other things, their compensation, and Wells Fargo terminated at least 5,000 employees, including managers, for their involvement in the misconduct

204.    TD's misconduct, as alleged herein, directly implicated some of the very same misconduct that occurred at Wells Fargo and for which Wells Fargo was investigated, prosecuted, and heavily penalized before and during the Class Period.  If TD's misconduct became known earlier, it would have faced significant monetary penalties and additional damage to its reputation.  Thus, the Individual Defendants had a strong motive to conceal the misconduct alleged herein and to commit the alleged fraud, particularly as they were engaged in ongoing insider transactions involving TD securities.

205.    In light of these facts, as further alleged above, the fact that the fraud directly implicated some of the very same misconduct as occurred at Wells Fargo before and during the Class Period that resulted in significant penalties and had widely-publicized negative effects on Wells Fargo's reputation, is strong evidence supporting the inference of Defendants' scienter.

**Defendants Signed, Were Quoted In, Or SOX Certified The Alleged Misstatements**

206.    As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, the Individual Defendants were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

207.    As the individuals who SOX certified SEC filings as described above, Defendants Masrani, Johnston, and Ahmed were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

**Suspicious Executive Demotions, Resignations, and Departures Evidence Scienter**

208.    Another indicator of Defendants' scienter is the removal of key executives during or shortly after the Class Period.  Such demotions, resignations, and departures, which were suspect in timing, occurred at the height of the alleged fraud, and strongly support the scienter inference, included the following:

(a)    Effective January 2, 2016, Defendant Johnston, who had been TD's CFO, changed roles – to a non-SOX-certifying position as Group Head, Direct Channels, Technology, Marketing and Corporate & Public Affairs.

(b)    On October 27, 2016, Defendant Pedersen announced his retirement as President and CEO of TD Bank, effective summer 2017, when Pedersen took on the new role of "Advisor."

(c)    Defendant Chauvin served as Group Head and Chief Risk Officer during the Class Period.  Shortly after the Class Period, TD announced Chauvin's decision to retire, via a

press release on September 28, 2017 and a Form 6-K filed with the SEC on September 29, 2017, as has served as "Special Advisor" since February 1, 2018.

### The Fraud Violated TD's Corporate Code of Conduct

209. TD's Code of Conduct and Ethics for Employees and Directors, detailed herein, barred all of the misconduct detailed by the extensive CW statements set forth above. This flagrant violation of express corporate policy, which was filed with the SEC repeatedly during the Class Period, further buttresses the inference of Defendants' scienter, whether based on their knowledge or their recklessness.

### NO SAFE HARBOR

210. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to TD's then-ongoing misconduct. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking

statement was authorized and/or approved by an executive officer of TD who knew that those statements were false when made.

211.    For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## THE CLAIMS ARE TIMELY

212.    The claims set forth herein were timely filed.

213.    The market was not arguably aware until March 10, 2017, at the earliest, that credible allegations existed to the effect that TD misrepresented and failed to disclose that its business practices during the Class Period were improper and illegal.

214.    It was also not until March 10, 2017 that Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period.  In the absence of publicly available information prior to then suggesting that TD's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Plaintiffs were not under any duty to inquire as to the truthfulness of TD's public statements.  Therefore, Plaintiff's duty in that regard arose no earlier than March 10, 2017.

215.    Prior to March 10, 2017, Plaintiff and Class Members could not have been on any inquiry notice of possible claims under the Securities Exchange Act.  Even assuming this early date for inquiry notice, Plaintiffs' Securities Exchange Act claims against Defendants were brought within two years.  Therefore, Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

## LOSS CAUSATION/ECONOMIC LOSS

216.    The market for TD shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct

and a scheme to deceive the market that artificially inflated TD shares and operated as a fraud or deceit on Class Period purchasers of TD shares by misrepresenting the material facts detailed herein. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of TD shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of TD shares during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

217. During the Class Period, Defendants presented a misleading picture of TD's financial condition, revenues, growth, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused TD shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

218. In response to the issuance of corrective reports on March 10, 2017, the price of TD shares sharply dropped, on high volume, as detailed herein. These drops, among others, removed inflation from the price of TD shares, causing real economic loss to investors who had purchased TD shares during the Class Period.

219. The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline in TD shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or TD-specific facts unrelated to Defendants' fraudulent conduct.

220. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate TD

share price and the subsequent significant decline in the value of TD shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PRESUMPTION OF RELIANCE

221.    At all relevant times, the market for TD shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)    TD met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "TD", a highly efficient and automated market;

(b)    TD had approximately 1.856 billion shares outstanding as of December 3, 2015, such that its stock was liquid.  During the Class Period, numerous shares of TD stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for TD stock and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, TD filed periodic public reports with the SEC;

(d)    TD regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    TD was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)    Unexpected material news about TD was rapidly reflected and incorporated into TD's stock price during the Class Period.

222.    As a result of the foregoing, the market for TD common stock promptly digested current information regarding TD from all publicly available sources and reflected such

information in the prices of the stock. Under these circumstances, all purchasers of TD stock during the Class Period suffered similar injury through their purchase of TD stock at artificially inflated prices and a presumption of reliance applies.

223. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

224. Plaintiffs bring this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of a class (the "Class") of all persons and entities , other than Defendants, their family members and their affiliates, who purchased or otherwise acquired the U.S.-traded stock of the Toronto-Dominion Bank (NYSE: TD) between December 3, 2015 and March 9, 2017, both dates inclusive (the "Class Period").

225. Excluded from the Class are Defendants herein, the officers and directors of TD at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TD securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TD or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

228.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

229.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TD;

- whether the Individual Defendants caused TD to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TD securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

231. As alleged herein, Plaintiffs will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of TD's securities; and Plaintiffs and members of the Class purchased or otherwise acquired TD securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

232. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

233. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

234. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TD securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire TD securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

235.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for TD securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TD's operations, finances and business prospects.

236.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at TD, and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

237. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of TD securities.

238. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein. Moreover, as the senior managers and/or directors of TD, the Individual Defendants had knowledge of the details of TD's operations, business, and internal affairs.

239. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TD. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TD's businesses, operations, financial condition and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TD securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning TD's business, operations and financial condition concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired TD securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

240. During the Class Period, TD securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TD securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of TD securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of TD securities declined sharply upon public disclosure of the fraud alleged herein, to the injury of Plaintiffs and Class members.

241. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

242. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of TD's securities during the Class Period, upon the disclosure that TD had been disseminating materially misstatements and omissions to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

243. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244. During the Class Period, the Individual Defendants participated in the operation and management of TD, and conducted and participated, directly and indirectly, in the conduct

of TD's business affairs. Because of their senior positions, they knew the adverse non-public information about TD's business, operations, finances, and prospects.

245. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TD's business, operations, financial condition, results of operations, and prospects and to correct promptly any public statements issued by TD which had become materially false or misleading.

246. Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TD disseminated in the marketplace during the Class Period concerning TD's business, operations, financial condition, results of operations, and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TD to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of TD within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TD securities.

247. Each of the Individual Defendants, therefore, acted as a controlling person of TD. By reason of their senior management positions and/or being directors of TD, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TD to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of TD and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

248. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TD.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: February 28, 2018

Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**

*/s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street
Suite 1201
Newark, NJ 07102
Telephone: (973) 877-3820
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

*Plaintiffs' Liaison Counsel*

**POMERANTZ LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo

J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        mltuccillo@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Plaintiffs' Lead Counsel*