Civil No. 17-1665 (NLH/JS)

In re TORONTO-DOMINION BANK
SECURITIES LITIGATION          **OPINION**

**APPEARANCES:**

JEREMY A. LIEBERMAN
MATTHEW L. TUCCILLO
JENNIFER BANNER SOBERS
POMERANTZ LLP
600 THIRD AVENUE, 20TH FLOOR
NEW YORK, NY 10016

PATRICK V. DAHLSTROM
POMERANTZ LLP
10 SOUTH LA SALLE STREET, SUITE 3505
CHICAGO, IL 60603

BRUCE DANIEL GREENBERG
LITE DEPALMA GREENBERG, LLC
570 BROAD STREET
SUITE 1201
NEWARK, NJ 07102

        *Attorneys for Plaintiffs.*

SUSAN M. LEMING
WILLIAM M. TAMBUSSI
BROWN & CONNERY, LLP
360 HADDON AVENUE
WESTMONT, NJ 08108

RICHARD C. PEPPERMAN, II
MATTHEW A. PELLER
SULLIVAN & CROMWELL LLP
125 BROAD STREET
NEW YORK, NEW YORK 10004

*Attorneys for Defendants The Toronto-Dominion Bank, Bharat Masrani, Colleen Johnston, Riaz Ahmed, Teri Currie, Leo Salom, Mike Pedersen, Mark Chauvin.*

**HILLMAN**, District Judge

This case is a putative securities class action concerning alleged material misrepresentations or omissions made by Defendants.  Presently before the Court are two motions.  First is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint.  Second, is Plaintiffs' Motion to File a Sur-Reply. For the reasons expressed herein, Defendants' motion will be granted, in part, and denied, in part.  Plaintiffs' motion will be granted.

**BACKGROUND**

We take our brief recitation of the facts from Plaintiffs' First Amended Class Action Complaint ("FAC").  This is a putative securities class action asserted against Defendant Toronto-Dominion Bank ("TD Bank") and several TD Bank executives (collectively, "Individual Defendants").  The executives include Bharat Masrani, CEO, Riaz Ahmed, CFO, Teri Currie, Group Head, Canadian Personal Banking, Leo Salom, Group Head, Wealth Management and TD Insurance, TD Bank Group (formerly, Executive Vice President, Wealth Management), Mike Pedersen, President and CEO until October 27, 2016 (formerly, Group Head, U.S. Banking), and Mark Chauvin, Group Head and Chief Risk Officer.  The

putative class consists of those who held United States-traded, TD Bank stock between December 3, 2015 and March 9, 2017, inclusive.

The securities claims are centered around TD's public statements about (1) strong risk management, (2) solid organic growth, and (3) growth in the Canadian Retail segment. Those statements, Plaintiffs allege, were false. Instead, Plaintiffs allege that a "highly pressurized work environment" and "forced sales targets" – among other things – led to violations of TD Bank's Code of Conduct, behavior that "exceeded TD's articulated risk appetite," and possibly illegal activity. Plaintiffs suggest that these allegations are supported by hundreds of confidential witnesses ("CWs").[1]

The FAC presents statements from nineteen CWs, who are non-parties. Those individuals and their statements are discussed as relevant, _infra_. The CWs statements generally allege that TD Bank implemented a strict sales quota on tellers, loan advisors, financial advisors, and customer service representatives. These sales quotas were consistently used by management to both reward and punish TD Bank employees. This so-called high-pressure environment led tellers to allegedly sign up customers – without

---

[1] To be clear, the FAC does not include statements from hundreds of CWs. Instead, it contains statements from nineteen. The hundreds of others allegedly gave information that was used in March 6 and 10, 2017 CBC News reports.

authorization – for TD Bank products, services, and accounts. This also led loan advisors to bend rules and guidelines – governing TD Bank's risk tolerance – in order to authorize a higher percentage of loans. Managers (at various levels) and the human resources department were unable to stop these unauthorized sales because it was the employees' word versus the customers' word, and serious discipline would only occur if the manager had personal knowledge of an unauthorized sale.

Plaintiffs complain of statements made in press releases, SEC filings, TD Bank's Code of Conduct, and investor teleconferences by TD Bank and Individual Defendants, which they say contradict the alleged experience of the CWs. These statements will be discussed as relevant, _infra_. Generally, Plaintiffs have separated these statements into three fraud categories: (1) risk management and internal controls fraud, (2) business operations fraud, and (3) reported results fraud.

Plaintiffs filed their first complaint on March 12, 2017. This Court consolidated this case with a similar action filed by Janet Tucci (No. 1:17-cv-1735 (NLH/JS)) and appointed Plaintiff Ethan Silverman as the lead plaintiff on December 13, 2017. Plaintiffs filed the operative FAC on March 5, 2018, alleging two counts. First, Plaintiffs allege violations of Section 10(b) of Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5

(codified at 17 C.F.R. 240.10b-5) against all Defendants. Second, Plaintiffs allege violations of Section 20(a) of the Exchange Act against Individual Defendants.

Defendants filed their Motion to Dismiss on April 16, 2018. The Motion to Dismiss has been fully briefed. Additionally, Plaintiffs filed their Motion for Leave to File a Sur-Reply or, in the Alternative, to Strike Exhibit 1 on July 24, 2018. This motion has also been fully briefed. Therefore, these motions are ripe for adjudication.

### A. Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this case because it presents a federal question under the Exchange Act. See 28 U.S.C. § 1331; 15 U.S.C. § 78aa.

### B. Motion to File a Sur-Reply

On July 24, 2018, Plaintiffs filed a Motion to File a Sur-Reply and attached, as an exhibit, a proposed sur-reply brief. In the alternative, Plaintiffs request this Court to strike Exhibit 1 of Susan Leming's Supplemental Declaration, which was attached to Defendants' reply brief. Plaintiffs' only complaint concerns one footnote in Defendants' reply brief, which mentions a Financial Consumer Agency of Canada ("FCAC") report (the "FCAC Report"). Plaintiffs believe the FCAC Report was improperly first set forth in a reply brief instead of being presented in Defendants' moving brief. Defendants disagree, arguing the FCAC

Report was properly presented in the reply brief in reply to one of Plaintiffs' arguments.

Local Rule of Civil Procedure 7.1(d) controls the filing of a sur-reply brief in this specific situation. It states: "No sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned." Loc. R. Civ. P. 7.1(d)(6). Since the proposed sur-reply was accompanied by a brief in support, Plaintiffs have complied with the Local Rules.

In the interests of justice, this Court will grant Plaintiffs' Motion to File a Sur-Reply and consider both Plaintiffs' and Defendants' arguments concerning the FCAC Report on the merits, to the extent relevant, _infra_. While this Court does not find either side's arguments particularly helpful (or persuasive), it considers it wise – in its discretion – to consider all argument on the merits. Considering Defendants have responded to Plaintiffs substantive arguments on the merits, this will not prejudice any of the parties. This Court will deny the Plaintiffs' alternative argument to strike the offending exhibit attached to Defendants' reply brief. In light of this Court's ruling to consider the sur-reply, that argument is moot.

## C.  Motion to Dismiss Standard

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted

pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing Conley v. Gibson, 355 U.S. 41, 47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

<u>Malleus v. George</u>, 641 F.3d 560, 563 (3d Cir. 2011) (alterations in original) (citations omitted) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 664, 675, 679 (2009)). A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." <u>Schmidt v. Skolas</u>, 770 F.3d 241, 249 (3d Cir. 2014) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." <u>Twombly</u>, 550 U.S. at 563 n.8 (quoting <u>Scheuer v. Rhoades</u>, 416 U.S. 232, 236 (1974)); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 684 ("Our decision in <u>Twombly</u> expounded the pleading standard for 'all civil actions' . . . ."); <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) ("<u>Iqbal</u> . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before <u>Twombly</u>."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" <u>Malleus</u>, 641 F.3d at 563 (quoting <u>Twombly</u>, 550 U.S. at 570).

Since this is a claim covered by the Private Securities Litigation Reform Act ("PSLRA"), heightened pleading standards

apply beyond those encapsulated by Rule 12(b)(6).  Federal Rule

of Civil Procedure 9(b) requires that "[i]n alleging fraud or

mistake, a party must state with particularity the circumstances

constituting fraud or mistake."  Moreover, to allege a material

misrepresentation, a plaintiff must "specify[] each allegedly

misleading statement, why the statement was misleading, and, if

an allegation is made on information or belief, all facts

supporting that belief with particularity."  Institutional

Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 252-53 (3d Cir. 2009).

Finally, to allege scienter, a plaintiff must "state with

particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  Id.

> **D.    Motion to Dismiss**

To allege a Section 10(b) claim, a plaintiff must plead

"(1) a material misrepresentation or omission, (2) scienter, (3)

a connection between the misrepresentation or omission and the

purchase or sale of a security, (4) reliance upon the

misrepresentation or omission, (5) economic loss, and (6) loss

causation."  City of Edinburgh Council v. Pfizer, Inc., 754 F.3d

159, 167 (3d Cir. 2014).  "Every person who, directly or

indirectly, controls any person liable under any provision of"

the Exchange Act will be held jointly and severally liable under

Section 20(a).  As is apparent from the statutory text, Section

20(a) liability may only be found if there is an underlying

violation of the Exchange Act – here Section 10(b).

Defendants present four main arguments concerning dismissal of Plaintiffs' claims, focusing on the materiality and falsity of the statements and whether scienter has been appropriately pleaded.  First, Defendants argue that the statements complained of were neither material nor false or misleading.  Second, Defendants argue that Plaintiffs have not presented the strong showing of scienter required for either the Individual Defendants or Defendant TD Bank.  Third, Defendants argue as a result of dismissal under either of the above two grounds, the Section 20(a) claims must also be dismissed.  Fourth and finally, Defendants argue that – at the very least – claims against two Individual Defendants, Pedersen and Chauvin, should be dismissed because of a lack of the necessary factual predicates for a claim.  This Court will address each argument in turn.

### a. <u>Materially False and Misleading Statements</u>

Defendants present three basic arguments in favor of dismissal of the Section 10(b) claim.  Essentially, Defendants argue the statements complained of were either not material or not false or misleading.  First, Defendants argue Plaintiffs have failed to plead the falsity of the statements with particularity, as required by the Federal Rules of Civil Procedure and applicable statutory law.  Second, Defendants

argue Plaintiffs cannot base their claim on TD Bank's earnings statements or certifications. Third, Defendants argue Plaintiffs only cite general statements about risk management, internal controls, and business operations. This is – in Defendants' understanding – not enough to support a Section 10(b) claim as the statements are so general as to be immaterial.

### i. Whether Plaintiffs Fail to Plead the Alleged Underlying Scheme with Particularity

Defendants assert Plaintiffs fail to plead facts with particularity concerning the underlying illegal scheme that resulted in improper, illegal, or unauthorized sales of TD Bank products, services, and accounts. Defendants' argument here contains two main facets: (1) Plaintiffs' CW allegations do not meet the standards required under controlling Third Circuit law and (2) even if they meet that standard, the allegations do not state an illegal scheme with the requisite particularity. Plaintiffs counter by stating the CW allegations are proper and an illegal scheme was pleaded with the requisite particularity. The details of those arguments will be addressed infra.

### 1. Analysis of CWs' Statements under the Third Circuit Test

In assessing the particularity of CWs' allegations, a court should examine "the sources' base of knowledge, the reliability of the sources, the corroborative nature of other facts alleged,

including from other sources, the coherence and plausibility of the allegations, and similar indicia." Cal. Pub. Emples.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004). When a plaintiff relies solely on CWs to meet the particularity requirement, those claims "assume[] a heightened importance." Id. at 148. This Court will not engage in a wholesale examination of each CW under this test. Instead, it will address the alleged deficiencies presented by Defendants.

Under this test, Defendants assert some CWs lack personal knowledge as they were not employed during the class period, some CWs' statements are conclusory, and some CWs' statements are based merely on rumor or conjecture. Defendants appear to be correct in that CW2, CW3, CW7, CW8, and CW9 were not employed at TD Bank during the class period. Although this seems to foreclose the possibility of personal knowledge of facts during the class period, that does not mean those CWs' statements must be – or can be – ignored. As Plaintiffs point out, the misstatements at issue made during the class period were based on TD Bank's conduct before the class period. The CWs statements are certainly relevant to those allegedly false statements – at least. Additionally, they may also serve as corroboration of CWs' statements regarding conduct within the class period.

Defendants are correct that CWs' statements which appear to

be based on rumor or conjecture do not meet the particularity requirement.  See Chubb Corp., 394 F.3d at 155 ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1).").  This Court will not consider these statements in evaluating Plaintiffs Section 10(b) claim.

But, CWs' statements are not conclusory merely because they state something happened "regularly," "often," or "usually." Even though these statements are not exceedingly precise, Defendants place too much emphasis on the particularity requirement.  These CW statements provide where the misconduct occurred – to a specific branch location or department, the time period when it occurred, how and why it occurred, and what products may have been involved.[2]  It seems Defendants would only find these statements "particular" if all the alleged bad actors stepped forward and provided statements concerning the specific date, location, and product that was improperly sold to a specific customer.  That is not required.  Avaya, Inc., 564 F.3d

---

[2] For example, Defendants attack CW3's statements as conclusory. (FAC ¶¶ 83-84.)  This is particularly confusing, considering CW3 claims to have overheard other tellers not disclosing fees to customers.  (FAC ¶ 83.)  The FAC then explains the application of CW3's personal knowledge, stating it was "usually" the highest sellers who did not explain fees.  That does not make CW3's statement conclusory, but provides more detail and context for the previous statement.

at 253 (stating that particularity only requires a plaintiff to "plead the who, what, when, where, and how: the first paragraph of any newspaper story." (internal quotations and citations omitted)).[3]

Defendants also challenge CW7's statements on grounds of particularity. The crux of Defendants argument is that CW7 does not provide a basis for how he determined a certain percentage of his subordinates' sales of certain services were without customer authorization. Defendants point to CW7's statements, which states he lacked "direct evidence" and never "saw" unauthorized sales occur. Plaintiffs counter that CW7's estimates are sufficiently supported by the detailed allegations in the FAC.

Defendants citations to Chubb Corp. and Intelligroup on this point are unhelpful. Both of those cases left the court without any idea of how the CWs came by their purported knowledge. As described in more detail infra, this case is distinguishable. The Court has enough information here to determine these estimates are based on personal knowledge of CW7

---

[3] Similarly, this Court will not ignore CW1's statement that "everyone knew" about TD Bank employees' unauthorized sales. This Court understands Defendants point to be that this statement should not be taken literally – that everyone actually knew. While this Court will not take this statement literally, it does understand it to state that similarly situated employees in CW1's branch also knew or suspected unauthorized sales were being made.

acquired during his time supervising his seventeen employees.
The Court does not doubt – at this stage – his knowledge or
reliability, and his allegations appear to be corroborated by
other accounts and are plausible based on the allegations of a
high-pressure sales environment.  Thus, this Court will not
ignore CW7's statements.

Finally, Defendants challenge the CW statements that appear
to be drawn from CBC reports released in March 2017.  Defendants
assert these allegations do not contain the necessary
specificity or indicia of reliability.  Defendants specifically
complain that Plaintiffs fail to allege when these CBC CWs
worked at TD Bank, the dates when they acquired the information
that serves as the basis of their allegations, and the facts
showing how they obtained the information.  Plaintiffs counter
with the assertion that many courts allow CW statements to be
taken from other complaints.  Moreover, some courts find news
reports – because of their independence – a more reliable source
than CW statements provided in other actions.

This Court will consider the allegations stemming from the
CBC CWs.  Defendants' own case, In re Optionable Sec. Litig.,
supports this holding.  577 F. Supp. 2d 681 (S.D.N.Y. 2008).  In
it, the Court assumes the veracity of allegations in a news
report for purposes of a motion to dismiss.  Id. at 690.
Considering Plaintiffs' CW allegations are consistent with those

15

made by the CBC CWs, there is no reason to seriously doubt their reliability at this stage in the proceedings.[4]

Additionally, Plaintiffs are correct that some courts have considered "the probative value of an independent news article or government report is much greater than that of confidential witness statements recounted in another complaint." In re Lehman Bros. SEC. & ERISA Litig., No. 09 MD 2017 (LAK), 2013 U.S. Dist. LEXIS 107559, at *13 (S.D.N.Y. July 31, 2013). This Court will follow in the footsteps of the Southern District of New York and consider these statements. To the extent a time period cannot be discerned from the CBC CWs' statements, this Court will only consider those statements for purposes of corroboration.

These appear to be the only objections to the CWs statements under the Third Circuit test. Thus, with the above caveats in mind, this Court finds it may rely on the CWs' statements in determining whether an underlying wrong has been sufficiently pled.

### 2. Whether the CWs' Statements Allege an Underlying Illegal Scheme

Since this Court has found it may rely on certain CWs statements, it must next determine whether those statements have adequately pleaded an underlying illegal scheme. Defendants

---

[4] This is especially so for those CWs who admit to actions that could give rise to their own civil or criminal liability.

provide several reasons why these statements do not show, with particularity, an underlying illegal scheme. First, the allegations mainly focus on "standard sales practices" that are not unlawful. (Defs.' Br. 10.) Second, the allegations pertain to only "isolated," "localized," or "episodic" unlawful activities at most, not widespread illegal conduct across the Canadian retail market. (Defs.' Br. 12-13.)

Defendants first argument on this point is a red herring. Plaintiffs do not complain that TD Bank's sales practices were per se illegal.[5] Even if Plaintiffs did complain of the legality of TD Bank's sales practices, it does not affect the sufficiency of Plaintiffs' other allegations concerning unauthorized sales. Moreover, Plaintiffs describe TD Bank's sales practices to explain why they believe TD Bank employees were engaging in improper or illegal conduct, like unauthorized sales or non-disclosure of fees. This provides helpful context for the Court in considering Plaintiffs' allegations. Accordingly, the Court finds Defendants' argument here does not bear on dismissal.

Defendants second argument, whether Plaintiffs have alleged an underlying, nationwide illegal scheme, is substantive. The

---

[5] The Court does note here Plaintiffs believe TD Bank's sales practices may have created a hostile work environment for some employees and may have created other consequences that were illegal. But, in isolation from their many consequences, it does not appear that Plaintiffs believe TD Bank's institutional practices are per se illegal.

Court is certainly cognizant that Plaintiffs have not provided a
CW – or even a statement – from someone occupying a high
position at TD Bank to show conclusively that untoward conduct
may have been occurring across the entire Canadian retail
sector.  The Court is also aware that the CWs' statements in the
FAC provide snapshots of different locations at different times.
But this does not make the FAC deficient.

This case is not Chubb Corp., which Defendants heavily rely
on in favor of dismissal.  In Chubb Corp., the shareholders
generally asserted a rate initiative in its commercial insurance
business meant to improve Chubb's bottom-line was failing and
that executives engaged in misleading accounting practices to
cover up this failure.  394 F.3d at 140-41.  In considering the
CWs used in that case, the Third Circuit noted:

> Plaintiffs fail to aver . . . when any of [the CWs]
> were employed by Chubb.  Nor do Plaintiffs allege the
> dates that these sources acquired the information they
> purportedly possess, or how any of these former
> employees had access to such information . . .
> Plaintiff heavily rely on former employees who worked
> in Chubb's local branch offices for information
> concerning Chubb's business on a national scale.
> Moreover, many of these sources were branch employees
> who worked in departments other than standard
> commercial . . . we are left to speculate whether the
> anonymous sources obtained the information they
> purport to possess by firsthand knowledge or rumor.

Id. at 148.

In contrast, the Plaintiffs have properly alleged where and
when the CWs worked for TD Bank, how the CWs had access to the

information they allege, and that they possess firsthand
knowledge.  Moreover, the CWs were employed in the very branches
and departments that are alleged to have engaged in
improprieties.  These allegations are much different than those
presented to the Third Circuit in Chubb Corp.

As noted supra, Defendants are correct that Plaintiffs have
not brought forth one source with nationwide knowledge.  But,
that is not dispositive of this matter.  As even Chubb Corp.
states, "[c]iting to a large number of varied sources may in
some instances help provide particularity, as when the accounts
supplied by the sources corroborate and reinforce one another."
Id. at 155.  This is what Plaintiffs have accomplished here,
relaying markedly consistent allegations from across TD Bank's
Canadian retail segment.

In fact, it appears Plaintiffs' case is most analogous to
the case cited by Plaintiffs out of the Central District of
California.  In re Countrywide Fin. Corp. Derivative Litig., 554
F. Supp. 2d 1044 (C.D. Cal. 2008).  There, fourteen low-level
CWs (underwriters, senior underwrites, senior loan officers,
vice presidents, auditors, and external consultants) in four
locations over the period of four years were found to have
sufficiently shown – at the motion to dismiss stage - improper
nationwide practices.  Id. at 1058-59.  Particularly persuasive
to the court there was the consistency of the statements between

19

different levels of employees at different locations across
time.  Id.  Plaintiffs' allegations are sufficiently similar to
those in Countrywide to allow them to survive a motion to
dismiss.

Defendants attempt to distinguish this case is unavailing.
Possibly, Defendants arguments about whether the claims were
elevated to higher levels of the company could have a bearing on
scienter, but it does not bear on whether an underlying scheme
has been pleaded with particularity.  Moreover, Plaintiffs have
presented CW statements from multiple levels – tellers,
advisors, customer service representatives, a branch manager, a
district vice president, a human resources employee, and a
senior credit analyst – not just the lowest levels as Defendants
attempt to argue.  Accordingly, this Court will not dismiss
Plaintiffs Section 10(b) claim on these grounds.

ii. Whether Plaintiffs Fail to Plead the Falsity of
Defendants' Statements with Particularity

Defendants argue, even if this Court finds an underlying
illegal scheme was sufficiently pleaded, Plaintiffs have not
explained why each statement is misleading.  Defendants assert
Plaintiffs' allegations concerning the falsity of these
statements are merely conclusory and boilerplate.  Plaintiffs
counter that their allegations may be repetitive, but they are
far from conclusory or boilerplate.

This Court first notes that it appears Plaintiffs have not merely used identical language to explain why each statement was allegedly misleading. Defendants seem to admit as much, saying the paragraphs are only "nearly identical." Plaintiffs actually offer a number of different versions of this paragraph that are specifically tailored to the alleged misstatement at issue. As Plaintiffs point out, this does not make their allegations conclusory, nor is it a ground for dismissal. In re Honeywell Int'l Sec. Litig., 182 F. Supp. 414, 426-27 (D.N.J. 2002).

Defendants are incorrect in that Plaintiffs do not refer to a public statement and then allege "in a general and conclusory manner, that those disclosures were false or misleading." In re Party City Sec. Litig., 147 F. Supp. 2d 282, 300 (D.N.J. 2001). Instead, Plaintiffs explain why the statement was misleading based on the CWs' statements, which allegedly disclose what was actually occurring in TD Bank's Canadian retail segment.

While this Court will not walk through each and every allegation – especially considering Defendants do not present argument specific to each and every allegation – it is instructive to provide an example. Plaintiffs complain of a statement made by Masrani on a December 1, 2016 earnings call. On it, Masrani stated, "**[b]y putting the customer front and center, we've been able to drive engagement to new levels**, particularly in mobile." (FAC ¶ 172 (emphasis in original).)

Plaintiffs then state "[i]t was especially misleading to state any positive notion of customer acquisition, deepening customer relationships, or putting the customer front-and-center, in light of the CW statements set forth herein." (FAC ¶ 173.) As discussed supra in that very paragraph, the statement is at odds with the CW statements which allegedly show "rampant misconduct" which included sales to customers that were unauthorized. (FAC ¶ 173.)[6]

### iii. Whether Plaintiffs Fail to Plead the Falsity of Defendants' Statements of Opinion

Defendants also argue that many of the complained of statements were statements of opinion. Defendants assert a statement of opinion is only actionable if the speaker did not "actually hold[] the stated belief" or if the statement "omits material facts about the [speaker's] inquiry into, or knowledge concerning [the] statement . . . and if those facts conflict with what a reasonable investor . . . would take from the statement itself." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1326, 1329 (2015). Plaintiffs counter that these opinion statements actually convey the speaker's basis for holding the opinion. In that circumstance, Plaintiffs argue, "if the real facts are

---

[6] The Court is aware that Defendants also make a specific argument as to the sole statement attributed to Chauvin. This will be addressed infra when this Court considers Defendants arguments on whether to dismiss Chauvin from this case.

otherwise, but not provided, the opinion statement will mislead the audience" and is therefore actionable.  Id. at 1328.

Defendants are correct.  First, as Plaintiffs seem to admit, there are no allegations in the FAC that the Individual Defendants did not truly hold the stated belief.  Without that, Plaintiffs do not properly plead a Section 10(b) claim premised on pure opinion.  Moreover, this Court finds that none of the statements referenced in Defendants' moving brief actually expresses an "embedded statement[] of fact."  Omnicare, Inc., 135 S. Ct. at 1327.  The closest Plaintiffs get is Masrani's statement about his feeling of comfort with "healthy levels on a consistent basis."  (FAC ¶ 158.)  But, even this is not enough. Masrani is not asserting TD Bank has "healthy levels," just that he feels comfortable with those levels.  Plaintiffs may not proceed on their Section 10(b) claims on the basis of the statements cited by Defendants on page seventeen of their moving brief.[7]

> iv. Whether Plaintiffs Adequately Allege TD Bank's Earning Statements and Certifications are False and Misleading

Next, Defendants argue that any claims based on figures in TD Bank's earnings statements must be dismissed.  Defendants

---

[7] The one exception is the statement made at paragraph 162 of the FAC.  That statement is not one of opinion, but one literally stating what keeps Chauvin up at night.  As discussed supra, Chauvin's statement will be addressed infra separately.

assert those allegations occur at paragraphs 177(a), 177(c), 178(a), 179(a), 180(a), 181(c), and 182(a) of the FAC. First, Defendants argue that as long as the numbers disclosed in the earning statements are accurate, they cannot give rise to Section 10(b) liability. Plaintiffs do not respond to this particular argument, instead pointing to assertions which attribute the growth of various factors that they believe violated Section 10(b).

Considering the strength of the case law in this area, this Court will dismiss any claims – to the extent they are made – which are premised on numbers reported in the earnings statements. See, e.g., In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)."); In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 579 (D.N.J. 2001) (same); In re Milestone Sci. Sec. Litig., 103 F. Supp. 2d 425, 457 (D.N.J. 2000) (same). While this Court understands this is not a per se rule, Plaintiffs do not allege the figures reported are actually inaccurate or provide estimates as to how dramatically unauthorized sales may have affected these figures. Therefore, Plaintiffs may not base their claims on either the figures in the earnings statements or the textual statements describing

those figures.[8]

Second, Defendants argue the statements attributing
financial results to specific sources cannot be the basis for a
Section 10(b) claim.  In doing so, Defendants rely heavily on
Galati v. Commerce Bancorp, Inc., 220 F. App'x 97 (3d Cir.
2007).  Galati was premised on the convictions of three officers
of Commerce Bank for their participation in a "pay-to-play
scheme" that involved Commerce Bank providing personal loans to
the Philadelphia Treasurer who, in turn, channeled millions of
dollars in municipal business into the bank.  Id. at 99-100.
The shareholders in that action claimed SEC filings and earnings
releases were misleading, because they discussed business growth
but did not disclose its source was the illegal pay-to-play
scheme.  Id. at 101.  The shareholders generally complained of
(1) descriptions of the percentage and actual growth of various
divisions and (2) positive statements describing this growth
like "dramatic," "strong," or "unique."  Id.

The Court rejected this entire theory of Section 10(b)
liability.  It held, as this Court has already described supra,
that an accurate factual recitation of past earnings cannot give
rise to Section 10(b) liability.  It also held that "statements

---

[8] For example, the statement that "TD reported net income of
$2,358 million and diluted earnings per share ("EPS") of $1.24,
on revenue of $8,701 million" would be inactionable under this
Court's ruling.  (FAC ¶ 180(a).)

concerning the [defendant's] 'dramatic deposit growth,' 'strong performance,' and 'unique business model,' constitute nothing more than mere puffery, insufficient to sustain a Rule 10b-5 claim." Id. at 102. In other words, "routine recitations of past financial performance, and general optimistic statements about the Company's future growth . . . [do] not give rise to a duty to disclose the malfeasance . . . ." Id.

Defendants may have correctly described the law, but they fail to grapple with the facts of this case. While this Court agrees – as discussed supra – that mere recitations of past financial performance (whether or not accompanied by puffery) do not give rise to Section 10(b) liability, attributing that financial performance to particular sources may. See, e.g., SEC v. Kearns, 691 F. Supp. 2d 601, 616-17 (D.N.J. 2010) ("A reasonable fact-finder could find it misleading to attribute increased revenue to increased sales to existing customers when, in fact, MedQuist's revenues were also due to falsely inflating bills to existing customers and not merely increased sales to those customers."). Here, attributing certain financials to "loan and deposit volume growth" or "good organic growth" or "higher fee-based revenue" could provide a basis for a Section 10(b) claim. As Defendants know, Plaintiffs assert this growth is actually based on improper, illegal, or unauthorized sales. This Court cannot decide as a matter of law that these

statements are immaterial or not misleading at this stage in the proceedings.

Third, Defendants argue the certifications accompanying the earnings statements are inactionable because the financial figures have been determined to be inactionable. Defendants assert those allegations occur at paragraphs 177(b), 177(c), 178(b), 179(b), 180(b), 181(c), and 182(b) of the FAC. Plaintiffs counter that Sarbanes-Oxley ("SOX") certifications are actionable here – regardless of whether the figures in the earnings statements are actionable – because Plaintiffs have pleaded deficient internal controls.

Plaintiffs are correct. SOX certifications are typically actionable when either the financial figures are inaccurate or when there is an allegation that the internal controls within a company were deficient. _City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc._, 686 F. Supp. 2d 404, 418 (D. Del. 2009). Thus, Defendants' argument on this point cannot support dismissal of this claim.

Defendants also argue over whether Plaintiffs have sufficiently alleged that the Individual Defendants who certified the reports had the necessary state of mind. This argument is more properly addressed in the scienter section below, so the Court will address it _infra_. _See, e.g._, _Carmack v. Amaya Inc._, 258 F. Supp. 3d 454, 467-68 (D.N.J. 2017)

(stating that whether the appropriate state of mind has been shown should be determined in a scienter analysis); Horizon Lines, Inc., 686 F. Supp. 2d at 420 ("[P]laintiffs [must] plead with sufficient particularity that either [defendant] was aware or should have been aware of the rate-fixing scheme at the time those certifications were made. This leads us to the scienter prong of the PSLRA." (emphasis added)).

### v. Whether TD Bank's Code of Conduct Contains Actionable Statements

Defendants also challenge whether Plaintiffs may base a Section 10(b) claim on statements made in TD Bank's Code of Conduct (the "Code"). Defendants assert Plaintiffs' claim regarding the Code is merely that TD Bank did not disclose violations, which were evidenced by the CWs' statements. Plaintiffs argue that statements in the Code are actionable because it contains "specific, concrete, objectively provable or disprovable statements." (Pltfs' Opp. Br. 23.)

This Court finds the Code is inactionable. To the extent that Plaintiffs' claim is based on the Code acting as a representation by TD Bank that the Code is not being violated by its employees, it is inactionable. City of Roseville Emps.' Ret. Sys., 686 F. Supp. 2d at 415. City of Roseville is persuasive on this point. There, shareholders argued that Horizon Lines, Inc.'s "Code of Ethics" was actionable because it

alleged the defendants failed to disclose violations of the Code

of Ethics.  Id.  The District of Delaware disagreed, finding the

theory of liability untenable.  Id.  The court there cited two

reasons why this was so: (1) since a code of ethics is required

under SEC regulations, allowing this theory of liability would

create liability for every company that did not disclose

violations; and (2) because it is mandatory, the publishing of a

code is not actually a statement or representation that it will

be followed.  Id.  The same applies here, regardless of the

contents of the Code.

Furthermore, to the extent Plaintiffs complain about the

actual statements made in the Code, those are also inactionable,

general statements.  Plaintiffs cited case is unavailing, as it

found inactionable most of the statements in the defendant's

ethics code, and only allowed a statement in a corporate

responsibility report to move forward.  City of Brockton Ret.

Sys. v. Avon Prods., No. 11 Civ. 4665 (PGG), 2014 U.S. Dist.

LEXIS 137387, *41-47 (S.D.N.Y. Sept. 29, 2014).  Unlike City of

Brockton Ret. Sys., Plaintiffs are unable to point to a

statement in the Code "about [an] allegedly elaborate internal

controls operation as reflecting concrete steps" that a

reasonable investor may interpret "as a guarantee that such

steps had, in fact, been implemented."  Id. at *46-47.

Instead, the statements are most analogous to those

considered inactionable.  For example, statements that "[o]ne of Avon's fundamental principles is that its associates will observe the very highest standards of ethics in the conduct of Avon's business" and "[b]ribes, kickbacks and payoffs to government officials, suppliers and other[s] are strictly prohibited" were found inactionable.  Id. at *38, 41.  Like the previous statements, statements that "TD is committed to conducting its affairs to the highest standard of ethics, integrity, honest, fairness and professionalism – in every respect, without exception, and at all times" or "[i]rregular business conduct . . . will not be tolerated under any circumstances" are general statements and immaterial puffery that are inactionable as a matter of law. (FAC ¶ 152(c), (h).) See In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731, 754–57 (S.D.N.Y. 2017) (finding similar general statements and immaterial puffery inactionable); City of Brockton Ret. Sys., 2014 U.S. Dist. LEXIS 137387, *41–47 (same).  Accordingly, Plaintiffs will not be permitted to proceed on the basis of the Code or statements made within the Code.

> vi. Whether General Statements about TD's Risk Management, Internal Controls, and Business Operations Are Material as a Matter of Law

Finally, Defendants argue the only statements left in the FAC beyond the earnings statements, SOX certifications, Code, and statements of opinion are "generalized positive comments

30

that are immaterial as a matter of law." (Defs.' Br. 20.)
Statements of optimism and hope, according to Defendants, are
inactionable because they are not relied upon by any reasonable
investor. Plaintiffs counter these statements are actionable
because they are statements which are provable or disprovable.

As both sides acknowledge, "[m]ateriality is ordinarily an
issue left to the factfinder and is therefore not typically a
matter for Rule 12(b)(6) dismissal." In re Adams Golf, Inc.
Sec. Litig., 381 F.3d 267, 274-75 (3d Cir. 2004). The standard
here is high. Accordingly, "[o]nly when the disclosure or
omissions are so clearly unimportant that reasonable minds could
not differ should the ultimate issue of materiality be decided
as a matter of law." In re Galena Biopharma, Inc. Sec. Litig.,
No. 2:17-cv-929-KM-JBC, 2018 U.S. Dist. LEXIS 141550, at *26
(D.N.J. Aug. 21, 2018) (quoting Craftmatic Sec. Litig. v.
Kraftsow, 890 F.2d 628, 641 (3d Cir. 1989)) (internal quotations
omitted). In other words, "where there is room for differing
opinions on the issue of materiality, the question should be
left for jury determination." Id. at *27 (quoting Ieradi v.
Mylan Lab, Inc., 230 F.3d 594, 599 (3d Cir. 2000)).

With that standard controlling this determination, this
Court declines to dismiss the statements cited by Defendants.
As Plaintiffs correctly point out, these statements are devoid
of context. For example, that TD Bank's "philosophy around

compensation [is] very conservative" is not a positive or general statement when taken in context.  (Defs.' Br. 20.)  The context of the statement is whether Pederson believes internal controls at TD Bank are sufficient to ensure that the improprieties that occurred at Wells Fargo could not occur at TD Bank.  The full statement Plaintiffs complain of states:

> We also have a philosophy around compensation that's very conservative.  So, the pay at stake for our sales force and the stores is significantly less than in other banks, because of our philosophy, which applies to my compensation too, that we have always believed we don't want compensation systems that incent any swinging for the fences.

(FAC ¶ 154.)  This Court cannot say at this point – as a matter of law – that this statement would not be material to a reasonable investor.

This Court is unable to discount the other statements complained of for the same or similar reasons.  Accordingly, this Court will not dismiss the Section 10(b) claim on these grounds.  But, the Court notes that Defendants are not foreclosed from pursuing this argument again on a fuller factual record.

### b. Scienter

Defendants also challenge whether Plaintiffs have pleaded the strong inference of scienter needed to propel Plaintiffs' FAC past the pleading stage.  In determining whether a strong

inference of scienter has been shown, courts must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) (emphasis in original).  In making this determination, courts "must take into account plausible opposing inferences" and determine whether "plaintiffs . . . plead with particularity facts that give rise to a 'strong' – i.e., a powerful or cogent – inference" of scienter.  Id.  In other words, a strong inference of scienter is shown "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 324.

Thus, this Court will discuss each basis for scienter and Defendants plausible opposing inference.  Then this Court will consider the complaint as a whole in determining whether Plaintiffs have shown a strong inference of scienter.

　　　　　i.　Whether Plaintiffs Plead Individual Defendants
　　　　　　　Were Aware of Conduct Described by CWs

Defendants present argument on two separate bases for why this Court cannot use the CWs' statements in conducting its scienter analysis.  First, Defendants assert Plaintiffs do not assert any facts alleging the Individual Defendants had actual

33

knowledge of the substance of the CWs' statements.  Defendants

argue to do so would require allegations by CWs that they

disclosed this information to Individual Defendants.  Plaintiffs

do not contest this characterization.  Accordingly, this Court

will not allow this theory to support scienter.[9]

> ii. Whether Plaintiffs "Should Have Known" Theory Is
> Sufficient to Plead Scienter[10]

Second, Defendants challenge whether Plaintiffs allegation

that Individual Defendants "should have known" of the alleged

improprieties should be allowed to support an inference of

scienter.  To the extent Plaintiffs pleaded this way, Defendants

would be correct.  See City of Roseville Emps.' Ret. Sys. v.

Horizon Lines, Inc., 713 F. Supp. 2d 378, 399 (D. Del. 2010)

("Mere allegations that a defendant 'should have known' of fraud

because of his supervisory role within a company or because his

subordinates were aware of it, are insufficient." (citations

omitted)).

But it appears Plaintiffs allegations go beyond that.

---

[9] As disclosed infra, this does not disclose other scienter
arguments made by Plaintiffs.  This is merely a recognition that
Plaintiffs have not pleaded direct evidence showing Individual
Defendants knew of the underlying wrong.  Instead, Plaintiffs
have pleaded circumstantial evidence, thus requiring this Court
to determine whether a strong inference of scienter has been
shown on the FAC.

[10] This Court will not address the argument made by Defendants in
their moving brief (Defs.' Br. 25-26) concerning internal
controls as it is mooted by the Court's decision, infra.

Plaintiffs do not argue Defendants should have known merely from their supervisory role, but because it was widely known within TD Bank that these alleged improprieties were occurring. As discussed _supra_, this Court has already found that Plaintiffs' have adequately pleaded an underlying, nationwide illegal scheme. It appears from those allegations that these activities were widespread – and therefore widely known.

Notably, there are some indications that individuals at the corporate office were aware of the underlying issues disclosed by the CWs. (_See_ FAC ¶ 141 ("For instance, CW7 said that the corporate office might send a stern email about the high number of customers placed in overdraft protection without permission. As CW7 put it, 'There'd be an email from head office, saying, 'It's come to our attention that overdraft protection is being put on accounts improperly . . . Stop doing it, let's not be a part of that culture.'").

This Court will permit the CWs' statements to support a strong inference of scienter. The Court finds it may infer from these allegations that Individual Defendants either knew or the improprieties were so obvious that they must have been aware.

The Court has decided to let these allegations serve as a basis for scienter because it finds the law unsettled. Plaintiffs cite cases tending to show that CW statements which show widespread misconduct may support an inference of scienter.

See <u>In re EZCorp, Inc. Secs. Litigs.</u>, 181 F. Supp. 3d 197, 209-10 (S.D.N.Y. 2016) ("Also supporting a finding of scienter is the collective picture painted by the confidential witnesses: a culture of unscrupulous lending practices and lax oversight that was so widespread as to be 'a matter of course' . . . ."); <u>Cornwell v. Credit Suisse Grp.</u>, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (finding CW statements which "allege[d] widespread knowledge at CSG of the company's problems with valuation, risk management and internal controls" supported scienter).

Although most of Defendants case law is not relevant,[11] one citation to a case within this District suggests only allegations of actual knowledge by Defendants of the substance of CWs statements would suffice to satisfy a strong inference of scienter. <u>See</u> <u>Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.</u>, 720 F. Supp. 2d 517, 553-56 (D.N.J. 2010) ("In sum, in over fifty paragraphs of statements made by confidential witnesses, not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants . . . which would sufficiently raise a

---

[11] This Court will not address each case individually. Generally, Defendants case law either assumes a very different set of facts (e.g., where CWs do not allege impropriety, but merely difficult sales goals or where the basis for scienter are reports which were never disclosed to the defendants) or presents an inapplicable point of law.

strong inference of scienter that Individual Defendants knew their public statements and disclosures were false.").

It would be improper for the Court to grant dismissal at this stage in the proceedings because of the apparently unsettled nature of the case law.  Therefore, Defendants are unable to prove these allegations are improper as a matter of law.  This does not disclose Defendants from challenging these allegations again on a fuller record.

### iii.  Whether Plaintiffs Impermissibly Rely Upon Group Pleading

Defendants also assert this Court may not consider Plaintiffs scienter allegations because they improperly rely upon group pleading.  Defendants cite cases which explain that group pleading is prohibited by the PSLRA.  Plaintiffs counter that they do not rely on group pleading and have identified particularly which statements are attributable to which Defendants and which scienter arguments are applicable to which Defendants.

Defendants have accurately stated the law in this Circuit. As pronounced in Winer Family Trust v. Queen, "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."  503 F.3d 319, 337 (3d Cir. 2007).  In Winer Family Trust, the Court rejected Plaintiffs' attempt to plead that all the defendants were

responsible for misrepresentations in published information.
Id. at 335-37.  That case and City of Roseville, however, did
not address group pleading in the scienter context.

Regardless, Plaintiffs have not relied upon group pleading
in alleging Defendants' statements.  The statements which have
survived the Motion to Dismiss are attributed to specific
Defendants, whether they are SOX certifications or statements
made at conferences or on earnings calls.  Defendants' argument
here is adequately countered by the FAC.

It appears In re Bio-Technology Gen. Corp. Sec. Litig. did
address group pleading and scienter – at least in part.  380 F.
Supp. 2d 574, 586-87 (D.N.J. 2005).  There, the Court held
"generalized allegations of motive and opportunity do not
suffice to create a strong inference of scienter unless
accompanied by particularized allegations . . . ."  Id. at 586.

Plaintiffs have offered particularized allegations as to
motive and opportunity where appropriate in the FAC.  Plaintiffs
have made particular allegations as to scienter stemming from
insider sales and SOX certifications.  Nor are the other bases
for scienter deficient.  For example, the core operations
doctrine is sufficiently pleaded.  Plaintiffs have alleged the
importance of the Canadian retail segment and Individual
Defendants position within TD Bank, which is enough to allow the
core operations doctrine pleading to survive a motion to

dismiss.  The Court will not ignore any allegations on the basis of this argument.

> iv.  Whether the FAC Pleads a Factual Basis for Its Allegation that Individual Defendants' Trades Were Suspicious[12]

Defendants challenge whether an inference of scienter may be derived from Individual Defendants' allegedly suspicious trades.  Generally, Defendants challenge this basis for scienter on grounds that Plaintiffs fail to allege the trades were unusual in scope or timing.  Plaintiffs essentially allege that Individual Defendants' trades support scienter because they occurred during the class period, were unusual, and amounted to C\$28,950,441.  Defendants offer multiple opposing inferences that may be derived from Individual Defendants allegedly suspicious trades during the class period that will be discussed in turn.  Defendants do not dispute the FAC's allegations concerning the types, dates, or amounts of trading by the Individual Defendants.

In determining whether a stock sale supports scienter, a court should consider whether it is "unusual in scope or timing."  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 277 (3d Cir. 2006) (citations and quotations omitted).  To

_____

[12] The Court will take judicial notice of the public filings relied upon by Defendants in their reply brief that were not objected to by Plaintiffs in their proposed sur-reply and related filings.

determine whether a sale is unusual in scope, a court may examine "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved."  Id. (citations and quotations omitted).

Defendants first argue that the "performance share units" ("PSUs") supposedly "exercised" by Individual Defendants were not suspicious because they were (1) not exercised by Defendants and (2) not unusual in amount.  As Defendants explain, PSUs are "phantom share units that track the price of common shares of [TD B]ank, receive dividend equivalents in the form of additional units, and are subject to an adjustment to a portion of the award at maturity to further reflect bank performance over the performance period."  (Defs.' Reply Br. 9.)  These PSUs cannot be exercised or sold, but are paid out at the end of three years.

While Defendants appear to be correct in that the PSUs were not technically exercised or sold, that does not necessarily defeat Plaintiffs' argument on scienter.  The motive, personal financial gain, and opportunity, because the PSUs vested shortly after planned public statements were made by various Individual Defendants, still exists whether the PSUs could be sold at particular times or vested at a predetermined time.  While this inhibits the flexibility of Individual Defendants in making a statement to raise the stock price and then immediately sell at

40

a higher price, the timing of the vesting of the PSUs is close
in time to various statements by Individual Defendants, which
are alleged to contain false or misleading information.  This
will contribute to Plaintiffs' scienter argument as the vesting
may have been unusual in time.

This Court must also consider "scope."  Defendants appear
to be correct, that the amounts sold were not unusual.
Examining the records, it appears a similar amount of PSUs were
paid out each December during the class period.  Plaintiffs,
incorrectly, combine two Decembers of PSU sales and compare them
to only one December of PSU sales for all Individual Defendants.
This will neither aid nor detract from Plaintiffs pleading of
scienter.  If the PSUs take three years to vest, as Defendants
assert, then the amounts were set before the class period.
Given that fact, this cannot be said to support either side's
scienter argument.

Regardless, there are still stock sales and options that
various Individual Defendants made during the course of the
class period.  Plaintiffs have presented evidence showing the
sales of shares and options were unusual in timing, as many were
sold in close proximity to allegedly false or misleading
statements.  Unlike the PSUs, Defendants do not allege these
sales were not within the control of Individual Defendants.
This supports scienter.  Moreover, it appears all Individual

Defendants either sold shares or exercised stock options during the class period.  This also supports scienter.  It also appears to be undisputed that these sales were unusual in amount, as opposed to the previous year where none of the Individual Defendants sold shares or exercised options (besides the aforementioned PSUs).  This supports scienter as well.  See In re Hertz Global Holdings Inc., 905 F.3d 106, 119-21 (3d Cir. 2018) (analyzing the above factors in determining whether insider stock sales were unusual in scope and timing).[13]

Defendants do not present this Court with a compelling counter-narrative of the stock sales.  Instead, Defendants rely on general principles about the percentage of holdings sold and whether the stock sold was in the form of options.  (Defs.' Reply Br. 11.)  If Defendants wished to challenge Plaintiffs' scienter argument, they could have provided this Court with percentages of holdings which each Individual Defendant sold off during the class period.[14]  They do not.  Thus, this Court lacks

_____

[13] The Court also notes that in additional letter briefs submitted by the parties, which discuss the recent opinion in the Hertz case from the Third Circuit, Plaintiffs show that the proceeds from the sales of the PSUs, shares, and options amounted to a large portion or exceeded Individual Defendants salaries.  From the Court's examination of the FAC, the general assertion appears to be true and would additionally support scienter.

[14] This Court acknowledges Defendants made an argument specific to Johnston, but they are unable to address the timing and amount of her sales.  As discussed above, what percentage was

the information to determine whether this would support or detract from the inference of scienter here.  The cases cited by Defendants are unhelpful, as they do not bear on the specific facts of this case or analyze arguments actually advanced by Defendants that are lacking here.

Moreover, In re Hertz Global Holdings Inc. seems to suggest that the percentage of holdings sold off in this case would not affect the outcome.  905 F.3d at 120-21.  The reason: the timing, amount – as compared to sales from the previous year, and individuals involved all support a plausible allegation of scienter.  The percentage sold could not here overwhelm the strength of these factors.  Accordingly, this Court finds the stock sales of the Individual Defendants may support a strong inference of scienter here.

>            v.  Whether the Misconduct at Wells Fargo May Support
>                Scienter

Defendants argue the allegations made concerning the effect of the legal troubles faced by Wells Fargo in 2016 add nothing to this Court's determination of scienter for two reasons. First, Defendants assert that the FAC does not plead that misconduct at Wells Fargo put Defendants on notice of misconduct at TD Bank.  Second, Defendants argue that "guilt by association" theories of scienter have been rejected by other

_____

sold is not dispositive of scienter.  It does not change the Court's analysis here.

federal courts.  Although Plaintiffs do not appear to dispute this argument, this Court will consider it on the merits.

This Court is persuaded by Defendants' argument on this point.  There appears to be no cogent inference that could be made here from the events that occurred at Wells Fargo.  While Plaintiffs allege the same types of misconduct occurred at both Wells Fargo and TD Bank, these are two separate banks with different executives, employees, and policies.  Defendants are right: the FAC does not allege that the occurrences at Wells Fargo put Defendants on notice of improper conduct at TD Bank. For this reason alone, this Court could find these allegations do not contribute in any way to its determination of scienter.

Moreover, the decision in <u>Pirnik v. Fiat Chrysler Automobiles</u> from the Southern District of New York is persuasive.  No. 15-cv-7199 (JMF), 2017 U.S. Dist. LEXIS 120841 (S.D.N.Y. Aug. 1, 2017).  The court there did not find allegations of Fiat Chrysler Automobiles' "awareness that <u>other</u> automobile manufacturers were facing regulatory scrutiny for using illegal 'defeat devices'" supported scienter.  <u>Id.</u> at *6 (emphasis in original).  This is a sensible conclusion, and this Court comes to the same conclusion here on similar allegations. Essentially, Plaintiffs allege Individual Defendants' were aware that illegal conduct could lead to regulatory scrutiny and other legal consequences.  That could apply to any case, thus, it does

44

not support scienter here.

> ### vi. Whether TD Bank's Management Structure and Corporate Organization May Support Scienter

Defendants argue Plaintiffs' allegations concerning the general structure and organization of TD Bank cannot be used as a basis to support scienter. Plaintiffs do not appear to oppose this argument.[15] This Court will consider it on the merits.

Defendants assert "a plaintiff cannot establish scienter on the part of defendant executives by 'loosely describing the managerial hierarchy' by which fraudulent conduct could have come to their attention." City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 422 (D. Del. 2009) (quoting Clark v. Comcast Corp., 582 F. Supp. 2d 692, 706 (E.D. Pa. 2008)). To state it another way:

> allegations that a securities-fraud defendant, because of his position within the company, "must have known" a statement was false or misleading are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny."

In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999) (quoting Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir.

---

[15] This Court recognizes that Plaintiffs do attempt to oppose it by citing to CW statements. (Pls.' Opp. Br. 28 n.21.) But, this does not actually address Defendants' argument. Defendants limit their argument to whether the general hierarchy of an organization may be used to support scienter. Regardless, this Court considered the CW statements, supra and infra, in weighing whether a strong inference of scienter has been shown by the FAC.

1998)).  This is essentially what Plaintiffs attempt to do in their FAC.  (FAC ¶¶ 191-96.)  These allegations do not support a finding of scienter.

>        vii.  Whether the Core Operations Doctrine May Support
>              Scienter

Defendants argue the core operations doctrine cannot support a strong inference of scienter when Plaintiffs fail to plead any facts in the FAC showing alleged misconduct so pervasive as to implicate the core operations of TD Bank. Defendants generally complain the allegations concerning the core operations doctrine are conclusory.  Plaintiffs contend the core operations doctrine applies and strengthens the inference of Defendants' scienter given the Canadian retail segment's central importance to TD Bank's profitability.

"[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge."  In re Urban Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 653-654 (E.D. Pa. 2015) (citations omitted).

The core operations doctrine was allowed to support scienter in Urban Outfitters, essentially on the basis that the business wherein fraud was alleged to have occurred accounted

46

for 44% of all sales by Urban Outfitters during the year in question.  Id. at 654.  A similar decision was made by the Third Circuit, where it allowed the core operations doctrine to support scienter even though no CW statement or particular document showed a defendant's knowledge.  Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 268, 271-72 (3d Cir. 2009).  But see Rahman v. Kid Brands, Inc., 736 F.3d 237, 246-47 (3d Cir. 2013) (refusing to allow the core operations doctrine to support scienter because the scheme involved only comprised a small percentage of the defendants' annual business).

Here, the Plaintiffs allege the Canadian Retail segment is "TD's flagship business," "contribut[ed] over 60%" of earnings, and that 95% of TD Bank's customer base used branch locations for banking – the very locations where alleged improprieties occurred. (FAC ¶¶ 48-59.)  Defendants fail to argue the Canadian retail segment is not one of TD Bank's core operations.  Defendants also fail to provide an alternative inference that should apply here.  Therefore, like Avaya, it appears here Individual Defendants made statements concerning the Canadian retail segment and internal controls and the Canadian retail segment was of central importance to TD Bank's success.  That is enough at the pleading stage to support the core operations doctrine.  In consideration of the procedural posture, the

particular facts alleged <u>supra</u> support scienter.

      viii. <u>Whether the Resignations or Reassignments of</u>
            <u>Certain Individual Defendants Support Scienter</u>

Defendants also challenge whether Plaintiffs assertion that
the resignation or reassignment of three of the Individual
Defendants may properly support scienter. Plaintiffs argue in
their opposition brief and the FAC that the resignations and
reassignments were suspicious because of their timing.

Generally, "[t]he departure of corporate executive
defendants is a factor that can strengthen the inference of
scienter." <u>In re Hertz Global Holdings, Inc.</u>, 905 F.3d 106, 118
(3d Cir. 2018) (citing <u>City of Dearborn Heights Act 345 Police &</u>
<u>Fire Ret. Sys. v. Align Tech., Inc.</u>, 856 F.3d 605, 622 (9th Cir.
2017)). But, even the termination of an executive after the
announcement of so-called bad news (e.g. accounting
irregularities) requires "more than pleading a link between bad
news and an executive's resignation." <u>Id.</u> at 119. There must
still be allegations which "cogently suggest that the
resignations resulted from the relevant executives' knowing or
reckless involvement in a fraud." <u>Id.</u>

The FAC does not support an inference of scienter from
these allegations. There are three reasons supporting this
conclusion. First, the timing of the two reassignments – that
of Johnson from CFO to Group Head and Pederson from President

48

and CEO to Advisor - was not suspicious.  Those occurred before
the CBC reports were published in March 2017.  Stepping down at
the height of an alleged fraud does not cogently lead to a
conclusion of knowledge or reckless involvement in a fraud.

Second, the fact that all three – Johnson, Pederson, and
Chauvin – retained a role at TD Bank further undercuts
Plaintiffs scienter theory.  A resignation may support a finding
of scienter because it may be implied that the individual knew
of the fraud being perpetrated.  Once those outside the fraud
find out, supposedly, they terminate (or force to resign) all
those who may have been responsible.  If these Individual
Defendants knew or were reckless in not knowing the alleged
fraud, why would TD Bank retain them in an advisory role?

Third, and most importantly, Plaintiffs plead nothing more
than that the resignation or reassignment happened within or
shortly after the class period.  The FAC does not allege, as is
required, that the resignations and reassignments had anything
to do with the specific Individual Defendants knowledge or
reckless involvement in the fraud.  Without more, this Court
finds these allegations do not support a finding of scienter.

> ix. <u>Whether TD Bank's Offerings During the Class
>     Period Support Scienter</u>

Defendants also challenge whether TD Bank's $2.75 billion

in note offerings during the class period may support scienter.[16] Since this is all the FAC states on this point, Defendants argue, it cannot support an allegation of scienter. Plaintiffs argue it should support scienter, because it shows that TD Bank allegedly continued to defraud shareholders in order to ensure the notes' terms were more favorable for TD Bank.

Defendants cite Avaya, Inc. in support of their position. 564 F.3d 242 (3d Cir. 2009). In that case, the shareholders alleged the defendants were motivated to inflate the price of stock in order to minimize paying cash for so-called Liquid Yield Option Notes ("LYONs") and obtain increased financing through a $400 million, five-year unsecured revolving credit facility. Id. at 278. In examining these facts, the Third Circuit stated "a general corporate desire to retire debt and raise funds and obtain credit on favorable terms" does not give rise to a strong inference of scienter. Id. at 279. The Third Circuit commented that "[c]orporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud." Id.

Plaintiffs counter with case law of their own. See, e.g., Van Dongen v. CNinsure Inc., 951 F. Supp. 2d 457, 474 (S.D.N.Y.

---

[16] Note, these allegations are solely advanced to support Plaintiffs' corporate scienter argument concerning TD Bank.

2013); In re Res. Am. Sec. Litig., No. 98-5446, 2000 U.S. Dist. LEXIS 10640, at *18-20 (E.D. Pa. July 26, 2000). The theory in these cases is that misleading statements made directly before company offerings may be used to artificially inflate stock prices or better credit terms, which provide a motive and opportunity in support of the inference of scienter.

This Court finds - based on the timing of the alleged misstatements and the offerings - that these allegations are probative of scienter. But, they are not particularly helpful. While the Court finds Plaintiffs have advanced a cogent theory, this Court finds these allegations only support scienter because it is at least as compelling as Defendants' inference. Therefore, this Court finds these allegations may lend some support to scienter.

> x. Whether SOX Certifications May Support Inference of Scienter

Finally, Defendants argue that the SOX certifications made by Masrani, Johnston, and Ahmed do not support an inference of scienter. Defendants essentially argue that "[a]n allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an

SEC filing." <u>In re Hertz Global Holdings, Inc.</u>, 905 F.3d at 118.

Considering this Court's previous findings, <u>supra</u>, this argument is unavailing. This Court has already found the CWs' statements may support a finding that Individual Defendants – including those who filed SOX certifications (Masrani, Johnston, and Ahmed) – either knew (or were reckless in not knowing) the alleged improprieties occurring at TD Bank. Considering the same factual basis is being used to allege scienter as to the SOX certifications as was used to allege scienter stemming from the CWs' statements, it is unclear whether this adds much more to the scienter analysis. To the extent it does, this Court will consider it.

xi. <u>Whether Plaintiffs' Allegations Create a Strong Inference of Scienter as to Defendants</u>

On balance, this Court finds Plaintiffs' allegations support a strong inference of scienter. In favor of a finding of scienter are Individual Defendants' stock sales, the core operations doctrine, the CWs' statements, and – to the extent helpful – the SOX certifications. The Court does not find that the resignations, management structure, or activities which occurred at Wells Fargo adds to the scienter puzzle. On balance, the FAC and Plaintiffs' arguments have persuaded this Court that – at this stage – Plaintiffs' proposed inference is

52

at least as plausible or more plausible than Defendants'
proposed inference.  Thus, this Court finds a strong inference
of scienter and it will not dismiss Plaintiffs' Section 10(b)
claim on this ground.

> xii.  Whether Plaintiffs Plead the Necessary Facts to
>        Support Corporate Scienter

Lastly, Defendants argue that the doctrine of corporate
scienter has not been adopted in the Third Circuit and cannot be
relied upon here.  Defendants also argue, even if this Court
allows the case to move forward on the doctrine of corporate
scienter, Plaintiffs have not met the exacting standard required
under that doctrine.

First, this Court will address Defendants argument
concerning the adoption of the doctrine of corporate scienter in
the Third Circuit.  Defendants are correct: the Third Circuit
has "neither accepted nor rejected the doctrine of corporate
scienter in securities fraud actions."  Rahman, 736 F.3d at 246;
see also In re Hertz Global Holdings, Inc., 905 F.3d at 121 n.6
(acknowledging the Third Circuit has "neither accepted nor
rejected th[e] doctrine" and declining to adopt it upon the
plaintiffs' request).

This does not provide an adequate basis for this Court to
dismiss the scienter argument made against TD Bank.  Federal
Rule of Civil Procedure 12(b)(6) only allows this Court to grant

a motion for "failure to state a claim upon which relief can be granted." The Third Circuit has yet to determine whether it will allow the doctrine of corporate scienter a place in its jurisprudence. While the outcome remains unknown, this Court cannot hold that Plaintiffs have failed to state a claim merely because the law is unsettled. Therefore, this Court will not dismiss the Section 10(b) claim against TD Bank on this basis.

Second, this Court must address whether – assuming the viability of the doctrine of corporate scienter – Plaintiffs have pleaded enough in the FAC. Defendants argue Plaintiffs have not pleaded facts (1) creating a strong inference that at least one of the Individual Defendants possessed intent that could be attributed to TD Bank or (2) evidencing "extraordinary" circumstances. Plaintiffs dispute Defendants allegedly narrow view of the doctrine.

Regardless, since this Court finds that a strong inference of scienter has been alleged as to Individual Defendants and Defendants admit that this may properly support a finding of corporate scienter, it will not dismiss the claim against TD Bank premised on corporate scienter. This argument, however, is not permanently foreclosed. Defendants are free to raise this argument again on a fuller record.

c. **Section 20(a) Claim**[17]

Defendants argue the Section 20(a) claim must also be dismissed based on two pleading deficiencies. First, Defendants argue that the FAC is deficient because Plaintiffs fail to plead that each of the Individual Defendants were Section 20(a) "controlling persons." Defendants assert, instead, Plaintiffs make only group allegations in their FAC. Second, Defendants assert the FAC fails to allege facts showing the Individual Defendants' culpable participation in the fraud. Acknowledging a split in this district, Defendants request this Court to follow one line of cases and require allegations of culpable participation.

First, this Court will address Defendants' argument concerning group pleading of control. While Defendants have accurately quoted the case law they cite, they have failed to provide the necessary context. For example, Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V. actually stands for the proposition that: "While status or position alone do not constitute control for purposes of § 20(a), . . . courts in this circuit have acknowledged that control person claims need not be pleaded with particularity so long as the underlying Section

---

[17] Defendants also argued the Section 20(a) claim is derivative of an underlying violation of Section 10(b) and should be dismissed if the Section 10(b) claim is dismissed. Because this Court has not dismissed the Section 10(b) claim thus far, it will not dismiss the Section 20(a) claim on that basis.

10(b) violation is properly pled." No. 00-5965, 2005 U.S. Dist. LEXIS 16854, at *43 (D.N.J. June 7, 2005).

The Rocker Mgmt., L.L.C. decision then cites cases from this Circuit and District which were allowed to move past the motion to dismiss stage containing similar allegations to this case. Id. at *43-44 (quoting In re Rent-Way Secs. Litig., 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002); In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 599-600 (D.N.J. 2001)). In fact, Rocker Mgmt., L.L.C. found the below allegations sufficient to show control under Section 20(a):

- "Individual Defendants, by reason of their stock ownership, directorships, and/or management positions, were controlling persons of L&H and had the power and influence to cause L&H to engage in the unlawful practices complained of herein."

- "[O]fficers and directors of L&H, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, [were] directly involved in the day-to-day operations of the Company at the highest level, and [were] privy to confidential proprietary information concerning the Company and its business, operations, and accounting practices as alleged herein."

Id. at *41-42 (alterations in original). Considering the state of the case law, the positions occupied by Individual Defendants, the statements and/or certifications made by them to the investing public, and the allegations made concerning the Section 20(a) claim, this Court finds Plaintiffs' allegations

are sufficient to survive Defendants' Motion to Dismiss.

Second, this Court will address Defendants' argument concerning pleading culpable participation. Defendants admit "[t]he Third Circuit has left [open the question of] whether plaintiffs must plead 'culpable participation' to survive a motion to dismiss." (Defs.' Reply Br. 34.) Therefore, there is no controlling law on-point for Defendants to assert that the Section 20(a) claims must be dismissed on these grounds. This, alone, could preclude dismissal.

Moreover, this Court finds the line of cases that do not require pleading of "culpable participation" at the motion to dismiss stage persuasive. Derensis has it right: (1) evidence of culpable participation is unlikely to emerge until after discovery is completed and (2) evidence relating to culpable participation will likely be entirely within a defendants' control. Derensis v. Coopers & Lybrand Chtd. Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996). Requiring pleading of culpable participation would essentially bar Section 20(a) claims from being brought in the vast majority of cases. The strict pleading requirements for Section 10(b) claims under the PSLRA provide an effective device to expose frivolous Section 10(b) claims – always leading to the dismissal of Section 20(a) claims attached thereto. Accordingly, this Court declines to dismiss the Section 20(a) claims at this juncture.

### d. **Claims Against Mike Pedersen and Mark Chauvin**

Lastly, Defendants request Defendants Pedersen and Chauvin be dismissed from this case. Essentially, Defendants argue that only one statement from each individual has been asserted by Plaintiffs to be false or misleading. But, Defendants argue, the FAC neither asserts facts showing these statements were false or misleading nor does it contain particularized allegations that these defendants' control over any other Defendant violated Section 10(b). The Court addressed this second argument, _supra_, and finds again that it cannot form the basis for dismissal of Section 20(a) claims.

Plaintiffs assert that Defendants unfairly quote the actual statement made, that the statement was alleged to be false and misleading, and that these statements are not the only basis for Plaintiffs' claim against them. This Court will address each statement in turn.

### i. Mike Pedersen

As discussed _supra_, this Court found this statement may be the basis for a Section 10(b) claim. This statement goes directly to the heart of the alleged improprieties here and does not solely contain statements of pure opinion. Defendants argument does not persuade this Court otherwise. This Court

will not dismiss Pedersen from this action.[18]

        ii. <u>Mark Chauvin</u>

Finally, this Court examines Chauvin's sole statement. Chauvin was asked by an analyst "what keeps you up at night" and he responded with what keeps him up at night – the loss and monetization of customer data or a disruption of TD Bank's systems by an outside force. (FAC ¶ 162.) Plaintiffs allege the statement was "materially false and misleading" but offer no facts showing that the stated concern was not what keeps Chauvin up at night. (FAC ¶ 163.) Generally, Plaintiffs' allegations do not have any relation to Chauvin's statement about cyber-attacks.

But, a statement may also be materially misleading by omission. And, Plaintiffs allege that Chauvin, TD Bank's Chief Risk Officer, was "asked, point-blank, to list" significant risks facing TD Bank. If Chauvin knew of the underlying improprieties and failed to list this as a significant risk, his statements could be misleading by their omission of that alleged fact. In light of the Court's determination that the other

---

[18] Defendants mischaracterize the statements Plaintiffs are challenging. There are actually multiple lines within Pedersen's statements that are alleged to be false or misleading, not just the single line quoted and devoid of context.

elements have been plausibly pled,[19] the Court will not dismiss
Chauvin from this case.

This does not mean, however, that Defendants are foreclosed
from reiterating this argument at some later point. Defendants
may present this argument again on a fuller record.

### E. Leave to Amend

Plaintiffs request in one sentence and two footnotes at the
end of their opposition brief that this Court grant leave to
amend. (Pls.' Opp. Br. 35 n.27-28.) Given the nature of this
Court's Opinion, granting, in part, and denying, in part,
Defendants' Motion to Dismiss, this Court will not decide
whether to grant or deny Plaintiffs' request for leave to amend.
First, Plaintiffs' request to amend the Section 20(a) claim is
moot – this Court did not dismiss it. Second, Plaintiffs appear
to only request leave to amend if the Court granted Defendants
entire motion; the Court has not done so here.

Upon consideration of this Opinion and the accompanying
Order, Plaintiffs' are permitted to file a motion complying with
the Federal Rules of Civil Procedure and this District's Local
Rules of Civil Procedure requesting leave to amend.

---

[19] The Court has already found that the FAC contains sufficient
allegations of scienter and has noted materiality is an issue
for the factfinder.

**CONCLUSION**

For the reasons stated in this Opinion, the Court will grant, in part, and deny, in part, Defendants' Motion to Dismiss and grant Plaintiffs' Motion to File a Sur-Reply.

An appropriate Order will be entered.


Date:  December 6, 2018              s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.